## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                                                    :
In re:                                              :    Chapter 11
                                                    :
VERSO CORPORATION, *et al.*,[1]                     :    Case No. 16-10163 (   )
                                                    :
                                        Debtors.    :    Joint Administration Requested
                                                    :
                                                    :
-------------------------------------------------------------x

### DENNIS STOGSDILL'S DECLARATION IN SUPPORT OF THE DEBTORS' MOTIONS TO PAY THE PREPETITION CLAIMS OF CRITICAL VENDORS, LIENHOLDERS, AND THE UPPER POTOMAC RIVER COMMISSION

I, Dennis Stogsdill, declare under penalty of perjury:

1.      I am a Managing Director with Alvarez & Marsal North America, LLC

("**A&M**"), a financial advisory firm that provides restructuring services to Verso Corporation

and its affiliated debtors and debtors in possession (collectively, the "**Debtors**").

2.      I have worked more than 20 years in financial restructuring and

management consulting specializing in bankruptcies, reorganizations, and business restructurings

for underperforming companies. I am experienced in strategic planning, cash management,

liquidation analysis, covenant negotiations, and valuation. I have substantial knowledge and

experience serving as either a senior officer or as a restructuring advisor to financially distressed

companies. My experience includes stabilizing company financial conditions, analyzing

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Verso Corporation (7389); Verso Paper Finance Holdings One LLC (7854); Verso Paper Finance Holdings LLC (7395); Verso Paper Holdings LLC (7634); Verso Paper Finance Holdings Inc. (7851); Verso Paper Inc. (7640); Verso Paper LLC (7399); nexTier Solutions Corporation (1108); Verso Androscoggin LLC (7400); Verso Quinnesec REP Holding Inc. (2864); Verso Maine Energy LLC (7446); Verso Quinnesec LLC (7404); Bucksport Leasing LLC (5464); Verso Sartell LLC (7406); Verso Fiber Farm LLC (7398); NewPage Holdings Inc. (5118); NewPage Investment Company LLC (5118); NewPage Corporation (6156); NewPage Consolidated Papers Inc. (8330); Escanaba Paper Company (5598); Luke Paper Company (6265); Rumford Paper Company (0427); Wickliffe Paper Company LLC (8293); Upland Resources, Inc. (2996); NewPage Energy Services LLC (1838); Chillicothe Paper Inc. (6154); and NewPage Wisconsin System Inc. (3332). The address of the Debtors' corporate headquarters is 6775 Lenox Center Court, Suite 400, Memphis, Tennessee 38115-4436.

company operations, and developing appropriate business plans to accomplish necessary restructuring operations and finances.

      3.     I earned a bachelor's degree in accounting from Rutgers University. I am a Certified Insolvency and Restructuring Advisor (CIRA), and an active member of the Association of Insolvency & Restructuring Advisors, American Bankruptcy Institute, and the Turnaround Management Association. Prior to joining A&M, I worked at a boutique investment bank, where I assisted in the formation of its restructuring practice. I also have worked in the corporate restructuring group of a Big Five firm and for a management/strategic consulting firm.

      4.     Since Verso's initial engagement of A&M on November 18, 2015, I, along with my team, have provided extensive financial advisory services to the Debtors in preparation for the Debtors' restructuring efforts. As a result of the work I performed, I have acquired significant knowledge of the Debtors and their business and am familiar with the Debtors' records, financial affairs, and operations. Specifically, I am familiar with the financial affairs and operations with regards to all Debtors and their affiliates.

      5.     On the date I am filing this Declaration, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

      6.     I submit this Declaration in support of the Critical Vendor Motion, Lienholder Motion, and the UPRC Motion (collectively, the "**Motions**").[2] I believe that the relief

---

[2] The Critical Vendor Motion refers to the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and Granting Related Relief;* the Lienholder Motion refers to the *Debtors' Motion for Order Pursuant to Sections 363(b), 105(a), 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousemen, Mechanics, Converters, and Other Lien Claimants and (II) Granting Related Relief* ; and the UPRC motion refers to the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay the Prepetition Claim of the Upper Potomac River Commission and Granting Related Relief.* Any capitalized term used but not defined in this Declaration has the meaning used in the relevant Motion.

sought in the Motions is necessary to ensure the Debtors' continued operations, minimize potential adverse effects of filing bankruptcy, and ease the administrative burden of operating in chapter 11. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management, employees, and other advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

7.    In these Motions, the Debtors request authority to pay prepetition claims. I am told by the Debtors' other advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

## I.    SUMMARY OF THE MOTIONS

### A.    Critical Vendor Motion

8.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition obligations of certain vendors, suppliers, service providers, and similar entities that provide goods or services critical to the ongoing operation of the Debtors' business (the "**Critical Vendors**," whose claims are the "**Critical Vendor Claims**") in the ordinary course in an amount not to exceed $15 million on an interim basis and $30 million on a final basis.

3

9.      The Debtors operate in a highly specialized industry that requires them to rely heavily on certain Critical Vendors to provide raw materials, unique parts and equipment, and specialized services necessary to manufacture the Debtors' printing papers, specialty papers, and pulp. Without these goods and services, I believe the Debtors' business would suffer severe disruption, jeopardizing the Debtors' ability to continue operating.

10.     With the assistance of A&M and the Debtors' other advisors, the Debtors thoroughly analyzed their suppliers and service providers, along with business needs during these cases, to identify the Critical Vendors. In examining their vendor relationships, the Debtors considered whether:

- the vendor is a sole-source or limited-source supplier or service provider;
- the vendor has the ability to exercise remedies against the Debtors' property;
- the vendor provides services that are so vital to the Debtors' business that even brief disruption would harm the Debtors' operations;
- the Debtors would be able to cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe;
- the vendor is able or likely to refuse providing essential supplies or services to the Debtors if prepetition balances are not paid; and
- the business relationship between the Debtors and the vendor is governed by a long-term contract.

11.     Based on these criteria, the Debtors identified a limited roster of Critical Vendors that generally fall into one or more of the following categories: (i) Component and Raw Materials Suppliers; (ii) Parts and Equipment Supplies; and (iii) Service Vendors.

12.     *Component and Raw Materials Suppliers*. A number of Critical Vendors supply the Debtors with raw materials used in manufacturing the Debtors' paper products (the "**Component and Raw Materials Suppliers**"). These vendors supply unique and high-quality materials without which the Debtors cannot produce their paper products with the quality and specifications that the Debtors' customers require. A number of the Component and Raw

4

Materials Suppliers are sole-source providers for certain raw materials, including specialty lubricants, clays, latexes, chemicals, enzymes, talcs, and dyes. These materials are all essential to production of the Debtors' paper products. In other cases, Component and Raw Materials Suppliers are the only source capable of shipping the volume of raw materials the Debtors require. In my opinion, the Component and Raw Materials Suppliers cannot be replaced by smaller suppliers at a competitive price (or at all). If there is any disruption to the Debtors' ability to obtain these raw materials—or even speculation that the Debtors may have difficulty procuring them—the Debtors risk losing their customers' orders to competitors, which would cause long-term damage to the Debtors' relationships with the Critical Vendors. This makes paying Component and Raw Materials Suppliers critical to preserving the value of the Debtors' estates.

13. *Parts and Equipment Suppliers*. Other Critical Vendors provide specialized parts, supplies, and technical equipment specifically tailored to meet the Debtors' essential business needs and to comply with various regulations (the "**Parts and Equipment Suppliers**"). Locating and agreeing to terms with replacement vendors would involve extensive testing and modifications at the Debtors' mills, resulting in needless delay and costs. Because the Debtors cannot immediately replace these vendors, and because any such replacement would be disruptive and expensive, the loss of the Parts and Equipment Suppliers could be devastating to the Debtors' business and reorganization efforts.

14. *Service Vendors*. The Debtors use a variety of vendors to provide services to their facilities, ranging from repair work to information technology services (the "**Service Vendors**"). In many instances, the Service Vendors are the only vendors able to provide the required services, particularly given the remote location of certain of the Debtors' mills. Any loss

of the Service Vendors following the commencement of these chapter 11 cases will impair the Debtors' effort to preserve and maximize the value of their estates and to successfully reorganize.

15.     If authorized to pay the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Critical Vendors to provide favorable trade terms consistent with historical practice. Specifically, where appropriate and practicable, the Debtors will seek to condition payment of a Critical Vendor Claim on the Critical Vendor's agreement to continue providing supplies or services to the Debtors in accordance with those practices and programs most favorable to the Debtors in place in the 12 months prior to the Petition Date or such other favorable terms as the Debtors and the Critical Vendor may mutually agree.

16.     The relief requested in the Critical Vendor Motion is narrowly tailored to facilitate the Debtors' restructuring efforts. Without the Critical Vendors' services, the Debtors may be forced to halt most, if not all, ongoing business immediately while they search for substitute vendors, if any even exist, and the Debtors could be forced to forgo existing favorable trade terms. Any interruption in the goods or services supplied by the Critical Vendors, however brief, would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' estates. Therefore, I believe that the relief requested in the Critical Vendor Motion is necessary to preserve the value of each of the Debtors' estates throughout these chapter 11 cases and is in the best interests of the Debtors, their estates, and all of their stakeholders.

**B.     Lienholder Motion**

17.     The Debtors seek an order authorizing, but not directing, the Debtors to pay prepetition obligations of certain shippers, warehousemen, mechanics, converters, and other claimants that may have or be capable of asserting liens against the Debtors' property

6

(collectively, the "**Lienholders**," whose claims are the "**Lienholder Claims**") in the ordinary course in an amount not to exceed $30 million.

18. Each of the Debtors' mills depends on a network of shippers (collectively, the "**Shippers**," whose claims are the "**Shipping Claims**") and third-party warehousemen (collectively, the "**Warehousemen**," whose claims are the "**Warehousing Claims**") that transport and store finished products, as well as raw materials, equipment, supplies, and other goods critical to the Debtors' paper manufacturing process. The Debtors also routinely contract with and rely on the services of certain third-party mechanics, technicians, and repairmen, (collectively, the "**Mechanics**," whose claims are the "**Mechanic Claims**") that may assert mechanic's liens, materialmen's liens, or other liens against the Debtors' property if the Debtors fail to pay for the services rendered. Finally, the Debtors also contract with certain converters (the "**Converters**," whose claims are the "**Converter Claims**") who process the Debtors' products for delivery to their customers. Converters may refuse to process or release from their possession the Debtors' products if the amounts the Debtors owe them for prepetition services are not satisfied.

19. It is essential for the Debtors' continuing business viability and the success of their restructuring efforts that the Debtors maintain a constant, reliable, and efficient manufacturing, supply, and delivery system. Many of the Lienholders have claims relating to goods they are transporting or holding. If the Lienholders' prepetition claims are not timely satisfied, they may assert liens over or withhold delivery of the Debtors' goods. That, in turn, would disrupt the Debtors' business and cause immediate loss in production and irreparable economic harm.

7

20.     The Debtors have identified three types of Lienholder Claims that, if not paid, could significantly disrupt the Debtors' operations: (i) Shipping and Warehousing Claims, (ii) Mechanic Claims, and (iii) Converter Claims.

**a.     Shipping and Warehousing Claims**

21.     Shippers include a variety of common carriers, railway shippers, truckers, distributors, and other third-party service providers. Shippers are critical to the timely delivery of raw materials used in the Debtors' paper manufacturing process, as well as the delivery of the Debtors' finished products to warehouses and customers. Third-party Warehousemen are essential to the storage of excess raw materials, equipment, supplies, and finished products. To my knowledge, as of the Petition Date, the Debtors use the services of approximately 184 Shippers and 100 Warehousemen.

22.      The Debtors' supply chain generally consists of two segments: (i) preproduction supply of raw materials and (ii) postproduction distribution of finished products.

23.     The Debtors rely heavily on Shippers and Warehousemen to transport and store the Debtors' raw materials. The majority of the Debtors' raw materials are purchased on "delivered" terms, meaning the cost of freight is included in the purchase price of the raw materials, and the seller is responsible for shipping. Sometimes, however, the Debtors purchase raw materials "Ex-Works," meaning the Debtors pay Shippers to transport the raw materials. I understand that the shipping costs for raw materials purchased on an Ex-Works basis are approximately $54 million per year. If the Debtors cannot pay the amounts outstanding for inbound transportation, Shippers may refuse to deliver raw materials to the Debtors' mills. This would immediately disrupt the Debtors' paper production because the Debtors rely on just-in-

time delivery for raw materials, as each mill has only enough raw materials to cover the mill's need through the next delivery date.

24.     The Debtors also receive and store certain raw materials at third-party warehouses until they are shipped to the mills for use. If the Debtors cannot pay amounts outstanding for the storage of raw materials, Warehousemen may refuse to release raw materials in their possession. This would delay the Debtors' ability to receive the materials they need to produce their products and satisfy customer orders.

25.     The Debtors also rely heavily on Shippers to transport and Warehousemen to store finished paper products and other goods. Each of the Debtors' mills is a "captive shipper" in that it relies on a single rail Shipper with direct access to the mill to transport finished products from that mill. Additionally, the Debtors' mills are in remote locations so they lack viable alternatives to their Shippers. If any of these Shippers refused to transport the Debtors' products, the Debtors could be unable to deliver products from the impacted mill.

26.     The Debtors generally pay the Warehousemen monthly fees for storage and handling of the Debtors' finished products, and in some cases, the Warehousemen pay a portion of the Debtors' outbound transportation costs. If the Debtors do not satisfy the prepetition invoices of the Warehousemen, they may refuse to store, or otherwise prevent access to, the Debtors' finished products, which would cause orders to go unfulfilled.

27.     As of the Petition Date, the Debtors estimate that the value of goods and supplies they have in transit with Shippers and in storage with Warehousemen is $40.3 million and $313 million, respectively. The Debtors need authority to satisfy the Shipping and Warehousing Claims to ensure that they have access to these goods and supplies. Moreover, I believe that satisfaction of the Shipping and Warehousing Claims is also needed because

Shippers and Warehousemen potentially have liens against the property in their possession securing the payment of outstanding obligations.

### b.    Mechanic Claims

28.    The Debtors also do business with mechanics, repairmen and technicians who perform maintenance and repair work on the Debtors' machinery, equipment, and facilities. I understand that if the Debtors cannot pay for the goods or services rendered by these Mechanics, under applicable state laws, Mechanics may assert mechanic's liens or materialmen's liens against the Debtors' property or retain the Debtors' property. Moreover, if the Debtors cannot satisfy prepetition obligations, certain Mechanics, many of whom provide specialty services or parts unique to the Debtors' machinery that cannot be easily replaced, may refuse to return repaired equipment or fulfill ongoing obligations to the Debtors—including critical maintenance, repair, and installation services. Disruption in the maintenance and servicing of the Debtors' parts and machinery could result in immediate harm to the Debtors' estates.

29.    The Debtors estimate that, as of the Petition Date, approximately $4.2 million has accrued and remains unpaid on account of the prepetition services performed by the Mechanics.

### c.    Converter Claims

30.    The Debtors also do business directly with Converters who further process the Debtors' paper products, typically adding a laminate or other chemical treatment so as to make it fit for use in the final product or by cutting rolls of paper into sheets or other specifications requested by the Debtors' customers. Based on my experience, if the Debtors cannot pay Converters for outstanding invoices, they may refuse to process or deliver the Debtors' products, thus leaving the Debtors unable to fulfill customer orders.

31.     The Debtors estimate that, as of the Petition Date, approximately $1.3 million has accrued and remains unpaid on account of the prepetition services performed by the Converters.

32.     If authorized to pay the Lienholder Claims, the Debtors will use commercially reasonable efforts to require the Lienholders to provide favorable trade terms consistent with historical practice. Specifically, where appropriate and practicable, the Debtors will seek to condition payment of a Lienholder Claim on the Lienholder's agreement to continue providing supplies or services to the Debtors in accordance with those practices and programs most favorable to the Debtors in place in the 12 months prior to the Petition Date or such other favorable terms as the Debtors and the Lienholder may mutually agree.

33.     The relief requested in the Lienholder Motion is narrowly tailored to facilitate the Debtors' restructuring efforts. The Debtors depend on their network of Shippers, Warehousemen, Mechanics, and Converters to ensure the continued operation of their business, and thus the relief requested is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**C.      UPRC Motion**

34.     The Debtors seek an order authorizing, but not directing, the Debtors to pay the prepetition claim (the "**UPRC Claim**") of the Upper Potomac River Commission (the "**UPRC**"), provided that, if the Debtors do not assume the contracts with the UPRC, the Debtors are authorized to reinstate the UPRC Claim and apply the amount paid on account of the UPRC Claim to any postpetition balance due to the UPRC.

35.     I understand that the UPRC is a nonprofit government agency that has jurisdiction over the water resources in the Luke-Westernport, Maryland area, including authority to maintain and operate facilities for the treatment and disposal of sewage, industrial,

and other wastes. The UPRC has constructed and maintains waste treatment facilities at a waste treatment plant in Westernport, Maryland (the "**Treatment Facilities**"). The Treatment Facilities were constructed to treat the sanitary and industrial wastewater of the Debtors' paper mill that is situated along the banks of the Potomac River in Luke, Maryland (the "**Luke Mill**"). The Luke Mill is owned and operated by Debtor Luke Paper Company ("**Luke Paper**"), a subsidiary of NewPage Corporation.

36.     I was informed by the Debtors' management that on February 3, 1958, the UPRC and a predecessor to Luke Paper, the West Virginia Pulp and Paper Company ("**WVPPC**"), entered into a construction and operation agreement, under which the UPRC agreed to construct, maintain, and operate the Treatment Facilities (the "**1958 Facilities Contract**"). The UPRC financed the cost of the Treatment Facilities by issuing revenue bonds and, in accordance with the 1958 Facilities Contract, WVPPC was required to pay the UPRC for its services in an amount sufficient to cover the expenses associated with maintaining and operating the Treatment Facilities and servicing the principal and interest on the revenue bonds.

37.     I also learned that on November 8, 2001, Westvaco Corporation ("**Westvaco**"), as successor to WVPCC, and the UPRC entered into a facilities agreement, pursuant to which the UPRC agreed to make certain improvements to the Treatment Facilities and to finance the costs of such improvements by the issuance of additional revenue bonds (the "**2001 Facilities Contract**" and together with the 1958 Facilities Contract, the "**UPRC Contracts**"). Under the 2001 Facilities Contract, Luke Paper, as the successor to Westvaco, pays the UPRC approximately $420,000 per month for wastewater treatment services, which is used by the UPRC to pay the costs of operating and maintaining the Treatment Facilities and servicing the principal and interest on the revenue bonds.

38.     As of the Petition Date, Luke Paper owes the UPRC approximately $375,000 on account of services the UPRC rendered prepetition. The Luke Mill constitutes more than 95% of the UPRC's gross revenue and, as a result, absent timely payment on a monthly basis from Luke Paper, the UPRC would lack the capital to operate the Treatment Facilities and service the revenue bonds. In other words, the UPRC is captive; it can only operate if Luke Paper remit all monthly payments in a timely manner.

39.     The consequences of the UPRC ceasing to operate the Treatment Facilities would be disastrous for the Luke Mill—without a means to treat the sanitary and industrial wastewater, the Luke Mill would be forced to shut down operations immediately. The possibility of finding an alternative company to treat and dispose of the waste generated at the Luke Mill is not practical, and even if it were, the process would be time consuming and costly.

40.     I believe that the relief requested in the UPRC Motion is narrowly tailored to facilitate the Debtors' restructuring efforts. If the Debtors are unable to pay the UPRC, the UPRC will not have the liquidity to operate the Treatment Facilities, which is essential to the operation of the Luke Mill. Thus, payment of the UPRC Claim is necessary to ensure that the Luke Mill continues to operate postpetition and is essential to preserving and enhancing the value of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          January 26, 2016

 

*/s/ Dennis Stogsdill*
_____
Dennis Stogsdill
Managing Director
Alvarez & Marsal North America, LLC