# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:

VERSO CORPORATION, *et al.*,[1]

                                    Debtors.

-------------------------------------------------------------x

: Chapter 11
:
: Case No. 16-10163 (KG)
:
: Joint Administration Requested

## DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING VERSO DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Verso Paper Holdings LLC ("**Verso Holdings**" or the "**Borrower**"), its direct parent, Verso Paper Finance Holdings LLC ("**Holdings**"), and the direct and indirect subsidiaries of Verso Holdings that are debtors and debtors-in-possession in the above-captioned cases, other than the NewPage Debtors[2] (collectively, the "**Subsidiary Guarantors**"; the Subsidiary Guarantors collectively with Holdings and Verso Holdings, the "**Verso Debtors**" or the "**Loan Parties**"), file this motion (the "**Motion**") to obtain a variety of relief related to funding these chapter 11 cases, including the authority to enter into a debtor-in-possession financing. The

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Verso Corporation (7389); Verso Paper Finance Holdings One LLC (7854); Verso Paper Finance Holdings LLC (7395); Verso Paper Holdings LLC (7634); Verso Paper Finance Holdings Inc. (7851); Verso Paper Inc. (7640); Verso Paper LLC (7399); nexTier Solutions Corporation (1108); Verso Androscoggin LLC (7400); Verso Quinnesec REP Holding Inc. (2864); Verso Maine Energy LLC (7446); Verso Quinnesec LLC (7404); Bucksport Leasing LLC (5464); Verso Sartell LLC (7406); Verso Fiber Farm LLC (7398); NewPage Holdings Inc. (5118); NewPage Investment Company LLC (5118); NewPage Corporation (6156); NewPage Consolidated Papers Inc. (8330); Escanaba Paper Company (5598); Luke Paper Company (6265); Rumford Paper Company (0427); Wickliffe Paper Company LLC (8293); Upland Resources, Inc. (2996); NewPage Energy Services LLC (1838); Chillicothe Paper Inc. (6154); and NewPage Wisconsin System Inc. (3332). The address of the Debtors' corporate headquarters is 6775 Lenox Center Court, Suite 400, Memphis, Tennessee 38115-4436.

[2]       "**NewPage Debtors**" means, collectively, NewPage Investment Company LLC and its direct and indirect subsidiaries that are debtors and debtors in possession in the above-captioned cases.

Verso Debtors seek this relief pursuant to a variety of provisions under the Bankruptcy Code and related authority,[3] and respectfully request entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**"), among other things:

(1)    authorizing Verso Holdings to obtain, and Holdings and the Subsidiary Guarantors (collectively, the "**Guarantors**") to guaranty, up to $100 million in DIP Financing, consisting of a senior secured asset-based revolving DIP Facility in an aggregate principal amount of up to $100 million, including a $50 million letter of credit ("**DIP L/C**") subfacility, all on the terms and conditions set forth in the Interim Order and the DIP Documents;

(2)    authorizing the Verso Debtors to execute and enter into the DIP Credit Agreement, substantially in the form annexed hereto as **Exhibit A**, and all other agreements, documents, instruments, and/or amendments executed and delivered in connection therewith (the "**DIP Documents**"), and to perform all such other and further acts as may be required in connection with the DIP Documents;

(3)    authorizing the Verso Debtors to immediately use proceeds of the DIP Financing and Cash Collateral (as defined below) to, simultaneously with the initial draw under the DIP Facility, (i)(A) refinance all of the Verso Debtors' outstanding obligations under the Prepetition ABL Agreements (the "**Prepetition ABL Debt**") in full including interest and fees through the date of repayment at the non-default contract rate and (B) immediately deem letters of credit issued under the Prepetition ABL Credit Agreement to be letters of credit under the DIP Facility, and (ii) pay down the DIP Facility using Cash Collateral to create borrowing availability;

(4)    until the irrevocable discharge of the Prepetition ABL Debt as provided in the Interim Order, granting adequate protection and contingent liens to the Prepetition ABL Secured Parties;

(5)    granting adequate protection to the Adequate Protection Parties, consisting of the Prepetition ABL Secured Parties, Prepetition Cash Flow Secured Parties, and First Lien Notes Secured Parties, who hold certain liens that are being primed by certain liens granted under the DIP Documents and Interim Order;

(6)    authorization for the Verso Debtors to continue to use Cash Collateral and all other Prepetition Collateral of the Adequate Protection Parties, the 1.5 Lien Notes Secured Parties and 2nd Lien Notes Secured Parties (collectively, the "**Prepetition Secured Parties**");

---

3    Specifically, sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the local rules for the District of Delaware (the "**Local Rules**").

(7)     subject to certain challenge rights of the Verso Debtors and other parties in interest set forth in the Interim Order, approving certain stipulations by the Verso Debtors with respect to the Existing Agreements and the liens and security interests arising therefrom;

(8)     granting superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and (with respect to the ABL Priority Collateral only) priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Verso Debtors' estates (other than the Excluded Assets (as defined in the DIP Documents)) and all proceeds thereof (including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds), subject only to the Carve-Out and the Permitted Prior Liens;

(9)     granting superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the Verso Debtors on account of the SSA True-Up Claim (as defined below), if any, payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than the Excluded Assets (as defined in the DIP Documents)) and all proceeds thereof (including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds), subject only to the Carve-Out, Permitted Prior Liens, and, with respect to the ABL Priority Collateral, to the DIP Superpriority Claims, the DIP Liens, Prepetition ABL Liens, the Prepetition ABL Adequate Protection Liens and the Contingent Liens;

(10)    subject only to and effective upon entry of the Final Order, waiving the Verso Debtors' right to surcharge the Prepetition Collateral and the Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Verso Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(11)    modifying the automatic stay to the extent set forth in the Interim Order, the Final Order, and in the DIP Documents;

(12)    authorizing and directing the Verso Debtors to cause their non-Debtor subsidiary, Verso Maine Power Holdings LLC, to distribute, via dividend, all cash and cash equivalents to the Verso Debtors;

(13)    pursuant to Bankruptcy Rule 4001, scheduling an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of an order granting the Motion on an interim basis; and

(14)    scheduling a final hearing (the "**Final Hearing**") to be held within 40 days of the entry of the Interim Order to consider entry of a final order approving the relief granted herein on a final basis and authorizing Verso Holdings to forthwith

borrow from the DIP Lenders under the DIP Documents up to the full amount of the DIP Financing and the Guarantors to guaranty all obligations owing to the DIP Lenders under the DIP Documents.

The Verso Debtors incorporate by reference *Allen J. Campbell's Declaration in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Campbell Declaration**") and *Steven M. Zelin's Declaration In Support of the DIP Financing Motions* (the "**Zelin Declaration**"), both filed concurrently with this Motion.

## PRELIMINARY STATEMENT

1.      The Verso Debtors and their affiliates (together with the NewPage Debtors (together the "Debtors") are the leading North American producer of coated papers, including printing papers and specialty papers, as well as a producer of high quality hardwood pulp. The Debtors' printing papers are designed primarily for commercial printing, media and marketing applications, including magazines, catalogs, books, direct mail, corporate collateral, and retail inserts. The Debtors' specialty papers are used primarily for product labels, flexible packaging, and technical paper applications. Headquartered in Memphis, Tennessee, the Debtors employee 5,200 men and women and own eight U.S. manufacturing facilities in six states: Kentucky, Maine, Maryland, Michigan, Minnesota, and Wisconsin.  For the first three quarters of 2015, the Debtors' gross revenue was approximately $2.4 billion.  The reasons these cases have been filed is described at length in the Campbell Declaration.  But the key issues facing all of the Debtors are an industry in decline, a complex capital structure, significant debt obligations and an urgent need for liquidity.

2.      The Debtors have an extraordinary opportunity to restructure their debts and use the bankruptcy process to create a stronger, fully integrated company that can effectively face the industry headwinds.  They have already garnered tremendous creditor support to achieve that goal, as demonstrated by the Debtors' execution, on the Petition Date, of a Restructuring

Support Agreement with virtually all of the their principal creditor constituencies.  But that Restructuring Support Agreement is not self-effectuating.  The proposed DIP Financing is critical to the NewPage Debtors' ability to implement the transactions contemplated by that agreement.  Without the liquidity and flexibility provided by the proposed Revolving DIP Facility and Term DIP Facility, a strong future would be impossible (with or without a consensual restructuring deal in hand).

3.     With the liquidity available from the DIP Financing, the Verso Debtors (and all other Debtors) can stabilize their business, pay critical vendors who have been stretched and take necessary steps to survive and thrive in their changed and changing economic environment.  Failure to secure financing will likely result in a liquidation, severe employee dislocation and major losses for vendors and customers.  This is not an acceptable outcome. Accordingly, the Verso Debtors request approval of the DIP Financing and interim approval to draw under the DIP Financing so that they may avoid this immediate and irreparable harm.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b).[4]

## BACKGROUND

1.     On January 26, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The

---

4 Pursuant to Local Rule 9013-1(f), the Verso Debtors hereby expressly confirm their consent to the entry of a final order by this Court in connection with this motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

Debtors continue to manage and operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors' current corporate form came into being through Verso's acquisition of NewPage Holdings Inc. and certain of its affiliates, including NewPage Corporation (collectively, "**NewPage**") on January 7, 2015. Verso acquired NewPage to establish a larger scale, more efficient enterprise, better positioned to compete long-term in the challenging paper market. Since the acquisition, the Debtors have made a sustained effort to integrate legacy Verso's and legacy NewPage's operations, to allow them to realize the benefits of their larger scale and complementary operations. Today, the Debtors operate as one integrated business, which has an aggregate total annual production capacity of approximately 3,440 thousand tons of paper and 290 thousand tons of pulp, and serves a client base of over 300 customers that reaches more than 1,700 end user accounts.

3.      Additional information on the Debtors' business and capital structure, as well as a description of the reasons for filing these cases and the Debtors' goals for these cases, is set forth in the Campbell Declaration.

### CONCISE SUMMARY OF TERMS OF DIP FINANCING

5.      Under the disclosure requirements of Bankruptcy Rule 4001(b), (c) and (d) and Local Rule 4001-2(a)(i) and (ii), the following table summarizes the significant terms of the DIP Financing and the Interim Order:[5]

| Summary of Relevant Provisions | |
| --- | --- |
| Borrower | Verso Paper Holdings LLC |
| Guarantors | Verso Paper Finance Holdings LLC, Verso Paper LLC, Verso Paper Inc., Verso Androscoggin LLC, Verso Maine Energy LLC, Verso Quinnesec REP Holding Inc., Verso Quinnesec LLC, |

---

[5] This summary, including the use of defined terms herein (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Documents and the Interim Order, as applicable. To the extent there are any conflicts between this summary, on the one hand, and any DIP Document or the Interim Order, as applicable, on the other, the terms of such DIP Document or the Interim Order, as applicable, shall govern.

| Summary of Relevant Provisions | |
|---|---|
| | Verso Sartell LLC, Verso Fiber Farm LLC, nexTier Solutions Corporation, Bucksport Leasing LLC and NewPage Holdings Inc. |
| **Lenders** | The DIP Lenders, as constituted from time to time |
| **DIP Agent** | Citibank, N.A. |
| **Amount and Facility** | $100.0 million superpriority secured debtor-in-possession asset-based revolving credit facility, all of which will be available upon entry of the Interim Order and satisfaction of the conditions precedent to borrowing under the DIP Credit Agreement.  Interim Order, ¶ 6(a); DIP Credit Agreement, § 2.01(a), 4.01, 4.02.  The Revolving DIP Facility includes a $50.0 million DIP L/C Subfacility.  DIP Credit Agreement, § 2.05. |
| **Purpose and Limitation on Use of Proceeds** | Proceeds of the DIP Facility may be used solely for working capital and general corporate purposes of the Verso Debtors and their subsidiaries, including to refinance in full the indebtedness under the Prepetition ABL Facility and to pay fees, costs and expenses incurred in connection with these Chapter 11 Cases.  Interim Order, ¶ 7; DIP Credit Agreement, § 5.08. |
| **Interest Rate** | *Eurocurrency Loans*:  LIBOR + 2.50%, with 0% LIBOR floor<br>*Alternative Base Rate Loans*:  Base Rate[6] + 1.50%<br>DIP Credit Agreement, § 2.13(a), (b). |
| **Default Interest** | During the continuance of an Event of Default, Loans will bear interest at an additional 2.0% *per annum*.  DIP Credit Agreement, § 2.13(c). |
| **Maturity** | The earliest to occur of (a) 18 months after the Closing Date, (b) 45 days after entry of the Interim Order if the Final Order has not been entered, (c) substantial consummation of a plan of reorganization, and (d) the acceleration of the DIP Loans and termination of commitments with respect to such DIP Facility in accordance with the DIP Documents.  DIP Credit Agreement, § 1.01 (definition of "Maturity Date"). |
| **Fees** | *Commitment Fees*:  0.75% per annum on daily amount of available unused commitments during the preceding quarter, payable to DIP Lenders.  These fees will increase by 2% per annum during the continuance of an Event of Default.<br><br>*L/C Participation Fees*:  quarterly fee paid to DIP Lenders with DIP L/C Commitments on daily aggregate DIP L/C exposure, calculated at rate per annum equal to applicable margin on Eurocurrency loans (initially, 2.5% per annum) or Alternative Base Rate loans (initially 1.0% per annum), as applicable.  These fees will increase by 2% per annum during the continuance of an Event of Default.<br><br>*Issuing Bank Fees*:  Fronting fee paid to DIP L/C issuing banks for period during which each DIP L/C is outstanding equal to 0.125% per annum of the daily average stated amount of such DIP L/C, plus other customary documentary and processing fees and charges of the issuing bank.  These fees will increase by 2% per annum during the continuance of an Event of Default.<br><br>*Administrative Agent Fees*:  payable as set forth in separate fee letters with DIP Agent.[7]<br><br>DIP Credit Agreement, § 2.12, 2.13(c). |
| **Borrowing Base/Availability** | Availability under the DIP Facility is limited by borrowing base requirements and applicable reserves, including discretionary reserves established in the DIP Agent's reasonable credit judgment .  The borrowing base is equal to (a) 85% of the net amount of eligible accounts receivable plus (b) the lesser of (i) 80% of the net book value of eligible inventory and (ii) 85% of the Net Orderly Liquidation Value (as defined in the Revolving DIP Credit Agreement) of Eligible Inventory.  Revolving DIP Credit Agreement, §§ 1.01 (definition of "Borrowing |

---

6 The **Base Rate** (as used in the DIP Credit Agreement) means the highest of (i) the DIP Agent's prime rate, (ii) the Federal Funds Effective Rate plus 0.5%, and (iii) the LIBO Rate for an interest period of one month.

7  The Verso Debtors are seeking authority to file the fee letters under seal, pursuant to the *Debtors Motion for Entry of an Order Authorizing Debtors to File Fee Letters Related to Proposed Postpetition Financing Facilities Under Seal*, filed substantially contemporaneously herewith.

| Summary of Relevant Provisions | |
|---|---|
| | Base"); 2.01. |
| **DIP Budget** | As a condition to borrowing under the DIP Credit Agreement, the DIP Agent shall have received (a) monthly projections for the 18 months after the closing date, in a form customary for "DIP budgets" and (b) 13-week cash flow forecast.  DIP Credit Agreement, § 4.02(e).  Neither the DIP Credit Agreement nor the Interim Order contain budget compliance covenants. |
| **Refinancing of Prepetition ABL Facility** | The proceeds of the DIP Financing will be used to refinance in full on the Closing Date the indebtedness outstanding under the Prepetition ABL Facility.  Interim Order, ¶ 7; DIP Credit Agreement, §§ 4.02(q), 5.08.  Prior to the discharge of the liens and obligations under the Prepetition ABL Facility, the Prepetition ABL Secured Parties shall receive contingent liens to secure any of the Prepetition ABL Debt that is required to be returned or repaid to the Verso Debtors or the DIP Lenders (the "**Contingent Prepetition ABL Debt**"), which shall have the priorities described in the section titled "Adequate Protection" below (the "**Contingent Liens**").  Interim Order, ¶ 7 |
| **Borrowing Conditions** | The conditions precedent to the Closing Date and the initial extensions/availability of credit and DIP L/Cs under the DIP Facility are customary for loans of this type, including, without limitation:  (i) execution of the DIP Documents, (ii) DIP Agent's receipt of certain legal opinions, certificates, and other documents; (iii) completion of actions and delivery/execution of documents necessary to perfect DIP Liens; (iv) DIP Agent's receipt of budget and cash-flow forecasts; (v) DIP Agent's receipt of perfection certificate and borrowing base certificate; (vi) satisfaction of certain requirements relating to perfection of security interests in intellectual property, insurance matters, and lien searches, (vii) DIP Agent's satisfaction with Verso Debtors' cash management arrangements; (viii) DIP Agent's satisfaction with the form and substance of the "first day orders"; (ix) entry of Interim Order within 3 business days of case commencement; (x) absence of trustee/examiner; (xi) absence of material adverse effect since September 30, 2015; (xii) receipt of necessary governmental/third party consents; (xiii) DIP Agent's satisfaction that DIP Financing will not permit counterparties to agreements with Verso debtors to exercise remedies or otherwise result in a material adverse effect; (xiv) absence of litigation that could reasonably be expected to have a material adverse effect; (xv) refinancing of Prepetition ABL Facility and termination/release of liens thereunder; (xvi) payment of DIP Financing fees and expenses due on or prior to closing; (xvii) receipt by DIP Lenders of "know your customer" documentation; and (xviii) commencement of chapter 11 cases by the Verso Debtors and the effectiveness of any debtor in possession financing facilities for such debtors. DIP Credit Agreement, § 4.02.<br><br>Subsequent extensions of credit are subject to additional conditions, including, without limitation:  (i) the continuing effectiveness of Interim Order; (ii) the entry of material "second day" orders; (iii) compliance with limits on borrowing imposed by Interim Order or Final Order, as applicable; (iv) the DIP Agent having received a borrowing request; (v) continued accuracy of representations and warranties, (vi) absence of Event of Default; (vii) requested extension of credit will not violate any law; and (viii) there being excess availability of not less than the applicable minimum excess availability amount under the DIP Credit Agreement.  DIP Credit Agreement, § 4.01. |
| **Priority of Claims and Liens** | The DIP Obligations will constitute allowed superpriority administrative expense claims in the Verso Debtors' chapter 11 cases having priority over all administrative expense claims and unsecured claims against the Verso Debtors now existing or hereafter arising (the "**DIP Superpriority Claims**").  Interim Order, ¶ 8(a).<br><br>The DIP Obligations will be secured by DIP Liens granted pursuant to sections 364(c)(2), (c)(3), and 364(d) of the Bankruptcy Code, which liens shall be automatically perfected pursuant to the Interim Order.  Interim Order, ¶ 21(a).  The following table (which is qualified in all respects by the Interim Order) lists the relative priorities (from senior to junior) of the Carve-Out, the DIP Liens, the SSA Lien, the Prepetition Liens, other liens existing as of the Petition Date, and Adequate Protection Liens granted in the Collateral by the Interim Order in the different categories of Collateral (in all cases, solely to the extent such liens are valid and |

| Summary of Relevant Provisions | |
|---|---|

perfected liens on the applicable Collateral):

| Property constituting ABL Priority Collateral[8] | Property constituting Notes Priority Collateral |
|---|---|
| Carve-Out | Carve-Out |
| ABL Permitted Prior Liens[9] | Notes Permitted Prior Liens |
| DIP Liens | SSA Lien, if any |
| Prepetition ABL Adequate Protection Liens | Prepetition First-Priority Adequate Protection Liens |
| Prepetition ABL Liens (Contingent Liens) | Prepetition First-Priority Liens |
| SSA Lien, if any | DIP Liens |
| Prepetition First-Priority Adequate Protection Liens | Prepetition ABL Adequate Protection Liens |
| Prepetition First-Priority Liens | Prepetition ABL Liens (Contingent Liens) |
| Prepetition Junior Adequate Protection Liens granted to 1.5 Lien Notes Secured Parties | Prepetition Junior Adequate Protection Liens granted to 1.5 Lien Notes Secured Parties |
| Prepetition 1.5 Notes Liens | Prepetition 1.5 Notes Liens |
| Prepetition Junior Adequate Protection Liens granted to 2nd Lien Notes Secured Parties | Prepetition Junior Adequate Protection Liens granted to 2nd Lien Notes Secured Parties |
| Prepetition 2nd Notes Liens | Prepetition 2nd Notes Liens |

Interim Order, ¶¶ 9(a), 15(a), 16(a), 18, 19.

| | |
|---|---|
| **Automatic Perfection of Liens** | All liens and security interests granted to the DIP Agent, the DIP Lenders, and the Adequate Protection Parties under the Interim Order shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order.  Interim Order, ¶ 21. |
| **Stipulations as to Prepetition Claims and Liens** | Pursuant to paragraph 4 of the Interim Order, the Verso Debtors agree and stipulate, among other things (as specifically set forth in paragraph 4 of the Interim Order, the "**Verso Debtors' Stipulations**"), that:  (a) the Verso Debtors' obligations under the Existing Agreements (the "**Prepetition Debt**") represent the legal, valid and binding obligation of the Verso Debtors and is not subject to contest, subordination, recharacterization, or avoidance; (b) the liens securing the Prepetition Debt (the "**Prepetition Liens**") are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral; (c) the aggregate value of the ABL Priority Collateral substantially exceeds the aggregate amount of the Prepetition ABL Debt; (d) that none of the Prepetition Secured Parties are control persons or insiders of the Verso Debtors by virtue of any actions taken with respect to the Existing Agreements; (e) no claims or causes of action exist against the Prepetition Secured Parties under any agreements by and among the Verso Debtors and such parties in existence as of the Petition Date; (f) each of the intercreditor agreements among the Verso Debtors and various Prepetition Secured Parties, including, without limitation, the Senior Lien Intercreditor Agreement (collectively, the "**ICAs**") is binding and enforceable against the Verso Debtors in accordance with its terms; and (g) that all cash, securities and other property of the Verso Debtors as of the Petition Date are subject to valid, perfected, enforceable liens under the Existing Agreements for the benefit of the Prepetition Secured Parties, and that all proceeds of such collateral are Cash Collateral.  Interim |

[8] "ABL Priority Collateral" has the meaning assigned in the Senior Lien Intercreditor Agreement, and generally includes working capital and other current assets.  "Notes Priority Collateral" has the meaning assigned in the Senior Lien Intercreditor Agreement, and generally includes substantially all of the Verso Debtors' other assets.

[9] ABL Permitted Prior Liens and Notes Permitted Prior Liens include valid, perfected and unavoidable third-party liens on the ABL Priority Collateral and Notes Priority Collateral, respectively, that were in existence as of the Petition Date and perfected as of the Petition Date or subsequent to the Petition Date pursuant to section 546(b) of the Bankruptcy Code, excluding the prepetition liens of the Prepetition Secured Parties

| Summary of Relevant Provisions |
| --- |

|  |  |
| --- | --- |
|  | Order, ¶ 4. |
| **Lien Challenges** | *Challenge Period and Challenge Proceedings*. Pursuant to paragraph 23 of the Interim Order, the Verso Debtors' Stipulations bind all parties in interest in the Verso Debtors' cases unless (a) a party in interest (including any Creditors' Committee (as defined below)) with requisite standing timely files an adversary proceeding or contested matter objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or otherwise asserting or prosecuting any action against the Prepetition Secured Parties or their representatives for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (a "**Challenge Proceeding**") no later than the latest of (i) the date that is 75 days after entry of the Interim Order or 60 days after the appointment of the Creditors' Committee, if any, (ii) any such later date as has been agreed to, in writing, by the Prepetition ABL Agent (with the consent of the Required Lenders, as defined in the Prepetition ABL Credit Agreement) or the Prepetition Cash Flow Agent (iii) with respect to any Challenge Proceeding against any First Lien Notes Secured Parties by (A) the Creditors' Committee (if any) as set forth below (under the heading "First Lien Notes Secured Party Challenge Proceedings") and (B) by any other party in interest, any such later date agreed to in writing by the Ad Hoc Group[10] as applicable, and (iii) any such later date as has been ordered by the Court upon a motion filed and served within any applicable period of time set forth in this paragraph (the "**Challenge Period**"), and (b) there is a final and non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding.  Interim Order, ¶ 23.

*Verso Challenge Rights*.  In addition, notwithstanding the Verso Debtors' Stipulations, the Verso Debtors' rights to commence a Challenge Proceeding on their own behalf during the Challenge Period (other than a Challenge Proceeding relating to the obligations and liens under the Prepetition ABL Agreements) are expressly preserved, subject to the provisions of paragraphs 23 and 24 of the Interim Order.  Interim Order, ¶¶ 23, 24.

*Rule 2004 Discovery*.  Discovery pursuant to Bankruptcy Rule 2004 will not be considered a Challenge Proceeding (but will be subject to the Investigation Budget).  Interim Order, ¶¶ 23, 24.

*Investigation Budget*.  The Verso Debtors may use up to $225,000 in the aggregate, and the Creditors' Committee may use up to $50,000 in the aggregate, of DIP Loans, DIP Collateral (including Cash Collateral) and/or the Carve-Out to investigate the claims and liens of the Prepetition Secured Parties, and potential claims, counterclaims, causes of action or defenses against such parties (the "Investigation Budget"); *provided* that the NewPage Debtors may not use the Investigation Budget for such purposes at any time prior to the occurrence of the Trigger Date. |
| **Adequate Protection** | The Prepetition ABL Secured Parties and First-Priority Secured Parties (collectively, the "**Adequate Protection Parties**") shall receive adequate protection of their interests in the Prepetition Collateral to the extent of any diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date, if any (such diminution in value and claims for adequate protection, "**Adequate Protection Claims**").  As adequate protection for the Adequate Protection Claims, the Adequate Protection Parties shall receive the following (collectively, the "**Adequate Protection Obligations**"):

(a) in the case of the Prepetition ABL Secured Parties, (i) the Contingent Liens and replacement liens on all Collateral in the amount of their Adequate Protection Claim (the "**Prepetition ABL** |

[10] "Ad Hoc Group" means that certain ad hoc group of holders of Old First Lien Notes Debt, New First Lien Notes Debt, and other Prepetition Debt represented by Milbank, Tweed, Hadley & McCloy LLP.

| Summary of Relevant Provisions |
|---|

|  | Adequate Protection Liens"), which Contingent Liens and Prepetition ABL Adequate Protection Liens shall be subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior (including the Permitted Prior Liens and, solely with respect to the Notes Priority Collateral, the Prepetition First-Priority Liens and Prepetition First-Priority Adequate Protection Liens), (B) the Prepetition ABL Liens, and (C) the Carve-Out; and (ii) a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the amount of their Adequate Protection Claim (the "**Prepetition ABL 507(b) Claim**"), which shall be subject and subordinate only to the Carve-Out, the DIP Superpriority Claim, and liens on the Collateral;<br><br>(b) in the case of the First-Priority Secured Parties, (i) replacement liens on all Collateral in the amount of their Adequate Protection Claim (the "**Prepetition First-Priority Adequate Protection Liens**" and, together with the Prepetition ABL Adequate Protection Liens, the "**Adequate Protection Liens**"), which shall be subject and subordinate only to (A) the Prepetition First-Priority Liens, (B) in the case of the ABL Priority Collateral, the DIP Liens and any liens to which the DIP Liens are junior (including the Permitted Prior Liens), the Prepetition ABL Adequate Protection Liens and the Contingent Liens, and (C) the Carve-Out; and (ii) a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the amount of their Adequate Protection Claim (the "**Prepetition First-Priority 507(b) Claim**" and, together with the Prepetition ABL 507(b) Claim, the "**507(b) Claims**"), which shall be subject and subordinate only to the Carve-Out, the DIP Superpriority Claim, the Prepetition ABL 507(b) Claim, and liens on the Collateral;<br><br>(c) in the case of all Adequate Protection Parties, current cash payment of professional fees and expenses to the extent provided in the Interim Order; and<br><br>(d) in the case of all Adequate Protection Parties, certain reporting and information rights.<br><br>Interim Order, ¶¶ 15-16. The 1.5 Lien Notes Secured Parties and 2nd Lien Notes Secured Parties are also receiving adequate protection of their interests in the Collateral as of the Petition Date, if any, in the form of replacement liens on Colateral, solely to the extent that such Collateral constitutes additional collateral securing the Adequate Protection Liens granted to the Prepetition First-Priority Secured Parties and Prepetition ABL Secured Parties. Interim Order, ¶ 18. |
| **Additional Adequate Protection for Prepetition First-Priority Secured Parties** | As additional adequate protection for their Prepetition First-Priority Adequate Protection Claims, the Prepetition First-Priority Secured Parties are receiving the following protections: (a) payment of reasonable and documented fees and expenses of the Ad Hoc Group; (b) rights (exercisable by the Ad Hoc Group) to direct a sale of the Verso Debtors' assets upon the sale of the NewPage Debtors' assets, or upon termination of the RSA (unless a replacement restructuring support agreement is entered into, or a plan reasonably acceptable to the Ad Hoc Group is filed, within the time periods specified in the Interim Order; (c) the implementation of certain notice mechanisms in connection with affiliate transactions; (d) certain collateral monitoring and information rights; (e) certain consent rights (exercisable by the Ad Hoc Group) with respect to material amendments to the DIP Documents; and (f) the right (exercisable by the Ad Hoc Group) to terminate the Verso Debtors' use of Notes Cash Collateral upon a material breach by the Verso Debtors of their obligations to provide the additional adequate protection described above. The rights of the Ad Hoc Group under these additional adequate protection provisions will fall away if the group no longer collectively holds at least a majority of the aggregate principal amount of outstanding Old First Lien Notes and New First Lien Notes. Interim Order, ¶ 17. |
| **Events of Default** | The DIP Credit Agreement contains events of default (as set forth in Section 8.01 of the DIP Credit Agreement, "**Events of Default**") that are customary for loans of this type, including, without limitation: (i) breaches of representations and warranties; (ii) failure to pay obligations under the DIP Credit Agreements when due (subject to applicable grace periods); (iii) failure to perform other covenants under the DIP Credit Agreements (including the Milestones); |

| | |
|---|---|
| **Summary of Relevant Provisions** | |

| | |
|---|---|
| | subject to applicable grace periods; (iv) cross-defaults to the NewPage Debtors' debtor-in-possession financing and other material indebtedness; (v) certain change in control events; (vi) certain insolvency events involving non-debtor subsidiaries; (vii) failure to pay judgments in excess of $15 million; (viii) certain ERISA events; (ix) disavowal in writing of material provisions of the DIP Documents; (ix) failure of certain subordinated obligations of the Verso Debtors to become subordinated to the DIP Obligations; (x) dismissal or conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (xi) appointment of a trustee, responsible officer or examiner with expanded powers; (xii) entry of an order (A) staying, reversing, vacating or modifying (in a manner adverse in any material respect to the applicable DIP Agent or DIP Lenders) the Interim Order, Final Order or the SSA Order, (B) terminating cash collateral usage, (C) granting relief from the automatic stay to permit foreclosure on material assets having a value in excess of $15 million, (D) charging the Collateral under section 506(c) of the Bankruptcy Code, (E) authorizing use of Cash Collateral, the incurrence of additional postpetition financing indebtedness or the granting of adequate protection without the DIP Agent's consent, or (F) the entry of an order granting adequate protection to any person without the DIP Agent's and Required Lenders' consent; (xiii) the filing of any pleading by any Verso Debtor or NewPage Debtor seeking or consenting to the relief set forth in (xii)(A) through (F) above;  (xiii) termination of exclusivity; (xiv) commencement of actions against the Prepetition Secured Parties with respect to obligations and liens under the Prepetition ABL Agreements; (xv) unauthorized prepetition debt payments; (xvi) failure of Final Order to be entered by 45 days after entry of the Interim Order; (xvii) entry of order granting additional superpriority claims unrelated to the DIP Financing that are pari passu with or senior to the claims of the DIP Secured Parties (or filing of a pleading seeking such relief by the Borrower); (xviii) incurrence of certain liens that are pari passu with or senior to the liens granted under the DIP Documents and Interim Order; (xix) non-compliance with Interim Order or Final Order; (xx) commencement of actions against DIP Secured Parties regarding the DIP Facility (other than proceedings relating to enforcement of the DIP Documents); (xxi) confirmation of a plan of reorganization (or entry of a dismissal order) not providing for termination of commitments under DIP Facility and indefeasible payment in full of all DIP Obligations; (xxii) filing of a motion to seek authority to sell assets having a value in excess of $20 million without DIP Agent's consent.  DIP Credit Agreement, § 8.01. |
| **Carve-Out** | An amount sufficient to satisfy (collectively, the "**Carve-Out**") (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate, (b) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code up to $50,000, (c) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Verso Debtors or the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery by the Administrative Agent of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Interim Order or Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any Prepetition Secured Parties; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof in accordance with the DIP Documents, in an aggregate amount not to exceed $5 million. Interim Order, ¶ 8(b).<br><br>The Carve-Out is unavailable, however, for, inter alia, (i) the pursuit, initiation, or prosecution of claims or litigation against the Prepetition Secured Parties or DIP Secured Parties, (ii) attempts to modify the rights of the DIP Secured Parties or Prepetition Secured Parties under the Interim Order, (iii) efforts to hinder or delay the DIP Secured Parties' exercise of remedies, (iv) payment of any prepetition claims without Court approval, and (v) after delivery of a Carve-Out Trigger Notice, payment of certain back-end success fees (other than such fees |

| Summary of Relevant Provisions | |
|---|---|
| | payable to the NewPage Debtors' financial advisor, which shall be paid solely from DIP Non-ABL Priority Collateral and shall not reduce the Post-EoD Carve Out Amount), all as set forth in the Interim Order.  Interim Order, ¶ 8(c).<br><br>The Carve-Out will be senior to all liens and claims granted under the Interim Order and the DIP Documents, any Adequate Protection Liens, any SSA Lien, the Adequate Protection Claims, the SSA True-Up Claim, and any and all other liens or claims securing the DIP Obligations.  Interim Order, ¶ 8(d).  In addition, all payments made pursuant to the Interim Order are subject to the Carve-Out.  Interim Order, ¶ 16. |
| **Milestones** | The DIP Credit Agreements contain the following milestones (the "**Milestones**"):  (i) filing of an Acceptable Plan of Reorganization (as defined below) and related disclosure statement within 365 days after the Petition Date, (ii) entry of an order approving a disclosure statement with respect to an Acceptable Plan of Reorganization within 426 days after the Petition Date, (iii) entry of an order confirming an Acceptable Plan of Reorganization within 517 days following the Petition Date, and (iv) the occurrence of the effective date of an Acceptable Plan of Reorganization within 532 days of the Petition Date.  DIP Credit Agreement, § 5.14.<br><br>An "**Acceptable Plan of Reorganization**" means a plan of reorganization in the Verso Debtors' and NewPage Debtors' cases that provides for the termination or commitments, repayment in full in cash and full discharge of the Verso Debtors' obligations under the DIP Facilities at emergence and contains releases and other exculpatory provisions for the DIP Agent, letter of credit issuing banks, lead arrangers and DIP Lenders in form and substance satisfactory to the DIP Agent and the Required Lenders.  DIP Credit Agreement, § 1.01 (definition of "Acceptable Plan of Reorganization"). |
| **Shared Services Agreement-Related Terms** | The Interim Order grants certain superpriority claims on account of the SSA True-Up Claim of the NewPage Debtors (if any), as well as a priming SSA Lien, as contemplated by the Interim SSA Protocol (defined below) providing for an interim resolution of issues relating to the Shared Services Agreement between the Verso Debtors and the NewPage Debtors, and subject to the limitations on such claims and liens set forth therein.  The Debtors are seeking approval of the Interim SSA Protocol by separate motion.  Interim Order, ¶ 19. |
| **VMPH Dividend** | The Interim Order authorizes and directs the Verso Debtors to cause their subsidiary, Verso Maine Power Holdings LLC ("**VMPH**") to distribute, via dividend, all cash and cash equivalents held by VMPH as of the Petition Date to one or more of the Borrower and Subsidiary Guarantors not later than the Closing Date (as defined in the DIP Credit Agreement). |
| **506(c) waiver** | Subject to the entry of the Final Order, the Verso Debtors' right to surcharge the Prepetition Collateral and Collateral pursuant to section 506(c) of the Bankruptcy Code shall be waived.  Interim Order, ¶ 12. |
| **Equities of the Case** | Subject to the entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equities of the case exception except under 11 U.S.C. § 552(b).  Interim Order, ¶ 11(c). |
| **Liens on Avoidance Actions** | Upon entry of the Final Order, the DIP Liens, Contingent Liens, SSA Lien, Adequate Protection Liens and Prepetition Junior Adequate Protection Liens shall attach to the Avoidance Proceeds.  Interim Order, ¶¶ 9(a), 15(a), 16(a), 18(a), 19(b). |
| **Indemnification** | The DIP Documents contain customary indemnification provisions (including coverage of environmental liabilities) by the Borrower and the Guarantors in favor of the DIP Agents, the DIP lead arrangers, the DIP Lenders, each DIP L/C issuing bank and each of their respective affiliates and representatives.  DIP Credit Agreement, § 10.05. |
| **Automatic Stay Waiver** | The Interim Order waives the automatic stay to the extent necessary: (a) to permit the DIP Agent and DIP Lenders to exercise rights and remedies following an Event of Default (subject to the limitations set forth in the Interim Order) and (b) to permit the DIP Secured Parties and/or Adequate Protection Parties to take certain actions to perfect the liens granted to those parties under the Interim Order.  Interim Order, ¶¶ 11(c), 21(b). |

**PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2**

6.    Local Rule 4001-2(a)(i) requires a debtor to:  (i) recite whether the proposed form of postpetition financing order contains certain provisions of the type enumerated therein; (ii) identify the location of such provisions in the proposed cash collateral order; and (iii) justify the inclusion of such provisions in the proposed cash collateral order.  The Verso Debtors hereby disclose the below provisions (collectively, the "**Highlighted Provisions**") in accordance with Local Rule 4001-2(i):

- **Provisions Authorizing "Roll Up" or Repayment of Prepetition Debt (Local Rule 4001-2(a)(i)(E))**:  Paragraph 7 of the Interim Order authorizes the Verso Debtors to refinance in full the Prepetition ABL Facility using proceeds of the DIP Financing.  The Verso Debtors believe that the proposed refinancing is justified for three primary reasons: (a) the refinancing merely serves to maintain the status quo, and will not increase the amount of the Verso Debtors' senior secured debt; (b) because the Prepetition ABL Debt is oversecured (and thus entitled to postpetition interest under section 506(b)), the refinancing will lower the Verso Debtors' postpetition debt service costs by (i) giving them flexibility to borrow (and pay interest on) only the funds they actually need (rather than the entire prepetition balance of the Prepetition ABL Facility) and (ii) eliminating the possibility of any claims by the Prepetition ABL Secured Parties for postpetition interest at the default rate; and (c) the refinancing of the Prepetition ABL Facility itself will provide assurance to the Verso Debtors' vendors that the Verso Debtors are stable, creditworthy parties that will have the ability to honor their obligations to trade creditors postpetition.  *See infra*, Basis for Relief, Section E(iii).

- **Disparate Treatment of Debtor and Creditors' Committee Professionals in Carve-Out (Local Rule 4001-2(a)(i)(G))**.  Paragraph 8 of the Interim Order establishes a Carve-Out for certain expenses, including expenses of administration of these cases, that may be paid from Collateral notwithstanding the occurrence of an Event of Default under the DIP Facilities or termination of the Verso Debtors' right to use Cash Collateral.  The Carve-Out provides for the same treatment of professionals retained by the Verso Debtors and Creditors' Committee except in one respect; the Carve-Out will be available to pay success fees payable to the Verso Debtors' financial advisor, PJT Partners ("**PJT**"), post-default, but not to pay any other post-default success fees (including, if applicable, any financial advisor retained by a Creditors' Committee, if any).  First, PJT's success fee will not reduce the post-default capped amount ($5 million) available for case professionals (without any preference or priority for the Verso Debtors' professionals), and thus the Creditors' Committee will not prejudiced by the payment of PJT's fees.  Second, PJT's post-default success fee would be paid solely from the Notes Priority Collateral, *i.e.*, the proceeds of the sales of Collateral on which PJT is most likely to advise.  Third, the Verso Debtors believe that any disparity in the treatment of PJT's success fee (vis-à-vis Creditors' Committee professionals) in a post-default scenario is

warranted because, in such a scenario, any success fee payable to PJT would result from PJT's efforts to market the Collateral for the benefit of the Prepetition Secured Parties; the Creditors' Committee's financial advisor, if any, would presumably have no meaningful role in any efforts to market the Collateral post-default. *See infra*, Basis for Relief, Section E(ii).

- **552(b) Waiver (Local Rule 4001-2(a)(i)(H))**: Pursuant to paragraph 11(c) of the Interim Order, subject to and effective upon entry of the Final Order, the Verso Debtors will waive any "equities of the case" claims against the Prepetition Secured Parties under Bankruptcy Code section 552(b). As set forth below, the Verso Debtors believe that waivers of their rights under the "equities of the case" exception is justified here because (a) the DIP Secured Parties, many of whom are Prepetition Secured Parties, would not have extended the DIP Financing without such waiver and (b) such waiver will not be effective unless and until approved by the Court in the Final Order, after parties in interest receive notice and an opportunity to be heard. *See infra*, Basis for Relief, Section E(iii).

      7.    In addition, although the Verso Debtors do not believe that such provisions are required to be highlighted under Local Rule 4001-2, the Verso Debtors note the following out of an abundance of caution:

- **Findings of Fact (Local Rule 4001-2(a)(i)(B))**: Pursuant to paragraph 4 of the Interim Order, the Verso Debtors have provided certain agreements and stipulations concerning the Prepetition Debt, described above. The stipulations are subject to challenge by parties in interest and the Verso Debtors (subject to the limitations set forth in paragraphs 22 through 24 of the Interim Order) and will not be binding upon any party in interest until the conclusion of the Challenge Period. With respect to all potential defendants other than the First Lien Notes Secured Parties, the Challenge Period will not end until, at the earliest, 75 days after entry of the Interim Order and, in the case of any Creditors' Committee that is appointed, 60 days from such appointment, as set forth in paragraph 23 of the Interim Order. The specific provisions of the order governing the pursuit of actions by the Verso Debtors and/or the Creditors' Committee against the Prepetition Term Secured Parties do not shorten the time that such parties would otherwise have to bring such actions; rather, those provisions effectively toll the commencement of the Challenge Period until after the Trigger Date has occurred.

- **506(c) Waiver (Local Rule 4001-2(a)(i)(C))**: The Verso Debtors are seeking approval of a waiver of rights under Bankruptcy Code section 506(c) against the Collateral and Prepetition Collateral only upon entry of the Final Order. Accordingly, parties will have notice of (and an opportunity to object to) the Verso Debtors' proposed waiver.

- **Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))**: The Verso Debtors are not seeking authority to grant liens on any Avoidance Actions. However, as described above, the Verso Debtors will grant DIP Liens and Adequate Protection Liens on the *proceeds* of such actions, subject to and effective upon entry of the Final Order.

- **Non-Consensual Priming of Prepetition Liens (Local Rule 4001-2(a)(i)(G))**. To the Verso Debtors' knowledge, all Prepetition Secured Parties have consented, or are deemed to have consented under applicable intercreditor agreements, to the priming liens granted under the Interim Order. Interim Order, ¶ 5(e).

## THE VERSO DEBTORS' PREPETITION DEBT AND CAPITAL STRUCTURE

8.     As of September 30, 2015, the Verso Debtors had funded debt outstanding of approximately $1.966 billion. The NewPage Debtors are not obligors in respect of the Verso Debtors' funded indebtedness, nor are the Verso Debtors obligors under any of the NewPage Debtors' funded indebtedness.

9.     The following table summarizes the Verso Debtors' prepetition funded indebtedness:

| Indebtedness | Principal Amount (as of September 30, 2015) | Current Interest Rate | Maturity Date |
|---|---|---|---|
| Prepetition ABL Credit Agreement | $66 million | 2.73% (weighted average) | 2017 |
| Prepetition Cash Flow Agreement | $50 million | 5.03% (weighted average) | 2017 |
| Old First Lien Notes Indenture | $424 million | 11.75% | 2019 |
| New First Lien Notes Indenture | $656 million | 11.75% | 2019 |
| 1.5 Lien Notes Indenture | $272 million | 11.75% | 2020 |
| 2nd Lien Notes Indenture | $272 million | 13.0% | 2020 |
| 16% Senior Subordinated Notes due 2020 | $89 million | 16.0% | 2020 |
| 8.75% Second Priority Senior Secured Notes due 2019 | $96 million | 8.75% | 2019 |
| 11.375% Senior Subordinated Notes due 2016 | $41 million | 11.375% | 2016 |

10.     The primary components of the Verso Debtors' prepetition indebtedness are described in greater detail below, as well as in the Campbell Declaration. The Verso Debtors also incur unsecured debt in the ordinary course of their operations.

A.      **Revolving Credit Facilities**

11.     In 2012, Verso Holdings entered into the Prepetition ABL Credit Agreement and Prepetition Cash Flow Credit Agreement, which provided for a $150 million asset-based loan facility (the "**Prepetition ABL Facility**") and a $50 million cash-flow facility (the "**Prepetition Cash Flow Facility**" and, together with the Prepetition ABL Facility, the "**Prepetition Revolving Credit Facilities**"), respectively. The indebtedness under the Prepetition Revolving Credit Facilities is guaranteed, jointly and severally, by each of the Guarantors under the DIP Facilities.  The indebtedness under the Prepetition Revolving Credit Facilities bears interest at a floating rate based on a margin over a base rate or LIBOR. As of September 30, 2015, the weighted-average interest rates on outstanding advances under the Prepetition ABL Facility and Prepetition Cash Flow Facility were 2.73% and 5.03%, respectively.

12.     As of September 30, 2015, there was $66 million in borrowings outstanding, $30 million in letters of credit issued, and $8 million available for future borrowing under the Prepetition ABL Facility.  The indebtedness under the Prepetition ABL Facility and related guarantees are secured by first-priority security interests, subject to permitted liens, in the ABL Priority Collateral, which generally consists of substantially all the inventory and accounts receivable of the Borrower, and second-priority security interests, subject to permitted liens, in the Notes Priority Collateral (*i.e.*, substantially all the foregoing entities' other assets).

13.     As of September 30, 2015, there was $50 million in borrowings outstanding, no letters of credit issued, and no availability for future borrowings under the Prepetition Cash Flow Facility. The indebtedness under the Prepetition Cash Flow Facility and related guarantees are secured, *pari passu* with the Old First Lien Notes and the New First Lien

Notes (and the related guarantees), by a first-priority security interest in the Notes Priority Collateral and a second-priority security interest in the ABL Priority Collateral.

14.    Draws on the Prepetition ABL Facility are backed by the ABL Priority Collateral, which generally consists of Verso's accounts receivable ("**AR**") from its customers, finished goods, work in process and raw materials inventory ("**Inventory**").  The amount that can be borrowed on the Prepetition ABL Facility is capped based on a borrowing base which is a percentage of the value of the ABL Priority Collateral, further reduced by certain exclusions known as reserves or ineligibles.  Verso can borrow against AR at an advance rate of 85%.  The Company's normal experience is to collect at or near 100% of AR ensuring that there is a cushion of approximately 15% against borrowings. Verso can borrow against Inventory at 80% of its Net Orderly Liquidation Value ("**NOLV**") rate. The standard applied for NOLV is the expected realizable value in the case of a liquidation of the Inventory.  Because Verso can borrow up to 80% of the NOLV of inventory, there is essentially a 20% cushion protecting those advances.  For purposes of the borrowing base, AR and Inventory are further reduced by reserves and ineligibles.  Examples would be AR with long collection terms or where an offsetting payable to that customer might impair the ability to collect.  Examples of ineligible Inventory would be items in-transit and not easily locatable or inventory associated with open chemical containers or defective product.  While reserves and ineligibles cannot be borrowed against, they can add to the value of the ABL Priority Collateral.

15.    Each month, the Verso Debtors provide a written certification to the agent on the Verso ABL Facility. That certification provides a true and accurate calculation of the available borrowing base, and shows the value of the ABL Priority Collateral.  Each month, the certification has shown that the Verso ABL Lenders are over-secured.  Factoring in the NOLV of

inventory, the value of AR and various reserves and ineligibles, the Prepetition ABL Facility is comfortably collateralized and oversecured as of the Petition Date.

**B.    First Lien Notes**

16.    In 2012, Verso Holdings issued $345 million aggregate principal amount of notes under the Old First Lien Notes Indenture and in 2013, Verso Holdings issued an additional $73 million aggregate principal amount of such notes (collectively, the "**Old First Lien Notes**"). The Old First Lien Notes are guaranteed, jointly and severally, by each of the Subsidiary Guarantors. The Old First Lien Notes are secured, *pari passu* with the Prepetition Cash Flow Facility and related guarantees, by a first-priority security interest in the Notes Priority Collateral and a second-priority security interest in the ABL Priority Collateral. The Old First Lien Notes mature on January 15, 2019.

17.    On January 7, 2015, in connection with the acquisition of the NewPage Debtors, Verso Holdings issued $650 million aggregate principal amount of New First Lien Notes to equity holders of NewPage Corporation ("**NewPage**") as partial consideration for the acquisition. Verso Holdings did not receive new cash funding in connection with the New First Lien Notes; rather, the New First Lien Notes were granted to NewPage equity holders in return for a portion of the value of NewPage's equity being acquired by Verso Holdings. The New First Lien Notes are guaranteed, jointly and severally, on a senior secured basis, by each of the Subsidiary Guarantors.

18.    The New First Lien Notes and the related guarantees are secured, pari passu with the Prepetition Cash Flow Facility and related guarantees, by a first-priority security interest in the Notes Priority Collateral and a second-priority security interest in the Prepetition ABL Priority Collateral. The New First Lien Notes mature on January 15, 2019.

C.    **Junior Secured Notes**

19.    In 2012, Verso Holdings issued $272 million aggregate principal amount of notes under the 1.5 Lien Notes Indenture (the "**1.5 Lien Notes**"). The 1.5 Lien Notes are guaranteed, jointly and severally, by each of the Subsidiary Guarantors under the DIP Facility.

20.    The 1.5 Lien Notes are secured by a security interest, subject to permitted liens, in substantially all of Verso Holdings' and the Subsidiary Guarantors' tangible and intangible assets. The liens securing the 1.5 Lien Notes rank junior to those securing the obligations under the Prepetition Revolving Credit Facilities, the Old First Lien Notes, and the New First Lien Notes and rank senior to those securing the 2nd Lien Notes (defined below). The 1.5 Lien Notes mature on January 15, 2019.

21.    On July 2, 2014, Verso Holdings commenced an offer to exchange (the "**2nd Lien Notes Exchange Offer**") any and all of Verso Holdings' outstanding 8.75% Second Priority Senior Secured Notes due 2019 ("**Old 2nd Lien Notes**") for Second Priority Adjustable Senior Secured Notes ("**2nd Lien Notes**"), issued pursuant to the 2nd Lien Notes Indenture, and warrants issued by Verso that were mandatorily convertible on a one-for-one basis into shares of Verso's common stock immediately prior to the NewPage acquisition (the "**Warrants**"). On August 1, 2014, approximately $299 million aggregate principal amount of Old 2nd Lien Notes was tendered and accepted in exchange for a like amount of 2nd Lien Notes and approximately 9.3 million Warrants.

22.    The 2nd Lien Notes are guaranteed, jointly and severally, by each of the Subsidiary Guarantors.  The 2nd Lien Notes and related guarantees are secured by liens that rank junior to those securing the obligations under the Prepetition Revolving Credit Facilities, the Old

First Lien Notes, the New First Lien Notes, and the 1.5 Lien Notes. The 2nd Lien Notes mature on August 1, 2020.

23.     In connection with the consummation of the NewPage acquisition, the provisions of the 2nd Lien Notes were adjusted and, as a result, the outstanding principal amount of the 2nd Lien Notes was reduced from approximately $299 million before January 7, 2015, to approximately $178 million thereafter.

D.     **Unsecured Notes**

24.     Following the settlement of the 2nd Lien Notes Exchange Offer, approximately $97 million in aggregate principal amount of the Old 2nd Lien Notes remained outstanding. The Old 2nd Lien Notes are guaranteed, jointly and severally, by each of the Subsidiary Guarantors except NewPage Holdings, Inc. As of August 1, 2014, the Old 2nd Lien Notes are no longer secured by any collateral. The Old 2nd Lien Notes mature on February 1, 2019.

25.     On July 2, 2014, Verso Holdings commenced an offer (the "**Subordinated Notes Exchange Offer**") to exchange any and all of Verso Holdings' outstanding 11.38% Senior Subordinated Notes due 2016 ("**Old Subordinated Notes**") for Adjustable Senior Subordinated Notes ("**New Subordinated Notes**") and Warrants. On August 1, 2014, approximately $102 million aggregate principal amount of Old Subordinated Notes was tendered and accepted in exchange for a like amount of New Subordinated Notes and approximately 5.4 million Warrants.

26.     In connection with the consummation of the NewPage acquisition, the provisions of the New Subordinated Notes were adjusted and, as a result, the outstanding principal amount of the New Subordinated Notes was reduced from approximately $102 million

before January 7, 2015, to approximately $63 million thereafter.  The New Subordinated Notes are guaranteed by each of the Subsidiary Guarantors.

27.    Following the settlement of the Subordinated Notes Exchange Offer, approximately $41 million aggregate principal amount of the Old Subordinated Notes remained outstanding.  The Old Subordinated Notes are guaranteed, jointly and severally, by each of the Subsidiary Guarantors except NewPage Holdings Inc.  The Old Subordinated Notes mature on August 1, 2016.

### THE VERSO DEBTORS' LIQUIDITY NEEDS
### AND EFFORTS TO OBTAIN POSTPETITION FINANCING

28.    As discussed in the Zelin and Campbell Declarations, the Verso Debtors urgently require both the ability to use Cash Collateral and incremental postpetition financing.  Without the relief sought by this Motion, the Verso Debtors will not have sufficient liquidity to operate their business, fund their ordinary course expenditures, including paying their employees, honoring customer programs, or paying the expenses necessary to administer the chapter 11 cases.  The potential consequences to the Verso Debtors of a failure to obtain adequate funding are dire:  among other things, the Verso Debtors could be forced to close their mills prematurely, lose valuable customer accounts, and liquidate on a piecemeal basis, resulting in irreparable harm to the Verso Debtors and every one of their stakeholders.

29.    To avoid such an outcome, the Verso Debtors, through their financial advisor, PJT, began a broad-based search for potential postpetition financing several weeks prior to the Petition Date.  The Verso Debtors and PJT believed it was particularly important to obtain asset-based financing because of the advantages such financing offers, including improved liquidity, increased flexibility, and an overall reduction in the cost of capital.  The Verso Debtors, through their financial advisor, PJT, contacted several prospective agent banks

regarding the Verso Debtors' financing needs, and the agent banks reached out to a variety of potential financing sources—including both parties inside and outside of the Verso Debtors' capital structure.

30.     Ultimately, no parties outside the capital structure were willing to provide a commitment for such financing given the complexity of the Verso Debtors' and NewPage Debtors' financing arrangements and uncertainty arising from potential intercompany and other legal disputes in these cases.  Thus, it became clear that the DIP Facility, which is being provided by certain of the existing Prepetition ABL Lenders, would be the Verso Debtors' best (and only) option for postpetition asset-based financing.

31.     The Verso Debtors propose to use the Revolving DIP Facility to refinance the Prepetition ABL Facility, which will minimize the Verso Debtors' postpetition debt service expenses.  This stems from the fact that the Prepetition ABL Facility is oversecured, and the Prepetition ABL Secured Parties are entitled to postpetition interest.  If the Prepetition ABL Facility remained outstanding, that postpetition interest would accrue on the full balance of the Verso Debtors' obligations thereunder, and the Verso Debtors would not have the option to use excess cash on hand to repay the Prepetition ABL Facility and reduce their postpetition interest burden.  In addition, the Prepetition ABL Secured Parties could assert that such postpetition interest is payable at the contractual default rate, which would exceed the rate of interest payable under the Revolving DIP Facility.  Through the refinancing, the Verso Debtors will eliminate the possibility of paying postpetition interest at the default rate.

32.     The Verso Debtors also require the immediate use of Cash Collateral.  The Prepetition Secured Parties have consented to the use of Cash Collateral on the terms set forth herein, which were the subject of extensive good-faith, arm's length negotiations between the

Verso Debtors and the Prepetition Secured Parties.  The Verso Debtors have no unencumbered cash, and it is therefore essential that they have use of cash to make payroll, vendor payments and other expenditures that are critical to their continued viability and ability to reorganize their capital structure.

## RELIEF REQUESTED

33.    By this Motion, the Verso Debtors seek entry of the Interim Order and Final Order:  (a) authorizing the Verso Debtors to, among other things, obtain the DIP Financing and enter into and perform under the DIP Documents, continue to use Cash Collateral, provide adequate protection to the Prepetition Secured Parties, and refinance in full the Prepetition ABL Debt, and (b) granting the other relief described at the beginning of this Motion, and such other relief as may be just or proper.

## BASIS FOR RELIEF

**A.    The Court Should Approve the DIP Facilities Under Section 364(c) and (d)(1) of the Bankruptcy Code.**

34.    The Verso Debtors qualify for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and grant superpriority administrative status and liens on its property.   Section 364(c) of the Bankruptcy Code provides—

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

35.     Section 364(d)(1) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

36.     In evaluating proposed post-petition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether:

    i.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    ii.    the credit transactions are necessary to preserve assets of the estate;

    iii.    the terms of the credit agreement are fair, reasonable, and adequate;

    iv.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    v.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549–551 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

    *(i)*    *The Verso Debtors Are Unable to Obtain Financing On More Favorable Terms Than the DIP Facilities.*

37.     The Verso Debtors cannot obtain financing on terms more favorable than the DIP Facilities.  A debtor needs only to make a good faith effort to obtain credit without the

protections of section 364(c) or 364(d) of the Bankruptcy Code.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

38.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

39.     As described in the Zelin Declaration, the Verso Debtors, with the assistance of PJT and their other advisors, worked for several weeks prior to the Petition Date to cultivate viable financing options for the Verso Debtors both inside and outside of the Verso Debtors' capital structure.  Those efforts were complicated, however, by the complex dynamics presented by the Debtors' dual capital structures, matters relating to the treatment of the Shared Services Agreement entered into in connection with the 2015 acquisition of NewPage (the "**Shared Services Agreement**"), and challenging economic conditions not specifically relating to the Verso Debtors.  Thus, the Verso Debtors ended up with limited options at their disposal. No party was willing to entertain the possibility of providing postpetition financing to the Verso

Debtors on an unsecured basis, or secured by junior liens on the applicable Collateral.  More generally, none of the parties PJT contacted were willing to providing alternative financing on terms that were cumulatively more favorable to the Verso Debtors than on the terms set forth in the DIP Facility.

40.      Despite the absence of viable alternatives to the DIP Facility, through vigorous, good-faith negotiations between the Verso Debtors and the DIP Agent, the Verso Debtors were able to secure financing with terms that are, on the whole, fair and reasonable. Simply put, the DIP Facility, combined with Cash Collateral usage, will provide the Verso Debtors with the liquidity and capital they need, at the lowest cost available.  Based on the negotiation history of the DIP Facility, and the marketing efforts undertaken by the Verso Debtors and PJT, the DIP Facilities represent the Verso Debtors' best available postpetition financing option.

> (ii)      *The DIP Facilities are Necessary to Preserve the Value of the Verso Debtors' Estates.*

41.      The Verso Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The Verso Debtors immediate access to postpetition financing and use of cash collateral is essential to the Verso Debtors' ability to effectively carry out that duty.  That financing and Cash Collateral will be used to fund critical payments, including obligations such as employee payroll and critical vendor payments that are essential to the Verso Debtors' continued operations.  Without the requested relief, the Verso Debtors' operations would be seriously disrupted, customer accounts would be put at risk, and the Verso Debtors' overall performance would suffer, to the detriment of all of their stakeholders.

42.     In contrast, immediate access to Cash Collateral and the proceeds of the DIP Facilities will provide the Verso Debtors with sufficient liquidity to fund their operations and maximize the value of their mills as they work toward a restructuring.  As set forth in the Zelin Declaration, the size of the DIP Facility is both necessary and sufficient to meet the Verso Debtors' immediate and projected liquidity needs.  In addition, and importantly, the terms of the DIP Documents facilitate the Verso Debtors' ability to implement the Interim SSA Protocol[11] by permitting Verso to accept reduce payments under the Shared Services Agreement during the initial 90-day period following the Petition Date, as contemplated by the Interim SSA Protocol. As discussed in greater detail in the Interim SSA Protocol Motion, the Interim SSA Protocol is in the Verso Debtors' best interests, as it obviates the need for costly and uncertain litigation that would threaten to derail the Debtors' reorganization efforts, while preserving all of the Verso Debtors' rights under the Shared Services Agreement.

43.     In sum, the Verso Debtors' immediate access to the DIP Financing and Cash Collateral will ensure a smooth transition into chapter 11 and pave the way for a successful, value-maximizing restructuring of the Verso Debtors.

(iii)     *Terms of the DIP Facilities are Fair, Reasonable, and Adequate under the Circumstances.*

44.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

---

[11]     "**Interim SSA Protocol**" means the "Interim Protocol" as defined in the Joint Motion of Verso Corporation and NewPage Corporation Under 11 U.S.C. 363, 364 and 105(a) for Entry of an Order Approving Interim Shared Services Agreement Protocol, filed contemporaneously with this Motion (the "**Interim SSA Protocol Motion**").

into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

45.     Here, the terms of the DIP Facility, including pricing, fees, interest rates and other terms and conditions, were the product of good-faith, arm's length negotiations between the Verso Debtors and the DIP Agent and are fair, appropriate, reasonable and in the Verso Debtors' best interests.  Indeed, those terms and conditions are generally consistent with those in place under the Prepetition ABL Facility.  In effect, the DIP Facility is in place to preserve the Verso Debtors' access to the liquidity provided by the Prepetition ABL Facility. Finally, as set forth in the Zelin Declaration, the covenants and restrictions included in the DIP Credit Agreement are reasonable and are not designed to make the Verso Debtors disproportionately susceptible to a breach of such terms.

> (iv)     *Entering into the DIP Facilities Reflects the Verso Debtors' Reasonable Business Judgment.*

46.     Courts view a debtor's proposed DIP loan under the business-judgment rule.  *See In re All Land Investments, LLC*, No. 09-13790, 2009 WL 7226974, at \*3 (Bankr. D. Del. Dec. 2, 2009) ("The terms of the proposed financing appear fair and reasonable, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration."); *In re QHB Holdings LLC*, No. 09-14312, 2009 WL 7226979, at \*7 (Bankr. D. Del. Dec. 22, 2009).  Under the applicable business-judgment rule, courts defer to a debtors' decision to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994).

47. As Delaware Bankruptcy Courts have found, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

48. Here, entry into the DIP Facility is the *only* reasonable option for the Verso Debtors, for the reasons discussed above and in the Zelin Declaration. *First*, the Verso Debtors need both the liquidity provided by the DIP Facility, and the flexibility afforded by asset-based financing more generally. Without access to the DIP Financing and Cash Collateral, the Verso Debtors would be unable to satisfy their day-to-day operational expenses. To the extent that the Verso Debtors instead sought to use the Cash Collateral of the Prepetition ABL Secured Parties without entering into the DIP Facility, the Verso Debtors' debt service costs would actually increase because of (a) the Prepetition ABL Secured Parties' entitlement, as oversecured creditors, to postpetition interest under section 506(b) of the Bankruptcy Code and (b) the Verso Debtors' inability to pay down and re-borrow under the Prepetition ABL Facility in accordance with their liquidity needs. Thus, interest would accrue on the full amount of the prepetition balance of the Prepetition ABL Facility, regardless of whether the Verso Debtors actually required all of the cash to which such accruals corresponded. *Second*, as discussed above, the DIP Facility is the only available source of asset-based financing for the Verso Debtors. *Third*, the terms of the DIP Facility were extensively negotiated by the Verso Debtors and their advisors in order to ensure that they contained the most favorable terms possible under the circumstances.

49.     For all of these reasons, the Verso Debtors determined that entry into the DIP Facility was in the best interests of the Verso Debtors and their estates and creditors.  The DIP Facility will provide the Verso Debtors with access to the liquidity they need to preserve the value of their assets through ongoing operations, as and when they need it, and facilitate a successful restructuring.  Accordingly, the Verso Debtors' decision to enter into the DIP Facility is an exercise of their sound judgment that warrants approval by the Court.

**B.      The Interests of the Prepetition Secured Parties are Adequately Protected.**

50.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  11 U.S.C. § 364(d)(1)(B).  Secured creditors are also entitled to adequate protection of their valid and perfected interests in Cash Collateral and other prepetition collateral to be used by a debtor-in-possession during the course of a bankruptcy case. 11 U.S.C. § 363(e).

51.     Although the Bankruptcy Code does not define "adequate protection", section 361 of the Bankruptcy Code delineates a non-exhaustive list of the available types of adequate protection, which include periodic cash payments, additional liens, replacement liens and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See   In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).  When priming of liens is sought under section 364(d), the courts also examine whether the prepetition secured creditors are

being provided adequate protection for the value of their liens. *See In re Utah 7000, LLC,* *No. 08-21869,* 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus.* *Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

52.     Here, the only known secured creditors of the Verso Debtors whose liens are being primed (and whose Prepetition Collateral is being used) are (a) the Prepetition First Lien Secured Parties (whose existing liens, for the avoidance of doubt, are only being primed by the DIP Liens on ABL Priority Collateral), the 1.5 Lien Notes Secured Parties, the 2nd Lien Notes Secured Parties and (b) solely to the extent that they are ultimately forced to disgorge amounts received in connection with the refinancing of the Prepetition ABL Debt, the Prepetition ABL Secured Parties.  Under the terms of the Interim Order, the Verso Debtors have agreed to provide an adequate protection package to these Adequate Protection Parties, which includes the forms of adequate protection set forth in section 361 of the Bankruptcy Code, solely to the extent of any diminution in value of such parties' respective interests in the Prepetition Collateral.

53.     The basic adequate protection offered to the Prepetition ABL Secured Parties and Prepetition First-Priority Secured Parties consists of (i) replacement security interests and liens on all Collateral securing the DIP Facilities, (ii) superpriority administrative claims under section 507(b) of the Bankruptcy Code, subject in right of payment only to DIP Superpriority Claims and the SSA True-Up Claim, if any, and with recourse to all Collateral (subject to the Carve-Out, the DIP Liens, and all other liens on such property), and (iii) payment of the reasonable and documented fees and expenses (including reasonable and documented professional fees) of the Prepetition ABL Agent, Prepetition Cash Flow Agent, Old First Lien Notes Trustee and the New First Lien Notes Trustee under the terms of the relevant Existing Agreements.

54.     Solely to the extent that the Adequate Protection Liens granted to the Adequate Protection Parties attach to additional collateral within the meaning of relevant intercreditor agreements (and solely to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral), holders of junior liens (*i.e.*, the 1.5 Lien Notes Secured Parties and 2nd Lien Notes Secured Parties) will receive replacement liens on such additional Collateral, junior to all other liens granted by the Interim Order and all Prepetition Liens (other than the Prepetition Liens of the 1.5 Lien Notes Secured Parties and 2nd Lien Notes Secured Parties).  As between those replacement liens, the liens granted to the 1.5 Lien Notes Secured Parties will be senior to those granted to the 2nd Lien Notes Secured Parties.

55.     As additional adequate protection on account of the Verso Debtors' use of Cash Collateral including, in particular, Notes Cash Collateral (*i.e.*, identifiable proceeds of Notes Priority Collateral in which the Prepetition First-Priority Secured Parties have a senior interest), the Prepetition First-Priority Secured Parties are receiving, in addition to the basic adequate protection described above, the following:   (a) payment of the reasonable and documented fees and expenses of counsel and other financial advisors to the Ad Hoc Group of holders of significant amounts of Prepetition Debt; (b) in the event that a section 363 sale process (including any marketing process) is commenced with respect to the NewPage Debtors' assets, a right to compel the Verso Debtors to commence a parallel sale process; (c) the implementation by the Verso Debtors and certain of their affiliates of certain oversight procedures with respect to intercompany and affiliate transfers; (d) certain collateral monitoring and information rights; (e) certain consultation rights in connection with amendments to the DIP Facility; (f) the ability of the Ad Hoc Group to terminate the Verso Debtors' use of Notes Cash Collateral in the event that the Verso Debtors materially breach the adequate protection obligations described in (a) through

(e) above.  *See* Interim Order, ¶ 17.  This additional adequate protection was a heavily bargained-for condition of the Prepetition First-Priority Secured Parties' consent to the Verso Debtors' continued use of Cash Collateral, including the Notes Cash Collateral, which the Verso Debtors intend to use to pay down the DIP Facility and create additional availability thereunder.

56.    The Prepetition Secured Parties have not objected to the Verso Debtors' entry into the DIP Facilities (and the granting of priming liens on the Prepetition Collateral), and the Verso Debtors' use of Prepetition Collateral (including Cash Collateral) on the terms set forth in the DIP Documents and the Interim Order, including the adequate protection described above. Accordingly, the Verso Debtors respectfully submit that the Prepetition Secured Parties are adequately protected and that the Verso Debtors' proposed DIP Financing and use of Cash Collateral satisfy the requirements of sections 363(e) and 364(d)(1)(B).

**C.    Approval of Use of Cash Collateral is Appropriate.**

57.    The Verso Debtors are also requesting immediate use of all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents (including the Interim Order and Final Order).  Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  The Court should grant the Verso Debtors' request to use Cash Collateral because the necessary parties with an interest in such Cash Collateral, *i.e.*, the necessary Prepetition Secured Parties, have consented to such use.

58.    Furthermore, as described above, the Verso Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral.  The Verso Debtors need the Cash Collateral to honor obligations to parties who are critical to the success of their ongoing operations, including employees, vendors, and customers.  Absent access to Cash

Collateral, the Verso Debtors' business will deteriorate, with damaging consequences for the Verso Debtors and their estates and creditors.

59.     The Verso Debtors believe that the terms and conditions of their use of the Cash Collateral are appropriate and reasonable and that the Prepetition Secured Parties will be adequately protected against any postpetition diminution in the value of their interests in the Cash Collateral (and all other Prepetition Collateral), as demonstrated by such parties having consented to the Verso Debtors' use of Cash Collateral on the terms set forth in the Interim Order, including the provision of the adequate protection described in section B above.   Therefore, the Verso Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Interim Order.

**D.     All Parties Granted Liens and Claims Under the Interim Order Have Acted in Good Faith and Are Entitled to the Protections of Section 364(e) and 363(m).**

60.     The DIP Documents and the proposed Interim Order are the product of extended arm's length, good faith negotiations between the Verso Debtors, the DIP Secured Parties and certain Prepetition Secured Parties, in which all parties made concessions in order to ensure that the Verso Debtors have access to the liquidity they need during these cases. Moreover, as set forth above, the terms and conditions of the DIP Documents are fair and reasonable, and the Verso Debtors' entry into the DIP Documents is in the best interests of the Verso Debtors and their estates and creditors.

61.     Additionally, the Interim SSA Protocol, pursuant to which the NewPage Debtors may (but not necessarily) become entitled to an SSA Lien and Verso True-Up Claim, was extensively and zealously negotiated by independent fiduciaries of each of the NewPage Debtors' and Verso Debtors' estates, as well as key creditor constituencies at each such estate. As set forth below, the benefits of the Interim SSA Protocol to the Verso Debtors are substantial,

as the arrangement will enhance the operational stability of all Debtors during the critical first few months of these cases.

62.     Accordingly, the Verso Debtors respectfully submit that the Court should find that the DIP Secured Parties, Prepetition Secured Parties, and the NewPage Debtors acted in good faith within the meaning of sections 364(e) and 363(m) of the Bankruptcy Code, to the extent each is applicable.

**E.     The Highlighted Provisions Are Appropriate.**

*(i)     The Refinancing of the Prepetition ABL Debt Is Appropriate*

63.     The proposed refinancing of the Prepetition ABL Debt is also justified under the circumstances.  *First*, although the proposed refinancing requires highlighting under the letter of Local Rule 4001-2(a)(i)(E), it does not violate the rule's spirit.   The refinancing of the Prepetition ABL Facility through the DIP Facility is effectively a continuation of the prepetition status quo, and will not layer any additional debt onto the top of the Verso Debtors' capital structure.  Nor does it reshuffle the relative priorities of creditors in any way.

64.     *Second*, the proposed refinancing will lower the Verso Debtors' debt service costs, in the aggregate, relative to the scenario in which the Prepetition ABL Facility were not refinanced.  If the Prepetition ABL Facility remained outstanding, the Prepetition ABL Secured Parties, as oversecured creditors, would unquestionably be entitled to postpetition interest at the contract rate under section 506(b) of the Bankruptcy Code.  This would have two negative implications for the Verso Debtors.  For one thing, the Verso Debtors would have no ability to borrow or pay down the Prepetition ABL Facility, and thus the full amount of the outstanding principal balance would accrue interest for the pendency of the case.  In contrast, with the Revolving DIP Facility in place, the Verso Debtors will have the flexibility to borrow

and pay down their ABL debt as necessary to meet their liquidity needs, and avoid paying unnecessary interest.  For another, the Prepetition ABL Secured Parties could assert that postpetition interest should be paid at the *default* rate provided in the Prepetition ABL Facility. The refinancing of the Prepetition ABL Facility takes that issue off the table.

65.    *Third*, the refinancing of the Prepetition ABL Facility should provide comfort to the Verso Debtors' vendors and other trade creditors.  The fact that the Revolving DIP Facility is being provided itself demonstrates that the Verso Debtors are creditworthy parties with whom to do business.  In addition, with access to the liquidity provided by the Revolving DIP Facility, trade creditors can rest assured that the Verso Debtors will have the financial wherewithal to honor their postpetition obligations to such parties.

66.    Additionally, refinancing the Prepetition ABL Facility is very important to the Verso Debtors because it gives them the ability to maintain existing letters of credit and reissue any that expire during these cases.  The Verso Debtors have an ongoing need to provide letters of credit to the applicable beneficiaries during these cases.  Absent the refinancing of the Prepetition ABL Facility, several of the Verso Debtors' existing letters of credit would expire. Through the refinancing of the Prepetition ABL Facility, the Verso Debtors will be able to ensure that they continue to have the flexibility they had under the Prepetition ABL Facility to provide creditors with letters of credit rather than other forms of credit support (*e.g.*, deposits) that would negatively affect the Verso Debtors' liquidity.

67.    Finally, roll-ups are a common feature of debtor-in-possession financings, and have been approved in a variety of cases, including pursuant to interim financing orders.  *See In re Laboratory Partners, Inc.*, Case No. 13-12769 (Bankr. D. Del. Oct. 29, 2013) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Southern Air*

*Holdings, Inc.*, Case No. 12-12690 (Bankr. D. Del. Oct. 1, 2012) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Appleseed's Intermediate Holdings LLC, et al.,* Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Hayes Lemmerz Int'l, Inc.,* Case No. 09-11655 (Bankr. D. Del. May 14, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Source Interlink Cos. Inc.,* Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Dayton Superior Corp*., Case No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Aleris Int'l, Inc*., Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Pacific Energy Resources, Ltd.*, Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Foamex International Inc.,* Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing debtor-in-possession financing that included full roll-up under the interim order); *In re Hilex Poly Co. LLC,* Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Holley Performance Products Inc.,* No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order).

(ii)     *The Treatment of the PJT Success Fee Under the Carve-Out Is Appropriate*

68.     Paragraph 8 of the Interim Order establishes a Carve-Out for certain expenses, including the expenses of administration of these cases, that may be paid from Collateral notwithstanding the occurrence of an Event of Default under the DIP Facilities or

termination of the Verso Debtors' right to use Cash Collateral. The Carve-Out provides for the same treatment of professionals retained by the Verso Debtors and Creditors' Committee with only one exception: the Carve-Out will be available to pay success fees payable to the Verso Debtors' financial advisor, PJT Partners ("**PJT**"), post-default, but not to pay any other post-default success fees. The Interim Order provides that PJT's success fee will not reduce the post-default capped amount ($5 million) available for case professionals (without any preference or priority for the Verso Debtors' professionals), and thus the Creditors' Committee will not be prejudiced by the payment of PJT's fees). Moreover, any success fee would be paid solely from the Notes Priority Collateral, *i.e.*, the fixed assets with respect to which PJT would be most likely to advise on and assist with a sale.

69. The Verso Debtors believe such disparity between the treatment of the success fee of PJT and other financial advisors is justified because, in a post-default scenario, PJT would effectively be advising on transactions that were primarily, if not exclusively, for the benefit of the Verso Debtors' secured creditors. In such a scenario, PJT should not be forced to work for free, and accordingly, the NewPage Debtors' secured creditors have agreed to the treatment of the PJT success fee set forth in the proposed Interim Order. Any financial advisor retained by the Creditors' Committee would be highly unlikely to render services that would entitle such advisor to a success fee under such circumstances. Accordingly, the Verso Debtors believe that there is a valid basis for the disparity in treatment of success fees that justifies approval of the Carve-Out in its current form.

(iii)    *The "Equities of the Case" Waiver is Appropriate*

70. In connection with consenting to priming liens or the use of cash collateral, prepetition secured parties commonly request a waiver the "equities of the case"

exception from the general rule, established by section 552 of the Bankruptcy Code, that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds of collateral.  Here, subject to the terms of the Interim Order, the requisite Prepetition Secured Parties are consenting to the priming DIP Financing and the Verso Debtors' use of Cash Collateral without contest, thereby providing the Verso Debtors with sufficient funds with which to continue their business operations and, as a result, providing a substantial benefit to the Verso Debtors' estates.  As a condition to providing consent, the requisite Prepetition Secured Parties required the Verso Debtors to waive the "equities of the case" exception under Bankruptcy Code section 552(b), subject to and effective upon entry of the Final Order.  In addition, the "equities of the case" waiver would only be approved pursuant to the Final Order, such that parties in interest (including any Creditors' Committee that is appointed) would have an opportunity to be heard in connection with the approval of such waiver.  Accordingly, the Verso Debtors submit that the proposed "equities of the case" waiver is appropriate.

**F.        The SSA Lien and SSA True-Up Claim Should Be Granted**

71.    By separate motion, Verso Corporation and NewPage Corporation are seeking approval of the Interim SSA Protocol, which resolves certain disputed issues between the NewPage Debtors and Verso Debtors relating to the Shared Services Agreement on an interim basis.  As part of that resolution, the parties have agreed that the NewPage Debtors will reduce their monthly payments to the Verso Debtors under the Shared Services Agreement from approximately $12 million per month to $3.5 million per month ("**Interim Payment**") for the 90-day term of the Interim SSA Protocol (the "**Interim Period**"), with the Verso Debtors' entitlement to the full amount of the contractual payments provided for in the Shared Services Agreement fully preserved.  The Interim SSA Protocol contemplates that, if the parties are

unable to consensually determine the amount due from the NewPage Debtors to the Verso Debtors on account of postpetition obligations under the Shared Services Agreement during the Interim Period, the court will determine the appropriate amount of such obligations (the "**Determined Claim**").

72.    Any difference between the Determined Claim and the sum of the Interim Payments would give rise to a claim (an "**SSA True-Up Claim**") in favor of either the Verso Debtors and the NewPage Debtors against the other debtor group, which SSA True-Up Claim would be, if against the Verso Debtors:  (a) entitled to super-priority administrative expense claim status in the NewPage Debtors' cases, and (b) secured by a priming lien (the "**SSA Lien**"), subject to the limitations on the extent of such superpriority claim and priming lien set forth in the Interim SSA Protocol.  The priority of the SSA Lien varies depending on the relevant Collateral as illustrated in the table of lien priorities set forth in the summary at the beginning of this Motion.

73.    Consistent with the Interim SSA Protocol, the Interim Order grants and approves the SSA Lien and SSA True-Up Claim, if any, against the Verso Debtors.  As described in the motion seeking approval of the Interim SSA Protocol, approval of the SSA Lien and SSA True-Up Claim is appropriate and necessary to implement the Interim SSA Protocol because the Debtor group entitled to the SSA True-Up Claim is effectively extending postpetition credit to the other Debtor group, within the meaning of section 364 of the Bankruptcy Code.  Adequate protection is not an issue, because all creditors whose liens would be primed by the SSA True-Up Claim (and whose consent is required) have consented to the priming mechanism set forth in the Interim SSA Protocol.[12]

---

12    To be clear, the Interim Protocol allows for the possibility that Verso provided NewPage with shared services that are valued in an amount in excess of the Interim Payments, giving rise to a Verso claim against

G. **The VMPH Dividend Authorization Should Be Approved**

74.     The Interim Order authorizes and directs the Verso Debtors to cause their non-Debtor, wholly-owned subsidiary, VMPH to distribute, via dividend, all cash held by VMPH as of the Petition Date to one or more of the Verso Debtors at closing of the DIP Facility. VMPH's only meaningful assets are the remaining cash proceeds (the "**VAP Sale Proceeds**") of an approximately $62 million sale of its interests in Verso Androscoggin Power LLC, the owner of four hydroelectric power generation facilities in southwest Maine.

75.     The Verso Debtors should be authorized to cause VMPH to pay (as a dividend) the VAP Sale Proceeds for two primary reasons. *First*, the DIP Credit Agreement requires the VAP Sale Proceeds (and any other cash or cash equivalents at VMPH) to be transferred from VMPH to the Verso Debtors no later than the closing date of the DIP Facility. *See* DIP Credit Agreement, § 5.17. If the Verso Debtors are not authorized to make such transfer, an Event of Default will occur under the Credit Agreement. *See* DIP Credit Agreement, § 8.01(d). *Second*, the VAP Sale Proceeds have provided the liquidity necessary for the Verso Debtors to enter chapter 11 in an orderly fashion and will be crucial to the Verso Debtors' ability to meet their postpetition obligations going forward. Indeed, in assessing their postpetition financing needs, the Verso Debtors assumed the use of the VAP Sale Proceeds. Based on that assumption concluded that the DIP Facility alone would be sufficient to meet the Verso Debtors' ongoing liquidity needs, and discontinued efforts to procure a separate term loan facility for the Verso Debtors. Thus, to ensure that the Verso Debtors have the liquidity they need to operate in chapter 11, it is necessary for the Verso Debtors to receive the VAP Sale Proceeds from VMPH.

---

NewPage. As described in greater detail in the motion of the NewPage Debtors' DIP financing motion, filed contemporaneously herewith, such a claim is given similar, reciprocal protections.

76.     For these reasons, the Verso Debtors respectfully submit that that causing VMPH to upstream the VAP Sale Proceeds constitutes an exercise of sound business judgment and satisfies the requirements of section 363 of the Bankruptcy Code, to the extent such requirements are applicable.

**H.     Approval of Interim Relief is Appropriate.**

77.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.   However, on request, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

78.     As described above, the Verso Debtors urgently and immediately need cash to pay salaries, vendors, and other day-to-day expenditures, all as set forth in the first-day motions filed concurrently with this Motion, that are critical to their continued viability and ability to reorganize.  Given the immediate and irreparable harm to the Verso Debtors, their estates, and their creditors absent interim relief, the Verso Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two business days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

**I.     The Verso Debtors Request a Final Hearing.**

79.     The DIP Credit Agreements require that a Final Order approving the Motion be entered within forty-five (45) days after the entry of the Interim Order.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Verso Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than

forty (40) days following the entry of the Interim Order, and fix the time and date before the

Final Hearing for interested parties to file objections to the Motion.

## NOTICE

80.     The Debtors will provide notice of this motion by facsimile, e-mail,

overnight delivery, or hand delivery to: (i) the Office of the United States Trustee for the District

of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a

consolidated basis; (iii) Ropes & Gray LLP as counsel to the Steering Committee of NewPage

Term Loans; (iv) Milbank, Tweed, Hadley & McCloy LLP as counsel to the Informal Committee

of Holders of Verso First Lien Debt; (v) Sidley Austin LLP as counsel to Credit Suisse AG as

administrative agent and collateral agent under the Debtors' prepetition cash flow revolving

facility; (vi) all agents and trustees under the Debtors' prepetition debt instruments;

(vii) Skadden, Arps, Slate, Meagher & Flom LLP as counsel to Barclays Bank PLC as

administrative agent and collateral agent under the NewPage Revolving DIP Facility and

NewPage Term DIP Facility; (viii) Davis Polk & Wardwell LLP as counsel to Citibank, N.A. as

administrative agent and collateral agent under the Verso Revolving DIP Facility; (ix) the

Internal Revenue Service; (x) the Securities and Exchange Commission; (xi) the Pension Benefit

Guaranty Corporation; (xii) all parties known by the NewPage Debtors to hold or assert a lien on

any asset of any NewPage Debtor; (xiii) all relevant state taxing authorities; and (xiv) all of the

NewPage Debtors' landlords, and owners and/or operators of premises at which any of the

NewPage Debtors inventory and/or equipment is located. Following the hearing, a copy of this

motion and any order entered with respect to it will be served on the foregoing parties and all

parties having filed requests for notice in these chapter 11 cases. A copy of the motion is also

available on the Debtors' case website at https://cases.primeclerk.com/verso

81.     As this motion is seeking "first day" relief, notice of this motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the relief requested, the Verso Debtors submit that no other or further notice is necessary.

## **NO PRIOR MOTION**

82.     The Verso Debtors have not made any prior motion for the relief sought in this motion to this Court or any other.

**WHEREFORE**, the Verso Debtors respectfully request that the Court (i) enter the

Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) following the Final

Hearing, enter the Final Order, and (iii) grant the Verso Debtors such other and further relief as

is just and proper.

Dated: January 26, 2016
      Wilmington, Delaware

/s/ Mark D. Collins
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
George A. Davis (*pro hac vice* admission pending)
Andrew M. Parlen (*pro hac vice* admission
pending)
Diana M. Perez (*pro hac vice* admission pending)
Times Square Tower
Seven Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

*Proposed Attorneys for the*
*Debtors and Debtors in Possession*