**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                               :

In re:                             :     Chapter 11

                             :
VERSO CORPORATION, *et al.*,[1]     :     Case No. 16-10163 (KG)

                             :
                 Debtors.     :     Joint Administration Requested

                             :
-------------------------------------------------------------x

**MOTION FOR ORDERS (I) AUTHORIZING NEWPAGE DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO
UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT
TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b), (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c), AND (IV) GRANTING
AUTHORITY TO USE CASH COLLATERAL ON AN EMERGENCY BASIS**

NewPage Corporation (the "**Borrower**" or "**NewPage**"), NewPage Investment Company,

LLC ("**NPIC**"), and each of NewPage's subsidiaries that is a debtor-and debtor-in-possession in

the above captioned cases other than Upland Resources, Inc., NewPage Energy Services LLC

and Chillicothe Paper Inc.[2] files this motion to obtain a variety of relief related to funding these

chapter 11 cases, including the authority to enter into a debtor-in-possession financing facility,

use cash collateral and provide adequate protection.  NewPage seeks this relief pursuant to a

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Verso Corporation (7389); Verso Paper Finance Holdings One LLC (7854); Verso Paper Finance Holdings LLC (7395); Verso Paper Holdings LLC (7634); Verso Paper Finance Holdings Inc. (7851); Verso Paper Inc. (7640); Verso Paper LLC (7399); nexTier Solutions Corporation (1108); Verso Androscoggin LLC (7400); Verso Quinnesec REP Holding Inc. (2864); Verso Maine Energy LLC (7446); Verso Quinnesec LLC (7404); Bucksport Leasing LLC (5464); Verso Sartell LLC (7406); Verso Fiber Farm LLC (7398); NewPage Holdings Inc. (5118); NewPage Investment Company LLC (5118); NewPage Corporation (6156); NewPage Consolidated Papers Inc. (8330); Escanaba Paper Company (5598); Luke Paper Company (6265); Rumford Paper Company (0427); Wickliffe Paper Company LLC (8293); Upland Resources, Inc. (2996); NewPage Energy Services LLC (1838); Chillicothe Paper Inc. (6154); and NewPage Wisconsin System Inc. (3332). The address of the Debtors' corporate headquarters is 6775 Lenox Center Court, Suite 400, Memphis, Tennessee 38115-4436.

[2] The latter three entities collectively with NewPage and NPIC are the "**NewPage Debtors**"; the NewPage Debtors collectively with the other debtors-in-possession in the above-captioned cases are the "**Debtors**"; and the Debtors other than the NewPage Debtors,  are the "**Verso Debtors.**"

variety of provisions under the Bankruptcy Code and related authority,[3] and respectfully requests entry of an interim order, in the form annexed hereto as Exhibit A (the "**Interim Order**")[4] and a final order (the "**Final Order**"), among other things:

(1)     authorizing NewPage to obtain, and the other NewPage Debtors to guaranty, up to $675 million in DIP Financing, consisting of two DIP Facilities: (i) a senior secured superpriority Revolving DIP Facility in an aggregate principal amount of up to $325 million, including a $100 million letter of credit subfacility; and (ii) a senior secured superpriority Term DIP Facility in an aggregate principal amount of up to $350 million (including $175 million in New Money Term DIP Loans ($125 million of which will be available upon entry of the Interim Order) and $175 million in Roll Up Term DIP Loans);

(2)     authorizing the NewPage Debtors to execute and enter into (i) the Revolving DIP Credit Agreement, substantially in the form annexed hereto as **Exhibit B**, and all other agreements, documents, instruments and/or amendments executed and delivered in connection therewith (the "**Revolving DIP Documents**"); and (ii) the Term DIP Credit Agreement, substantially in the form annexed hereto as **Exhibit C**, and all other agreements, documents, instruments and/or amendments executed and delivered in connection therewith (the "**Term DIP Documents**" and, together with the Revolving DIP Documents, the "**DIP Documents**"), and to perform all such other and further acts as may be required in connection with the DIP Documents;

(3)     approving the form and substance of the Termination Agreement, by and among the NewPage Debtors and the Prepetition ABL Agent (as defined below) in the form annexed hereto as **Exhibit D**;

(4)     authorizing the NewPage Debtors to immediately use proceeds of the DIP Financing and Cash Collateral to, (i) simultaneously with the initial draw under the Revolving DIP Facility, (A) refinance in full, including interest and fees through the date of repayment at the non-default contract rate, all outstanding obligations (the "**Prepetition ABL Debt**") under the Prepetition ABL Credit Agreement and all related Prepetition ABL Agreements and (B) immediately obtain letters of credit under the Revolving DIP Facility to backstop or replace letters of credit issued under the Prepetition ABL Credit Agreement and (ii) simultaneously with the initial draw under the Term DIP Facility, pay down the Revolving DIP Facility to create borrowing availability;

---

[3] Specifically, sections 105, 361, 362, 363, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the local rules for the District of Delaware (the "**Local Rules**").

[4] Capitalized terms used but not defined in this motion have the same meanings as used in the Interim Order.

(5)     granting adequate protection to the Adequate Protection Parties (consisting of the Prepetition ABL Secured Parties, the Prepetition Term Secured Parties (together, the "**Prepetition Secured Parties**"), and any other secured party whose liens are primed by the liens being granted under the DIP Documents (the "**DIP Liens**") or the SSA Lien);

(6)     authorizing the NewPage Debtors to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and granting adequate protection to the Prepetition Term Secured Parties respect to, inter alia, such use of their Cash Collateral and the other Prepetition Collateral;

(7)     subject to certain challenge rights of the NewPage Debtors and parties in interest, approving certain stipulations by the NewPage Debtors with respect to the Prepetition ABL Agreements and Prepetition Term Agreements (the "**Existing Agreements**") and the liens and security interests arising therefrom;

(8)     granting superpriority claims to the DIP Agents and DIP Lenders under each DIP Facility (collectively, the "**DIP Secured Parties**") payable from, and secured by liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the NewPage Debtors' estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds), which liens shall have the relative priorities set forth in the DIP Intercreditor Agreement;

(9)     granting certain superpriority claims to the Verso Debtors on account of any SSA True-Up Claim (as defined below), payable from, and secured by liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, the Collateral securing the DIP Facilities, subject only to the Carve-Out, the DIP Liens (other than the liens securing the Roll Up Term DIP Loans), and the DIP Superpriority Claims (as defined below);

(10)    authorizing the NewPage Debtors to use the DIP Financing to complete certain pending transactions with their affiliate, Verso Maine Power Holdings ("**VMPH**");

(11)    subject only to and effective upon entry of the Final Order, waiving the NewPage Debtors' right to surcharge the Prepetition Collateral and the Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the NewPage Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(12)    modifying the automatic stay to the extent set forth in the Interim Order and Final Order, and in the DIP Documents;

(13)   pursuant to Bankruptcy Rule 4001, scheduling an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of an order granting the Motion on an interim basis (the "**Interim Order**"); and

(14)   scheduling a final hearing (the "**Final Hearing**") to be held within 30 days of the entry of the Interim Order to consider entry of a final order (the "**Final Order**") approving the relief granted in the Interim Order on a final basis and authorizing the Borrower to borrow from the DIP Lenders under the DIP Documents up to the full amount of the DIP Financing and the Guarantors to guaranty all obligations owing to the DIP Lenders under the DIP Documents.

**In addition, the NewPage Debtors request that the Court authorize, on an emergency basis prior to the closing of the DIP Financing, the NewPage Debtors to use Cash Collateral in which the Prepetition Secured Parties have an interest, in order to ensure that the NewPage Debtors are able to satisfy certain payroll obligations on Wednesday, January 27, 2016.**   The NewPage Debtors incorporate by reference *Allen J. Campbell's Declaration in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Campbell Declaration**") and *Steve M. Zelin's Declaration in Support of the DIP Financing Motions* (the "**Zelin Declaration**"), both filed concurrently with this Motion.

## PRELIMINARY STATEMENT

1.     The Debtors are the leading North American producer of coated papers, including printing papers and specialty papers, as well as a producer of high quality hardwood pulp. The Debtors' printing papers are designed primarily for commercial printing, media and marketing applications, including magazines, catalogs, books, direct mail, corporate collateral, and retail inserts. The Debtors' specialty papers are used primarily for product labels, flexible packaging, and technical paper applications. For the first three quarters of 2015, the Debtors' gross revenue was approximately $2.4 billion. The reasons these cases have been filed is described at length in the Campbell Declaration.  But the key issues facing all of the Debtors are

an industry in decline, a complex capital structure, significant debt obligations and an urgent need for liquidity.

2.     The Debtors have an extraordinary opportunity to restructure their debts and use the bankruptcy process to create a stronger, fully integrated company that can effectively face the industry headwinds.  They have already garnered tremendous creditor support to achieve that goal, as demonstrated by the Debtors' execution, on the Petition Date, of a Restructuring Support Agreement with virtually all of the their principal creditor constituencies.  But that Restructuring Support Agreement is not self-effectuating.  The proposed DIP Financing is critical to the NewPage Debtors' ability to implement the transactions contemplated by that agreement.  Without the liquidity and flexibility provided by the proposed Revolving DIP Facility and Term DIP Facility, a strong future would be impossible (with or without a consensual restructuring deal in hand).

3.     With the liquidity available from the DIP Financing, the NewPage Debtors (and all other Debtors) can stabilize their business, pay critical vendors who have been stretched, and take necessary steps to survive and thrive in their changed and changing economic environment.  Failure to secure financing will likely result in a liquidation, severe employee dislocation and major losses for vendors and customers.  This is not an acceptable outcome. Accordingly, the NewPage Debtors request approval of the DIP Financing and interim approval to draw under the DIP Financing so that they may avoid this immediate and irreparable harm.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b).[5]

## BACKGROUND

5.      On January 26, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Debtors' current corporate form came into being through Verso's acquisition of NewPage Holdings Inc. and certain of its affiliates, including NewPage Corporation (collectively, "**NewPage**") on January 7, 2015. Verso acquired NewPage to establish a larger scale, more efficient enterprise, better positioned to compete long-term in the challenging paper market. Since the acquisition, the Debtors have made a sustained effort to integrate legacy Verso's and legacy NewPage's operations, to allow them to realize the benefits of their larger scale and complementary operations. Today, the Debtors operate as one integrated business, which has an aggregate total annual production capacity of approximately 3,440 thousand tons of paper and 290 thousand tons of pulp, and serves a client base of over 300 customers that reaches more than 1,700 end user accounts.

---

[5]      Pursuant to Local Rule 9013-1(f), the Debtors hereby expressly confirm their consent to the entry of a final order by this Court in connection with this motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

7.     Additional information on the Debtors' business and capital structure, as well as a description of the reasons for filing these cases and the Debtors' goals for these cases, is set forth in the Campbell Declaration.

## CONCISE SUMMARY OF TERMS OF DIP FINANCING FACILITIES

8.     Under the disclosure requirements of Bankruptcy Rule 4001(b), (c) and (d) and Local Rule 4001-2(a)(i) and (ii), the following table summarizes the significant terms of the DIP Facilities and the Interim Order:[6]

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| **Borrower** | NewPage Corporation | NewPage Corporation |
| **Guarantors** | NewPage Investment Company LLC, Wickliffe Paper Company LLC, Luke Paper Company, Escanaba Paper Company, NewPage Consolidated Papers Inc., NewPage Wisconsin System Inc., and Rumford Paper Company | |
| **Lenders** | The Revolving DIP Lenders (consisting of certain lenders under the Prepetition ABL Facility (as defined below)) | The Term DIP Lenders (consisting of certain lenders under the Prepetition Term Loan Facility (as defined below)) |
| **DIP Agent** | Barclays Bank PLC (as Administrative Agent and Collateral Agent) and BMO Harris Bank, N.A., as Co-Collateral Agent | Barclays Bank PLC (as Administrative Agent and Collateral Agent) |
| **Amount and Facility** | $325 million senior secured superpriority non-amortizing asset-based revolving credit facility, all of which will be available upon the Closing Date.  Interim Order, ¶ 6(a); Revolving DIP Credit Agreement, § 2.01.<br><br>The Revolving DIP Facility includes a $100 million DIP L/C Subfacility.  Revolving DIP Credit Agreement, § 2.05. | $350 million senior secured superpriority non-amortizing term loan facility, consisting of $175 million in new money term loans (the "**New Money Term DIP Loans**") and a dollar-for-dollar roll-up of up to $175 million in loans held by the Term DIP Lenders under the Prepetition Term Loan Facility (as defined below) (such loans, the "**Roll Up Term DIP Loans**").  $125 million of the New Money Term DIP Loans would be available upon the first draw on the facility, following entry of the Interim Order, with the remaining $50 million in New Money Term DIP Loans funded (and the full $175 million of Roll Up Term DIP Loans deemed borrowed) upon the final draw on the facility, following entry of the Final Order.  Interim Order, ¶ 6(a); Term DIP Credit Agreement, § 2.01. |
| **Borrowing Base/Availability** | Availability under the Revolving DIP Facility is limited by borrowing base requirements and applicable reserves, including discretionary reserves established in the DIP Agent's | n/a |

[6] This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Documents and the Interim Order, as applicable.  To the extent there are any conflicts between this summary, on the one hand, and any DIP Document or the Interim Order, as applicable, on the other, the terms of such DIP Document or the Interim Order, as applicable, shall govern.

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| | reasonable credit judgment . The borrowing base is equal to (a) 85% of the net amount of eligible accounts receivable <u>plus</u> (b) the lesser of (i) 80% of the net book value of eligible inventory and (ii) 85% of the Net Orderly Liquidation Value (as defined in the Revolving DIP Credit Agreement) of Eligible Inventory.  Revolving DIP Credit Agreement, § 2.01. | |
| **Use of Proceeds** | Proceeds of the DIP Facilities may be used for working capital and general corporate purposes materially consistent with the DIP Budget (as defined below), including to refinance in full the indebtedness under the Prepetition ABL Facility, and to pay fees, costs and expenses incurred in connection with these chapter 11 cases.  Interim Order, ¶ 6(a), 7, 26; Revolving DIP Credit Agreement, § 5.08; Term DIP Credit Agreement, § 5.08. | |
| **Interest Rate** | *ABR Loans*:  ABR[7] + 1.5%<br>*Eurocurrency Rate Loans*:  Adjusted LIBO Rate[8] + 2.5%<br>Revolving DIP Credit Agreement, §§ 1.01, 2.13(a), (b) | *ABR Loans*:  ABR + 8.5%<br>*Eurocurrency Rate Loans*:  Adjusted LIBO Rate + 9.5%<br>Term DIP Credit Agreement, §§ 1.01, 2.10(a), (b).  Interest on Roll Up Term DIP Loans shall be paid in kind. Term DIP Credit Agreement, § 2.10(d). |
| **Default Interest** | During the continuance of an Event of Default, Loans (including unreimbursed amounts on account of drawn DIP L/Cs) will bear interest at an additional 2% *per annum* (and certain fees described below will also increase by 2% per annum).  Revolving DIP Credit Agreement, § 2.12, 2.13(b); Term DIP Credit Agreement, § 2.09, 2.10(c). | |
| **Maturity** | Under each DIP Facility, the earliest to occur of (a) 18 months after the Closing Date, (b) 45 days after entry of the Interim Order if the Final Order has not been entered, (c) substantial consummation of a plan of reorganization, (d) consummation of a sale of substantially all of the assets of the NewPage Debtors, and (e) the acceleration of the DIP Loans and termination of commitments with respect to such DIP Facility in accordance with the DIP Documents.  Revolving DIP Credit Agreement, § 1.01; Term DIP Credit Agreement, § 1.01. | |
| **Fees** | *Unused Commitment Fee*:  monthly fee of 0.375% per annum on daily amount of available unused commitments.<br><br>*L/C Participation Fees*:  monthly fee paid to holders of DIP L/C commitments at applicable margin on Eurocurrency Loans (initially, 2.5% per annum)<br><br>*Issuing Bank Fees*:  Fronting fee paid to DIP L/C issuers equal to 0.125% per annum of the daily average stated amount of outstanding DIP L/Cs, plus other customary documentary and processing fees and charges of the issuer.<br><br>*Duration Fee*:  0.25% of commitments under the Revolving DIP Facility 12 months after | *Unused Delayed Draw NM Commitment Fee*:  monthly fee of 0.375% per annum on daily average amount of the unused Delayed Draw NM Term Loan Commitment, payable to applicable lenders.<br><br>*Backstop Fee:*  2.5% of principal amount of commitments for New Money Term DIP Loans as of the Closing Date, payable to Backstop Lenders (as defined below).<br><br>*Duration Fee:*  2.0% of principal amount of New Money Term DIP Loans outstanding 210 days after closing.<br><br>*Upfront Fee:*  1.5% of principal amount of New Money Term DIP Loans, payable to applicable lenders on the date such loans are funded. |

---

[7] The "ABR" (as used in the DIP Documents) means the highest of (i) the DIP Agent's prime rate, (ii) the Federal Funds Effective Rate plus 0.5%, and (iii) the Adjusted LIBO Rate for an interest period of one month.

[8] The "Adjusted LIBO Rate" (as used in the DIP Documents) means the LIBO Rate in effect for such Interest Period divided by (one minus the Statutory Reserves applicable to such Eurocurrency Borrowing).

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| | closing.<br><br>*Upfront Fee:* 0.5% of commitments as of closing date.<br><br>*Revolving DIP Agent Fees*: payable as set forth in NewPage Fee Letters[9].<br><br>Revolving DIP Credit Agreement, § 2.12.<br><br>The aggregate amount of fees payable under the DIP Facilities (including the fees of the DIP Agents and arrangers set forth in the NewPage Fee Letters, but excluding unused commitment fees, duration fees and L/C fees) is approximately 3% of the total principal amount of the DIP Facilities | *Term DIP Agent Fees:* payable as set forth in the NewPage Fee Letters.<br><br>Term DIP Credit Agreement, § 2.09. |
| **DIP Budget and Related Covenants** | Proceeds of the DIP Facilities may be used materially consistent with a budget attached as Exhibit A to the Interim Order, as updated from time to time in accordance with the DIP Documents. Interim Order, ¶ 26, Ex. A; Revolving DIP Credit Agreement, § 5.08, Term DIP Credit Agreement, § 5.08. | |
| **Refinancing of Prepetition ABL Facility/Roll-Up of Prepetition Term Loan Facilty** | The proceeds of the Revolving DIP Facility will be used to refinance in full on the Closing Date the indebtedness outstanding under the Prepetition ABL Facility (and to replace or backstop letters of credit outstanding thereunder). Interim Order, ¶ 6(a), 7; Revolving DIP Credit Agreement, § 5.08; | Any Prepetition Term Debt held by Term DIP Lenders will be "rolled-up," dollar for dollar, into Roll Up Term DIP Loans under the Term DIP Facility. Term DIP Credit Agreement, § 2.01(d).<br><br>Holders of Prepetition Term Debt will have the opportunity to fund, in the aggregate, up to 70% of the New Money Term DIP Loans and receive the benefit of the roll-up, in each case on a *pro rata* basis. The remaining 30% of New Money Term DIP Loans would be reserved for certain members of an ad hoc committee of holders of Prepetition Term Debt (the **NewPage Ad Hoc Group**") that have agreed to provide a funding backstop for 100% of the New Money Term DIP Loans (in such capacity, the "**Backstop Lenders**"). |
| **Borrowing Conditions** | The NewPage Debtors' ability to borrow under each DIP Facility is cross-conditioned upon their ability to draw on the other facility. The other conditions precedent to the Closing Date and the initial extensions/availability of credit under the DIP Facilities are substantially similar. Notable conditions precedent to the initial extensions of credit under each DIP Facility include, without limitation: (i) entry of the Interim Order and other customary "first day orders" in form and substance satisfactory to the DIP Agents, (ii) payment of certain costs, fees and expenses of the DIP Secured Parties required to be paid on or before the Closing Date, (iii) NewPage having Excess Availability under the Revolving DIP Facility of at least $50.0 million after giving effect to the initial drawings and issuances of DIP L/Cs under the Revolving DIP Facility and borrowings under the Term DIP Facility, (iv) absence of any material adverse change since September 30, 2015, (v) compliance with requirements relating to perfection of liens, (vi) repayment in full of the Prepetition ABL Debt; (vii) commencement of chapter 11 cases by the Verso Debtors; (viii) entry an "SSA Order" authorizing the NewPage Debtors to make specified payments under the Shared Services Agreement (which requirement would be satisfied by entry of the order approving the Interim SSA Protocol (as defined below). Revolving DIP Credit Agreement, § 4.02; Term DIP Credit Agreement, § 4.02. | |

---

[9] "**NewPage Fee Letters**" has the meaning assigned in the *Debtors Motion for Entry of an Order Authorizing Debtors to File Fee Letters Related to Proposed Postpetition Financing Facilities Under Seal*, filed substantially contemporaneously herewith.

| Summary of Relevant Provisions | | |
| --- | --- | --- |
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| **Shared Services Agreement-Related Terms** | The Interim Order grants certain superpriority claims on account of the SSA True-Up Claim of the Verso Debtors (if any), as well as a priming SSA Lien, as contemplated by the Interim SSA Protocol (defined below) providing for an interim resolution of issues relating to the Shared Services Agreement[10] between the Verso Debtors and the NewPage Debtors, and subject to the limitations on such claims and liens set forth therein.  The Debtors are seeking approval of the Interim SSA Protocol by separate motion.  Interim Order, ¶ 19. | |
| **VMPH Transactions** | The Interim Order authorizes and directs the NewPage Debtors to use the proceeds of the DIP Financing to repurchase from their affiliate, Verso Maine Power Holdings LLC ("**VMPH**"), certain stores and supplies inventory sold to VMPH by NewPage on or about January 6, 2016 (the "Stores Inventory Repurchase").  Interim Order, ¶ 33.<br><br>The Interim Order also authorizes and directs the NewPage Debtors to use the proceeds of the DIP Financing to promptly reimburse VMPH for its allocable share of the $1 million VMPH paid to Canadian National Railway on January 25, 2016, to ensure uninterrupted deliveries to certain of the Loan Parties' mills.  Interim Order, ¶ 33. | |

---

[10] "**Shared Services Agreement**" means that certain Shared Services Agreement, dated January 7, 2015, by and among Verso Corporation (f/k/a Verso Paper Corp., NewPage, and NewPage Holdings, Inc.), as described in greater detail in the Campbell Declaration.

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| **Priority of Claims and Liens** | The DIP Obligations (including, without limitation, obligations in respect of DIP L/Cs and Bank Product Obligations) will constitute allowed superpriority administrative expense claims in the NewPage Debtors' chapter 11 cases having priority over all administrative expense claims and unsecured claims against the NewPage Debtors now existing or hereafter arising (the "**DIP Superpriority Claims**"). The DIP Superpriority Claims in respect of the Revolving DIP Obligations and Term DIP Obligations shall rank *pari passu* with one another. Interim Order, ¶ 8(a). | | |

The DIP Obligations will be secured by DIP Liens granted pursuant to sections 364(c)(2), (c)(3), and 364(d) of the Bankruptcy Code, which liens shall be automatically perfected pursuant to the Interim Order. Interim Order, ¶ 21(a). The following table (which is qualified in all respects by the Interim Order) lists the relative priorities (from senior to junior) of the Carve-Out, the DIP Liens, the SSA Lien, the Prepetition Liens, other liens existing as of the Petition Date, and Adequate Protection Liens granted in the Collateral by the Interim Order in the different categories of Collateral (in all cases, solely to the extent such liens are valid and perfected liens on the applicable Collateral):

| Property constituting DIP ABL Priority Collateral[11] | Property constituting Non-DIP ABL Priority Collateral |
|---|---|
| Carve-Out | Carve-Out |
| Specified Prepetition Liens[12] | Specified Prepetition Liens |
| Revolving DIP Facility DIP Liens | Term DIP Facility DIP Liens securing New Money Term DIP Loans[13] |
| Prepetition ABL Facility Adequate Protection Liens | SSA Lien, if any |
| Prepetition ABL Liens | Term DIP Facility DIP Liens securing Roll Up Term DIP Loans |
| Term DIP Facility DIP Liens securing New Money Term DIP Loans | Prepetition Term Loan Facility Adequate Protection Liens |
| SSA Lien, if any | Prepetition Term Liens |
| Term DIP Facility DIP Liens securing Roll Up Term DIP Loans | Revolving DIP Facility DIP Liens |
| Prepetition Term Loan Facility Adequate Protection Liens | Prepetition ABL Facility Adequate Protection Liens |
| Prepetition Term Liens | Prepetition ABL Liens |

Interim Order, ¶¶ 10(a), 11(a), 18(a), 19.

| **New Money Term DIP Loans/Roll Up Term DIP Loans** | The Final Order will provide that, with respect to the proceeds of any sale of either DIP ABL Priority Collateral or Non-DIP ABL Priority Collateral, the relative priorities of any DIP Liens securing Roll Up Term DIP Loans and New Money Term DIP Loans in the priority scheme above will be reversed. All other priorities would remain unaffected. The practical effect of this feature of the Final Order is | | |

---

[11] "**DIP ABL Priority Collateral**" means "ABL Priority Collateral" as defined in the DIP Intercreditor Agreement, and includes working capital and other current assets. "DIP Non-ABL Priority Collateral" means "Non-ABL Priority Collateral" as defined in the DIP Intercreditor Agreement and includes substantially all of the NewPage Debtors' other assets.

[12] Specified Prepetition Liens include valid, perfected and unavoidable third-party liens that were in existence as of the Petition Date and perfected as of the Petition Date or subsequent to the Petition Date pursuant to section 546(b) of the Bankruptcy Code), excluding the prepetition liens of the Prepetition Secured Parties.

[13] With respect to the proceeds of any sale of either DIP ABL Priority Collateral or Non-DIP ABL Priority Collateral, the relative priorities of any DIP Liens securing Roll Up Term DIP Loans and New Money Term DIP Loans will be reversed; all other priorities would remain unaffected.

| | | |
|---|---|---|
| **Summary of Relevant Provisions** | | |
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| **Priority Flip** | that, with respect to sale proceeds, the Roll Up Term DIP Loans will be repaid before the New Money Term DIP Loans in all cases after entry of the Final Order. | |
| **Automatic Perfection of Liens** | The liens granted pursuant to the DIP Order, including the DIP Liens, Adequate Protection Liens, and SSA Lien shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order or thereafter, regardless of whether the holders of such liens choose to take any action that otherwise may be required under federal, state or local law in any jurisdiction to validate and perfect a security interest or lien.  Interim Order, ¶ 21. | |
| **Stipulations as to Prepetition Claims and Liens** | Subject to the challenge rights of the NewPage Debtors and other parties in interest set forth in paragraphs 23 and 24 of the Interim Order (and the limitations thereon contained in paragraphs 23 through 25 of the Interim Order, pursuant to paragraph 4 of the Interim Order, the NewPage Debtors agree and stipulate, among other things (as specifically set forth in paragraph 4 of the Interim Order, the "**NewPage Debtors' Stipulations**")), that:  (a) the Prepetition Debt represents the legal, valid and binding obligations of the NewPage Debtors and is not subject to contest, subordination, recharacterization, or avoidance; (b) the Prepetition Liens are valid, binding, properly perfected, enforceable liens and security interests in the Prepetition Collateral; (c) the aggregate value of the ABL Priority Collateral substantially exceeds the aggregate amount of the Prepetition ABL Debt; that none of the Prepetition Secured Parties are control persons or insiders of the NewPage Debtors by virtue of any actions taken with respect to the Existing Agreements; (d) as of the Petition Date, other than as expressly permitted under the Existing Agreements, there were no liens on or security interests in the Prepetition Collateral other than the Prepetition Liens (e) no claims or causes of action exist against the Prepetition Secured Parties under any agreements by and among the NewPage Debtors and such parties in existence as of the Petition Date; and (f) that all cash, securities and other property of the NewPage Debtors as of the Petition Date are subject to valid, perfected, enforceable liens under the Existing Agreements for the benefit of the Prepetition Secured Parties, and that all proceeds of such collateral are "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (as defined in such section, the "**Cash Collateral**").  Interim Order, ¶ 4. | |
| **Lien Challenges** | *Challenge Period and Challenge Proceedings.*  Pursuant to paragraph 23 of the Interim Order, the NewPage Debtors' Stipulations bind all parties in interest in the NewPage Debtors' cases unless (a) the NewPage Debtors (in accordance with paragraph 24 of the Interim Order), or a party in interest (including any Creditors' Committee) with requisite standing timely files an adversary proceeding or contested matter objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (a "**Challenge Proceeding**") no later than (i) (w) in the case of a party in interest other than the Creditors' Committee with requisite standing, the date that is 75 days after entry of the Interim Order, and (x) in the case of the Creditors' Committee, 60 days after appointment, (y) with respect to any Challenge Proceeding against any Prepetition ABL Secured Parties, any such later date agreed to in writing by the Prepetition ABL Agent in its sole discretion, and (z) with respect to any Challenge Proceeding against any Prepetition Term Secured Parties by (A) the Creditors' Committee, as set forth below (under the heading "Prepetition Term Secured Party Challenge Proceedings") and (B) by any other party in interest, any such later date agreed to in writing by the Ad Hoc Term Lender Group, and (iii) any such later date as has been ordered by the Court upon a motion filed and served within any applicable period of time set forth in this paragraph (the "**Challenge Period**"), and (b) there is a final and non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding.  Interim Order, ¶ 23.<br><br>In addition, notwithstanding the NewPage Debtors' Stipulations, the NewPage Debtors' rights to commence a Challenge Proceeding on their own behalf during the Challenge Period are expressly preserved, subject to the provisions of paragraph 24 of the Interim Order.  Interim Order, ¶ 24. | |

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| | *Rule 2004 Discovery.*  Discovery pursuant to Bankruptcy Rule 2004 will not be considered a Challenge Proceeding (but will be subject to the Investigation Budget).  Interim Order, ¶¶ 23, 24.<br><br>*Investigation Budget.*  The NewPage Debtors may use up to $225,000 in the aggregate, and the Creditors' Committee may use up to $50,000 in the aggregate, of DIP Extensions of Credit, Cash Collateral, Collateral, Prepetition Collateral, proceeds of any of the foregoing or the Carve-Out to investigate the claims and liens of the Prepetition Term Secured Parties, and potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties (the "**Investigation Budget**"); *provided* that the NewPage Debtors may not use the Investigation Budget for such purposes at any time prior to the occurrence of the Trigger Date.  Interim Order, ¶ 25.<br><br>*Prepetition Term Secured Party Challenge Proceedings.*  The Creditors' Committee, if any, and the NewPage Debtors shall not (and the Creditors' Committee shall not be granted standing to) pursue any Challenge Proceeding against the Prepetition Term Secured Parties for so long as the Consenting NewPage Creditors (as defined in the Restructuring Support Agreement[14]) are bound by the Restructuring Support Agreement.  For each of the NewPage Debtors and the Creditors' Committee, the Challenge Period is tolled, and will not begin to run until, either (a) the Restructuring Support Agreement is terminated or (b) the Consenting NewPage Creditors withdraw as parties thereto. | |
| **Adequate Protection** | The Prepetition Secured Parties and other parties primed by the DIP Liens (collectively, the "**Adequate Protection Parties**") shall receive Adequate Protection Claims to the extent of any diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date.  As adequate protection for their Adequate Protection Claims, the Adequate Protection Parties will be granted the following Adequate Protection Obligations:  (i) current cash payment of reasonable professional fees and expenses of the Prepetition ABL Agent, Prepetition Term Agent and the NewPage Ad Hoc Group; (ii) in each case to the extent of Diminution in Value, (A) new or replacement liens on the Collateral that are junior to the liens securing the DIP Facilities and any liens to which the DIP Liens are junior, and subject and subordinate to the Carve-Out and (B) superpriority claims under section 507(b) of the Bankruptcy Code, as subject to the Carve-Out and junior only to the DIP Superpriority Claims; (iii) reporting and information rights substantially similar to those contained in the DIP Documents; and (iv) the implementation of certain notice mechanisms with respect to affiliate transactions.   Interim Order, ¶ 18. | |
| **Events of Default** | The DIP Facility Agreements contain events of default that are customary for loans of this type, including, without limitation:  (i) failure to pay obligations under the DIP Credit Agreements when due (subject to applicable grace periods), (ii) breaches of representations and warranties, (iii) failure to perform other covenants under the DIP Credit Agreements (including the Milestones), (iv) cross-defaults to (A) other debt in excess of $15.0 million, (B) the Term DIP Facility and (C) debtor-in-possession financing for the Verso Debtors; (v) judgments in excess of $15.0 million, (vi) certain ERISA events, (vii) actual or asserted invalidity of any DIP Document or DIP Lien, (viii) the entry of an order dismissing or converting any of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ix) appointment of a trustee, responsible officer or examiner with expanded powers; (x) entry of an order (A) staying, reversing, vacating or modifying (in a manner not reasonably satisfactory to the applicable DIP Agent) the Interim Order or Final Order, (B) terminating cash collateral usage, (C) granting relief from the automatic stay to permit foreclosure on material assets, or (D) charging the Collateral under section 506(c) of the Bankruptcy Code; (xi) commencement of an action challenging the rights and remedies of the DIP Agents or DIP Lenders under the applicable DIP Documents or that is inconsistent with the applicable DIP Documents; (xii) entry of an order approving certain additional postpetition financing or the sale of substantially all of the Loan Parties' assets (unless such order contemplates payment in full of all obligations | |

---

[14]    "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, entered into as of January 26, 2016, by the Debtors, the Consenting Verso Creditors, and the Consenting NewPage Creditors (each as defined therein).

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| | under the DIP Financing; (xiii) any NewPage Debtor filing or supporting any pleading seeking the relief set forth in (viii) through (xii) above; (xiv) payment of certain prepetition claims; (xv) failure of the Final Order to be entered within 45 days after entry of the Interim Order (subject to certain extensions); (xvi) entry of an order granting liens or claims that are senior or *pari passu* with the liens granted under the Interim Order and Final Order (including adequate protection liens); (xvii) non-compliance by any NewPage Debtor with the Interim Order or Final Order or other compensation order entered by the Bankruptcy Court; and (xviii) the confirmation or entry of (or failure by any Debtor to oppose) a plan of reorganization or order dismissing the cases that is not an Acceptable Plan of Reorganization.  Revolving DIP Credit Agreement, § 1.01, 8.01; Term DIP Credit Agreement, § 1.01, 8.01. | |
| **Carve-Out** | The "**Carve-Out**" is an amount equal to the sum of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate, (b) fees and expenses up to $50,000 of any chapter 7 trustee, (c) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the NewPage Debtors or the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery by the Administrative Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Interim Order or Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any prepetition secured parties; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof in accordance with the DIP Documents, in an aggregate amount not to exceed $5.0 million (the "**Post-EoD Carve Out Amount**").  Interim Order, ¶ 8(b).

The Carve-Out is unavailable, however, for, *inter alia*, (i) the pursuit, initiation, or prosecution of claims or litigation against the Prepetition Secured Parties or DIP Secured Parties, (ii) attempts to modify the rights of the DIP Secured Parties, (iii) efforts to hinder or delay the DIP Secured Parties' exercise of remedies, (iv) payment of any prepetition claims without Court approval, and (v) after delivery of a Carve-Out Trigger Notice, payment of certain back-end success fees (other than such fees payable to the NewPage Debtors' financial advisor, which shall be paid solely from DIP Non-ABL Priority Collateral and shall not reduce the Post-EoD Carve Out Amount), all as set forth in the Interim Order.  Interim Order, ¶ 8(c).

The Carve-Out will be senior to all liens and claims granted under the Interim Order and the DIP Documents, any Adequate Protection Liens, any SSA Lien, the Adequate Protection Claims, the SSA True-Up Claim, and any and all other liens or claims securing the DIP Obligations.  Interim Order, ¶ 8(d).  In addition, all payments made pursuant to the Interim Order are subject to the Carve-Out. Interim Order, ¶ 16. | |

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| Milestones | The Revolving DIP Credit Agreement contains the following milestones: (i) filing of an Acceptable Plan of Reorganization[15] and related disclosure statement within 365 days after the Petition Date, (ii) entry of an order approving a disclosure statement relating to an Acceptable Plan of Reorganization within 426 days after the Petition Date, (iii) confirmation of an Acceptable Plan within 517 days following the Petition Date, and (iv) the occurrence of the effective date of an Acceptable Plan of Reorganization within 532 days of the Petition Date. The Revolving DIP Agent has certain consent rights with respect to each of the documents referenced above. Revolving DIP Credit Agreement, § 5.14. | The Term DIP Credit Agreement contains the following milestones: (i) NewPage must file an Acceptable Plan of Reorganization and a disclosure statement within 75 days after the Petition Date; (ii) the Court must approve a disclosure statement with respect to an Acceptable Plan of Reorganization no later than 125 days after the Petition Date; (iii) an Acceptable Plan of Reorganization must be confirmed no later than 185 days after the Petition Date; and (iv) such plan must become effective no later than 30 days after confirmation.[16] The Term DIP Agent and Required Lenders have certain consent rights with respect to each of the documents referenced above. Revolving DIP Credit Agreement Term DIP Credit Agreement, § 5.14. |
| 506(c) waiver | Subject to the entry of the Final Order, none of the DIP Secured Parties or Prepetition Secured Parties, or any of their respective claims or liens, shall be subject to any surcharge under 11 U.S.C. § 506(c).   Interim Order, ¶ 15. | |
| Equities of the Case | Subject to the entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equities of the case exception under 11 U.S.C. § 552(b).  Interim Order, ¶ 14(d). | |
| Liens on Avoidance Actions | Upon entry of the Final Order, the DIP Liens, the Adequate Protection Liens, and SSA Lien shall attach to the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.  Interim Order, ¶¶ 10, 11, 18, 19. | |
| Indemnification | The DIP Documents contain customary indemnification provisions (including coverage of environmental liabilities) by the NewPage Debtors (jointly and severally) in favor of the DIP Agents, the DIP Lenders, letter of credit issuing banks, and arrangers of the DIP Facilities, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys, and representatives of each of the foregoing.  Revolving DIP Credit Agreement, § 10.05(a); Term DIP Credit Agreement, § 10.05(a). | |

---

[15] As defined in the Revolving DIP Credit Agreement, an "Acceptable Plan of Reorganization" means a plan of reorganization in the chapter 11 cases that (i) provides for the termination of the unused commitments under the DIP Facilities, repayment in full in cash and full discharge of the NewPage Debtors' obligations under the DIP Facilities at emergence, (ii) contains releases and other exculpatory provisions for the DIP Agents and DIP Lenders in form and substance satisfactory to the DIP Agents and (iii) is otherwise in form and substance reasonably satisfactory to the DIP Agents.  Revolving DIP Credit Agreement, § 5.14.

[16] As used in the Term DIP Credit Agreement, "Acceptable Plan of Reorganization" means a plan that (i) provides for the termination of the unused commitments under the DIP Facilities and the payment in full in cash and full discharge of the Loan Parties' obligations under the DIP Facilities at emergence or as to which the Supermajority Class Lenders for any Class of Loans not being so repaid in full in cash have informed the Borrower in writing that such Plan is an "Acceptable Plan of Reorganization", (ii) contains releases and other exculpatory provisions for the Administrative Agent and the Lenders in form and substance satisfactory to the Administrative Agent and the Required Lenders, and (iii) is otherwise in form and substance reasonably satisfactory to the Administrative Agent. Capitalized terms used in this footnote have the meanings assigned in the Term DIP Credit Agreement.

| Summary of Relevant Provisions | | |
|---|---|---|
| **Material Terms** | **Revolving DIP Facility** | **Term DIP Facility** |
| Automatic Stay Waiver | The automatic stay imposed under section 362 of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit the DIP Secured Parties in respect of any DIP Facility, upon the occurrence or during the continuance of an Event of Default, to (i) declare the termination, reduction or restriction of any remaining Commitment, (ii) declare all DIP Obligations immediately due, owing and payable, (iii) terminate the DIP Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders; (iv) in connection with the Revolving DIP Facility, demand cash collateral in accordance with the Revolving DIP Credit Agreement, or (v) proceed to protect, enforce and exercise all rights and remedies of the DIP Secured Parties under the DIP Documents, subject to the five-day Remedies Notice Period (if applicable).  Interim Order, ¶ 14(c). | |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

9.      Local Rule 4001-2(a)(i) requires a debtor to: (i) recite whether the proposed form of postpetition financing order contains certain provisions of the type enumerated therein; (ii) identify the location of such provisions in the proposed order; and (iii) justify the inclusion of such provisions in the proposed order.  The NewPage Debtors hereby disclose the below provisions (collectively, the "**Highlighted Provisions**") in accordance with Local Rule 4001-2(i):

- **Provisions Authorizing "Roll Up" or Repayment of Prepetition Debt (Local Rule 4001-2(a)(i)(E))**:

  - Paragraph 7 of the Interim Order authorizes the NewPage Debtors to refinance in full the Prepetition ABL Facility using proceeds of the DIP Financing.  The NewPage Debtors believe that the proposed refinancing is justified for three primary reasons:  (a) the refinancing merely serves to maintain the status quo, and will not increase the amount of the NewPage Debtors' senior secured debt; (b) because the Prepetition ABL Debt is oversecured (and thus entitled to postpetition interest under section 506(b)), the refinancing will lower the NewPage Debtors' postpetition debt service costs by (i) giving them flexibility to borrow (and pay interest on) only the funds they actually need (rather than the entire prepetition balance of the Prepetition ABL Facility) and (ii) eliminating the possibility of any claims by the Prepetition ABL Secured Parties for postpetition interest; and (c) the refinancing of the Prepetition ABL Facility itself will provide assurance to the NewPage Debtors' vendors that the NewPage Debtors are stable, creditworthy parties that will have the ability to honor their obligations to trade creditors postpetition.

  - The Final Order would approve and authorize the dollar-for-dollar "roll-up" of $175 million in loans under the Prepetition Term Loan Facility into Roll Up Term

DIP Loans under the Term DIP Facility (the "**Roll-Up**").[17]  As described below and in the Zelin Declaration, the Roll-Up was a non-negotiable condition to the Term DIP Lenders' agreement to fund the Term DIP Facility which, in turn, is essential to the NewPage Debtors' ability to maintain adequate liquidity to operate their business during these cases.  *See infra*, Basis for Relief, Section F(i).

- **Disparate Treatment of Debtor and Creditors' Committee Professionals in Carve-Out (Local Rule 4001-2(a)(i)(G))**.  Paragraph 8 of the Interim Order establishes a Carve-Out for certain expenses, including expenses of administration of these cases, that may be paid from Collateral notwithstanding the occurrence of an Event of Default under the DIP Facilities or termination of the NewPage Debtors' right to use Cash Collateral.  The Carve-Out provides for the same treatment of professionals retained by the NewPage Debtors and Creditors' Committee except in one respect; the Carve-Out will be available to pay success fees payable to the NewPage Debtors' financial advisor, PJT Partners ("PJT"), post-default, but not to pay any other post-default success fees (including, if applicable, any financial advisor retained by a Creditors' Committee, if any).  First, the PJT's success fee will not reduce the post-default capped amount ($5 million) available for case professionals (without any preference or priority for the NewPage Debtors' professionals), and thus the Creditors' Committee will not prejudiced by the payment of PJT's fees.  Second, PJT's post-default success fee would be paid solely from the proceeds of the DIP Non-ABL Priority Collateral.  Third, the NewPage Debtors believe that any disparity in the treatment of PJT's success fee (vis-à-vis Creditors' Committee professionals) in a post-default scenario is warranted because, in such a scenario, any success fee payable to PJT would result from PJT's efforts to market the Collateral for the benefit of the Prepetition Secured Parties; the Creditors' Committee's financial advisor, if any, would presumably have no meaningful role in any efforts to market the Collateral post-default.  *See infra*, Basis for Relief, Section F(ii).

- **552(b) Waiver (Local Rule 4001-2(a)(i)(H))**: Pursuant to paragraph 14(d) of the Interim Order, subject to and effective upon entry of the Final Order, the NewPage Debtors will waive any "equities of the case" claims against the Prepetition ABL Secured Parties under Bankruptcy Code section 552(b).  As set forth below, the NewPage Debtors believe that waivers of their rights under the "equities of the case" exception is justified here because (a) the DIP Secured Parties would not have extended the DIP Financing absent such waiver and (b) such waiver will not be effective unless and until approved by the Court in the Final Order, after parties in interest receive notice and an opportunity to be heard.  *See infra*, Basis for Relief, Section F(iii).

10.    In addition, although the NewPage Debtors do not believe that any of the provisions discussed below are required to be highlighted under Local Rule 4001-2, the NewPage Debtors note the following out of an abundance of caution:

---

[17] Accordingly, an additional $50 million in Roll Up Term DIP Loans will be deemed borrowed upon the draw on the Term DIP Facility following entry of the Final Order.

- **Cross-Collateralization Provisions (Local Rule 4001-2(a)(i)(A))**: Inapplicable; neither the DIP Documents nor the Interim Order contain provisions providing for cross-collateralization of prepetition debt (other than replacement liens granted as adequate protection).

- **Findings of Fact (Local Rule 4001-2(a)(i)(B))**: Pursuant to paragraph 4 of the Interim Order, the NewPage Debtors have provided certain agreements and stipulations concerning the Prepetition Debt, described above.   The stipulations are subject to challenge by parties in interest and the NewPage Debtors (subject to the limitations set forth in paragraphs 23 through 25 of the Interim Order) and will not be binding upon any party in interest until the conclusion of the Challenge Period.  With respect to all potential defendants other than the Prepetition Term Secured Parties, the Challenge Period will not end until, at the earliest, 75 days after entry of the Interim Order and, in the case of any Creditors' Committee that is appointed, 60 days from such appointment, as set forth in paragraph 23 of the Interim Order.  The specific provisions of the order governing the pursuit of actions by the Loan Parties and/or the Creditors' Committee against the Prepetition Term Secured Parties do not shorten the time that such parties would otherwise have to bring such actions; rather, those provisions effectively toll the commencement of the Challenge Period until after the Trigger Date has occurred.

- **506(c) Waiver (Local Rule 4001-2(a)(i)(C))**: The NewPage Debtors are seeking approval of a waiver of rights under Bankruptcy Code section 506(c) against the Collateral and Prepetition Collateral only upon entry of the Final Order..  Accordingly, parties will have notice of the NewPage Debtors' proposed waiver.  Interim Order, ¶ 15.

- **Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))**:  The NewPage Debtors are not seeking authority to grant liens on any avoidance actions arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  However, out of an abundance of caution, the NewPage Debtors note that paragraphs 10(a), 11(a), 18(a) and 19 of the Interim Order grant the DIP Secured Parties, the Verso Debtors, and Prepetition Term Secured Parties DIP Liens, the SSA Lien, and Adequate Protection Liens, respectively, on the proceeds of such actions ("**Avoidance Proceeds**"), subject to and effective upon entry of the Final Order.

- **Non-Consensual Priming of Prepetition Liens (Local Rule 4001-2(a)(i)(G)).**  To the NewPage Debtors' knowledge, no Prepetition Secured Party objects to the priming liens granted under the Interim Order.  Interim Order, ¶ 5(e).

### THE NEWPAGE DEBTORS' PREPETITION DEBT AND CAPITAL STRUCTURE

11.    As of the date of this filing, the NewPage Debtors' funded debt totals approximately $945 million, comprised of the principal balance under the Prepetition ABL Facility and the Prepetition Term Loan Facility (as defined below).  The Verso Debtors are not

obligors under these credit facilities, nor are the NewPage Debtors obligors under any of the Verso Debtors' funded indebtedness.

12.     The following table summarizes the NewPage Debtors' prepetition funded indebtedness:

| Indebtedness | Total Commitment/Initial Principal Amount | Principal Amount (as of Petition Date) | Current Interest Rate | Maturity Date |
|---|---|---|---|---|
| Prepetition ABL Facility | $350 million | $238 million | 2.75% (weighted average) | 2019 |
| Prepetition Term Loan Facility | $750 million | $707 million | 9.50% | 2021 |

13.     The primary components of the NewPage Debtors' prepetition indebtedness are described in greater detail below.  The NewPage Debtors also incur unsecured debt in the ordinary course of their operations.

A.      **Prepetition ABL Facility**

14.     On February 11, 2014, the NewPage Debtors entered into a revolving credit facility (the "**Prepetition ABL Facility**"), pursuant to which NewPage could borrow up to $350 million from time to time, subject to the terms of the Prepetition ABL Agreements, including the borrowing base and availability restrictions set forth therein. As of September 30, 2015, $238 million in loans were outstanding under the Prepetition ABL Facility (plus an additional $52 million in face amount of letters of credit issued thereunder), and $54 million was available for future borrowing under the Prepetition ABL Facility.  As of September 30, 2015, the weighted-average interest rate on outstanding advances was 2.75%.  The Prepetition ABL Facility matures on February 11, 2019.

15.     Pursuant to the Prepetition ABL Agreements, the Prepetition ABL Facility is secured by first-priority liens on the ABL Priority Collateral, and a second-priority lien with

respect to the Non-ABL Priority Collateral.  Draws on the Prepetition ABL Facility are backed by the ABL Priority Collateral, which generally consists of the NewPage Debtors' accounts receivable ("**AR**") from its customers, finished goods, work in process and raw materials inventory ("**Inventory**").  The amount that can be borrowed on the Prepetition ABL Facility is capped based on a borrowing base which is a percentage of the value of the ABL Priority Collateral, further reduced by certain exclusions known as reserves or ineligibles.  The NewPage Debtors can borrow against AR at an advance rate of 85%.  The NewPage Debtors' normal experience is to collect at or near 100% of AR ensuring that there is a cushion of approximately 15% against borrowings.  NewPage can borrow against Inventory at 80% of its Net Orderly Liquidation Value ("**NOLV**") rate.  The standard applied for NOLV is the expected realizable value in the case of a liquidation of the Inventory.  Because the NewPage Debtors can borrow up to 80% of the NOLV of inventory, there is essentially a 20% cushion protecting those advances. For purposes of the borrowing base, AR and Inventory are further reduced by reserves and ineligibles.  Examples would be AR with long collection terms or where an offsetting payable to that customer might impair the ability to collect.  Examples of ineligible Inventory would be items in-transit and not easily locatable or inventory associated with open chemical containers or defective product.  While reserves and ineligibles cannot be borrowed against, they can add to the value of the ABL Priority Collateral.

16.     Each month the NewPage Debtors provide a written certification to the agent for the Prepetition ABL Facility which sets forth a true and accurate calculation of the available borrowing base. Based on the NewPage Debtors' understanding of the value of the borrowing base, the Prepetition ABL Facility is oversecured because the value of the ABL Priority Collateral exceeds the pre-petition outstanding balance on the Prepetition ABL Facility.

Adding the value of reserves and ineligibles which constitute ABL Priority Collateral increases the amount by which the Prepetition ABL Lenders are oversecured.

**B.    Prepetition Term Loan Facility**

17.    On February 11, 2014, NewPage Corp entered into a $750 million term loan facility (the "**Prepetition Term Loan Facility**") pursuant to the Prepetition Term Agreements.    As of the Petition Date, approximately $707 million in obligations were outstanding under the Prepetition Term Loan Facility.    Pursuant to the Prepetition ABL Intercreditor Agreement and the Prepetition Term Agreements, the Prepetition Term Loan Facility is secured by first-priority liens on the Prepetition Term Loan Priority Collateral and a second-priority lien with respect to the Prepetition ABL Priority Collateral.    Amounts drawn under the Prepetition Term Loan Facility bear annual interest at either the LIBOR rate plus a margin of 8.25% per year or at a base rate plus a margin of 7.25% per year.    The interest in effect for the Term Loan Facility as of September 30, 2015 was 9.50% per year.    The Prepetition Term Loan Facility matures on February 11, 2021.

**THE NEWPAGE DEBTORS' LIQUIDITY NEEDS
AND EFFORTS TO OBTAIN POSTPETITION FINANCING**

18.    As discussed in the Zelin Declaration, the NewPage Debtors urgently require both the ability to use Cash Collateral and incremental postpetition financing.    Without the relief sought by this Motion, the NewPage Debtors will not have sufficient liquidity to operate their business, fund their ordinary course expenditures, including paying their employees, honor customer programs, or pay the expenses necessary to administer the chapter 11 cases.    The potential consequences to the NewPage Debtors of a failure to obtain adequate funding are dire:    among other things, the NewPage Debtors could be forced to close their mills

prematurely, lose valuable customer accounts, and liquidate on a piecemeal basis, resulting in irreparable harm to the NewPage Debtors and every one of their stakeholders.

19.     It is therefore clear that the NewPage Debtors require committed postpetition financing immediately.  The DIP Facilities represent the best available sources of such financing under the circumstances.  With respect to the Revolving DIP Facility, as set forth in the Zelin Declaration, the NewPage Debtors, through their financial advisor, PJT, contacted several leading asset-based lenders in the market, including both parties inside and outside of the NewPage Debtors' capital structure, to attempt to procure ABL financing to replace the Prepetition ABL Facility.  It was particularly important to obtain ABL financing, in the view of the NewPage Debtors and PJT, because of the advantages such financing offers, including improved liquidity, increased flexibility, and an overall reduction in the cost of capital. However, no parties outside the capital structure were willing to provide a commitment for such financing given the complexity of the NewPage Debtors' and Verso Debtors' financing arrangements and uncertainty arising from potential intercompany and other legal disputes in these cases.  Ultimately, the Revolving DIP Facility, which is being provided by certain of the existing Prepetition ABL Lenders, emerged as the NewPage Debtors' best (and only) option for postpetition asset-based financing.

20.     The proposed structure of the DIP Financing - in which the proceeds of Term DIP Facility in order to pay down the Revolving DIP Facility immediately after the proceeds of the Revolving DIP Facility are used to refinance the Prepetition ABL Facility - is designed to minimize the NewPage Debtors' postpetition debt service expenses.  The savings the NewPage Debtors will realize through this structure could not be realized in a scenario in which the NewPage Debtors secured only a term loan with no accompanying Revolving DIP Facility

and refinancing of the Prepetition ABL Facility.  This is because the Prepetition ABL Facility is oversecured, and the Prepetition ABL Secured Parties are entitled to postpetition interest.  If the Prepetition ABL Facility remained outstanding, that postpetition interest would accrue on the full balance of the NewPage Debtors' obligations thereunder, and the NewPage Debtors would not have the option to use excess cash on hand to repay the Prepetition ABL Facility and reduce their postpetition interest burden.  In addition, the Prepetition ABL Secured Parties could assert that such postpetition interest is payable at the contractual default rate, which would exceed the rate of interest payable under the Revolving DIP Facility.  Through the refinancing, the NewPage Debtors will eliminate the possibility of paying postpetition interest at the default rate.

21.     The Term DIP Facility, which is being provided by certain of the lenders under the Prepetition Term Facility, will be used to pay down the Revolving DIP Facility following the refinancing, thereby increasing the NewPage Debtors' borrowing availability under the revolver, and enhancing liquidity relative to the NewPage Debtors' prepetition position.  The Term DIP Facility is the only postpetition financing available to the NewPage Debtors to accomplish this objective.  No prospective lender outside the Debtors' capital structure expressed serious interest in providing NewPage with term debtor-in-possession financing.  And, no party in the capital structure was willing to provide such financing on an unsecured basis or financing secured by junior liens on the Non-ABL Priority Collateral.  Rather, all lenders indicated that were they to provide financing, they would only do so if their liens primed the Prepetition Term Loan Secured Parties under 364(d) of the Bankruptcy Code.  Thus, any such financing would have resulted in a costly, value-depletive priming fight with the Prepetition Term Loan Secured Parties, to the detriment of the NewPage Debtors' stakeholders.

22.     Entry into the Term DIP Facility is also in the NewPage Debtors' best interests because it implements the Interim SSA Protocol.[18]  As discussed in greater detail in the motion seeking approval of the Interim SSA Protocol, the protocol will allow the NewPage Debtors to avoid very costly and highly contentious litigation, while ensuring that the NewPage Debtors will have operational stability as they enter chapter 11.

## RELIEF REQUESTED

23.     By this Motion, the NewPage Debtors seek entry of the Interim Order and Final Order, granting the relief described at the beginning of this Motion, and such other and further relief as may be just or proper.

## BASIS FOR RELIEF

**A.     The Court Should Approve the DIP Facilities Under Section 364(c) and (d)(1) of the Bankruptcy Code.**

24.     The NewPage Debtors satisfy the standards for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and grant superpriority administrative status and liens on its property.  Section 364(c) of the Bankruptcy Code provides—

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

---

[18] "**Interim SSA Protocol**" means the "Interim Protocol" as defined in the *Motion Under 11 U.S.C. § 363, 364 and 105(a) for Immediate Entry of an Order Approving Interim Shared Services Agreement Protocol*, filed contemporaneously herewith.

11 U.S.C. § 364(c).

25.     Section 364(d)(1) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

26.     In evaluating proposed post-petition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether:

    i.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    ii.    the credit transactions are necessary to preserve assets of the estate;

    iii.    the terms of the credit agreement are fair, reasonable, and adequate;

    iv.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    v.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549–551 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

    *(i)*    *The NewPage Debtors Are Unable to Obtain Financing On More Favorable Terms Than the DIP Facilities*

27.     The NewPage Debtors, advised by PJT Partners, a leading restructuring investment bank, have diligently assessed their financing options and cannot obtain financing on

terms more favorable than the DIP Facilities.  A debtor needs only to make a good faith effort to obtain credit without the protections of section 364(c) or 364(d) of the Bankruptcy Code.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

28.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

29.     As set forth in the Zelin Declaration, the NewPage Debtors, conducted marketing efforts and carefully reviewed their financing alternatives with respect to both revolving and term loan facilities.  As a threshold matter, no party was willing to entertain the possibility of providing such financing on an unsecured basis, or secured by junior liens on the applicable Collateral.  More generally, none of the parties PJT contacted were willing to providing alternative financing on terms that were cumulatively more favorable to the NewPage Debtors than on the terms set forth in the DIP Credit Agreements.

30.     Generally speaking, parties outside of the Debtors' capital structure, after conducting due diligence, were not interested in lending for reasons including the challenging economic conditions, the complex dynamics presented by the Debtors' dual capital structure and matters related to the Shared Services Agreement.  As a result, PJT was unable to secure *any* commitment to provide asset-based financing from a party outside the NewPage Debtors' capital structure, and the only term loan financing options available to the NewPage Debtors would have required the NewPage Debtors to engage in a costly priming fight with the Prepetition Term Secured Parties, with highly uncertain results.  Accordingly, the DIP Facilities provided by the Prepetition Term Agent and Prepetition ABL Agent, as well as certain of the NewPage Debtors' prepetition lenders, are the only source of viable postpetition financing.

31.     Notwithstanding the NewPage Debtors' lack of alternative financing options, the DIP Facilities are the product of extensive, good-faith negotiations between the NewPage Debtors, the DIP Lenders, and the DIP Agent, each of whom was represented by experienced counsel and financial advisors.  Through these vigorous negotiations, the NewPage Debtors were able to secure the most favorable terms possible for the DIP Facilities.  Simply put, the DIP Facilities provide the NewPage Debtors with the liquidity and capital they need, at the lowest cost available.  Based on the negotiation history of the DIP Facilities, and the marketing efforts undertaken by the NewPage Debtors and PJT, the DIP Facilities represent the NewPage Debtors' best available postpetition financing option.

*(ii)*     *The DIP Facilities are Necessary to Preserve the Value of the NewPage Debtors' Estates.*

32.     The NewPage Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The NewPage Debtors immediate access to postpetition financing and use of

cash collateral is essential to the NewPage Debtors' ability to effectively carry out that duty.  The NewPage Debtors are currently surviving on overadvances under the Prepetition ABL Facility and have virtually *no* cash on hand with which to fund critical payments, including obligations such as employee payroll and critical vendor payments that are essential to the NewPage Debtors' operational viability.  Without the requested relief, the NewPage Debtors would be rapidly destabilized, its customer accounts would be jeopardized, and the NewPage Debtors could be forced to shut down their mills in the near term, with devastating, and irreparable consequences for their stakeholders.

33.    In contrast, with access to the DIP Financing and use of cash collateral, the outlook for the NewPage Debtors would become much brighter.  The DIP Facilities will provide the NewPage Debtors with sufficient liquidity to fund their operations and maximize the value of their mills as they work toward a restructuring.  In addition, the DIP Facilities will allow the NewPage Debtors to resume making payments under the Shared Services Agreement (as such payments are proposed to be modified by the Interim SSA Protocol) and ensure that the NewPage Debtors continue to receive essential operational support from the Verso Debtors in accordance with the Interim SSA Protocol.  With the operational stability provided by the DIP Financing and access to cash collateral, the NewPage Debtors would be well on their way to a successful, value-maximizing restructuring.

(iii)    *Terms of the DIP Facilities are Fair, Reasonable, and Adequate under the Circumstances.*

34.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re*

*Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record*  at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

35.     Here, the terms of the DIP Facilities are fair, appropriate, reasonable and in the best interests of the NewPage Debtors, their estates and their creditors.  Specifically, the terms (including, but not limited to, the economic terms) of the Revolving DIP Facility are generally consistent with those in place under the Prepetition ABL Facility.  In effect, the Revolving DIP Facility is in place to preserve the NewPage Debtors' access to the liquidity provided by the Prepetition ABL Facility (as such liquidity will be enhanced by the NewPage Debtors' access to the proceeds of the Term DIP Facility).  As set forth in the Zelin Declaration, covenants and restrictions included in the Revolving DIP Facilities are reasonable and are not designed to make the NewPage Debtors disproportionately susceptible to a breach of such terms.

36.     The terms of the Term DIP Facility are also fair and reasonable under the circumstances, including, most notably, that there was only one viable, committed provider of incremental postpetition term financing for the NewPage Debtors:  the Prepetition Term Lenders. Despite the Prepetition Term Lenders' obvious leverage in these negotiations, the interest rate payable on the Term DIP Obligations is the same as the current effective rate under the Prepetition Term Loan Facility (adjusted LIBOR plus 9.5%) (although there are, obviously and not-unexpectedly, new fees associated with obtaining new capital).  As is also customary, the Term DIP Facility contains certain case controls (*e.g.*, milestones) and other bankruptcy-related

terms.   The NewPage Debtors believe that these terms provide sufficient flexibility for the NewPage Debtors to maximize the value of their assets.

37.   The Term DIP Facility contains reasonable commitment fees and delayed draw commitment fees, upfront fees, and ticking fees, as set forth in the summary at the beginning of this Motion.  In addition, the Term DIP Facility requires payment of a backstop fee (the "**Backstop Fee**") equal to 2.5% of principal amount of the commitments for New Money Term DIP Loans, which will be payable to the Backstop Lenders, who have agreed to provide a funding backstop for 100% of the New Money Term DIP Loans. The Backstop Lenders would not agree to provide their respective backstop commitments absent payment of the Backstop Fee. And, without such commitments, the NewPage Debtors would have no assurance that they would receive the full $175 million in new money financing being provided under the Term DIP Facility.  The NewPage Debtors require committed financing in the full amount of the Term DIP Facility in order to maintain sufficient liquidity for operations during these cases.  Because the NewPage Debtors' agreement to the Backstop Fee was a necessary inducement for the Term DIP Lenders' agreement to provide $175 million in fully-committed postpetition new money financing, the NewPage Debtors submit that the Backstop Fee is reasonable and should be approved.

38.   And all terms, including the Roll-Up (as discussed in greater detail below), were strenuously negotiated by the NewPage Debtors and their advisors to ensure that the terms were as favorable to the NewPage Debtors as possible under the circumstances, and the NewPage Debtors believe that such terms represent fair consideration for the critical financing being provided by the Term DIP Lenders.

*(iv)*     *Entering into the DIP Facilities Reflects the NewPage Debtors'*
          *Reasonable Business Judgment.*

39.     Courts view a debtor's proposed DIP loan under the business-judgment

rule.  *See In re All Land Investments, LLC*, No. 09-13790, 2009 WL 7226974, at *3 (Bankr. D.

Del. Dec. 2, 2009) ("The terms of the proposed financing appear fair and reasonable, reflect the

Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value

and fair consideration."); *In re QHB Holdings LLC*, No. 09-14312, 2009 WL 7226979, at *7

(Bankr. D. Del. Dec. 22, 2009).  Under the applicable business-judgment rule, courts defer to a

debtors' decision to borrow money unless such decision is arbitrary and capricious.  *See In re*

*Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994).

40.     As Delaware Bankruptcy Courts have found, to determine whether the

business judgment standard is met, a court is "required to examine whether a reasonable business

person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*,

No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting*

*In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).  Under the circumstances, it would

be patently *unreasonable* for the NewPage Debtors *not* to enter into the DIP Facilities, for the

reasons discussed above and in the Zelin Declaration.  First, and most importantly, without

access to the DIP Financing, the NewPage Debtors will not be able to pay expenses necessary to

their ability to sustain ongoing operations and could be forced to shut down, which would

irreparably impair the value of the NewPage Debtors.  Second, the DIP Facilities are the only

available sources of financing to make such payments.  Third, the terms of the DIP Facilities

were extensively negotiated by the NewPage Debtors and their advisors in order to ensure that

they contained the most favorable terms possible given the relative bargaining power of the

NewPage Debtors and the DIP Agents and DIP Lenders.

41.    For all of these reasons, the NewPage Debtors determined that entry into the DIP Facilities was in the best interests of the NewPage Debtors and their estates and creditors.  The DIP Facilities will provide the NewPage Debtors with access to the liquidity they need to preserve the value of their assets through ongoing operations and ultimately, achieve a successful restructuring.  Accordingly, the NewPage Debtors' decision to enter into the proposed DIP Facilities is an exercise of their sound judgment that warrants approval by the Court.

**B.    The Interests of the Prepetition Secured Parties in the Collateral are Adequately Protected.**

42.    To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  11 U.S.C. § 364(d)(1)(B).  Secured creditors are also entitled to adequate protection of their valid and perfected interests in Cash Collateral and other prepetition collateral to be used by a debtor-in-possession during the course of a bankruptcy case. 11 U.S.C. § 363(e).

43.    Although the Bankruptcy Code does not define "adequate protection", section 361 of the Bankruptcy Code delineates a non-exhaustive list of the available types of adequate protection, which include periodic cash payments, additional liens, replacement liens and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See   In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).  When priming of liens is sought

under section 364(d), the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  *See In re Utah 7000, LLC, No. 08-21869*, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

44.    Here, the only known secured creditors of the NewPage Debtors whose liens are being primed (and whose Prepetition Collateral is being used) are (a) the Prepetition Term Secured Parties and (b) solely to the extent that they are ultimately forced to disgorge amounts received in connection with the refinancing of the Prepetition ABL Debt, the Prepetition ABL Secured Parties.  Under the terms of the Interim Order, the NewPage Debtors have agreed to provide an adequate protection package to these Prepetition Secured Parties, which includes the forms of adequate protection set forth in section 361 of the Bankruptcy Code, solely to the extent of any diminution in value of the Prepetition Collateral, including (i) replacement security interests and liens, subject to the terms of the DIP Intercreditor Agreement, (ii) superpriority administrative claims under section 507(b) of the Bankruptcy Code, subject in right of payment only to DIP Superpriority Claims and the SSA True-Up Claim, if any, and with recourse to all Collateral securing the DIP Facilities (subject to the Carve-Out, the DIP Liens, and all other liens on such property), and (iii) payment of the reasonable and documented fees and expenses (including reasonable and documented professional fees) of the Prepetition ABL Agent and Prepetition Term Agent under the terms of the Prepetition ABL Agreements and Prepetition Term Agreements, and the reasonable fees and expenses of the NewPage Ad Hoc Group (including its counsel and financial advisors).

45.    The Prepetition Term Agent and Prepetition ABL Agent have, on behalf of the Prepetition Secured Parties, consented to the NewPage Debtors' entry into the DIP

Facilities (and the granting of priming liens on the Prepetition Collateral), and the NewPage Debtors' use of Prepetition Collateral (including Cash Collateral) on the terms set forth in the DIP Documents and the Interim Order, including the adequate protection described above. Accordingly, the NewPage Debtors respectfully submit that the Prepetition Secured Parties are adequately protected and that the NewPage Debtors' proposed DIP Financing and use of Cash Collateral satisfy the requirements of sections 363(e) and 364(d)(1)(B).

**C.      Approval of Use of Cash Collateral is Appropriate.**

46.      The NewPage Debtors are also requesting immediate use of all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents (including the Interim Order and Final Order).  Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." The Court should grant the NewPage Debtors' request to use Cash Collateral because all parties with an interest in such Cash Collateral, *i.e.*, the Prepetition Secured Parties, have consented to such use.

47.      Furthermore, as described above, the NewPage Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral.  The NewPage Debtors need the Cash Collateral to honor obligations to parties who are critical to the success of their ongoing operations, including employees, vendors, and customers.  Absent access to Cash Collateral, the NewPage Debtors' business will quickly become unstable, with damaging consequences for the NewPage Debtors and their estates and creditors.

48.      The NewPage Debtors believe that the terms and conditions of their use of the Cash Collateral are appropriate and reasonable and that the Prepetition Secured Parties will be adequately protected against any postpetition diminution in the value of their interests in the Cash

Collateral (and all other Prepetition Collateral), as demonstrated by such parties having consented to the NewPage Debtors' use of Cash Collateral on the terms set forth in the Interim Order, including the provision of the adequate protection described in section B above.  Therefore, the NewPage Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Interim Order.

**D.      The NewPage Debtors Require Immediate Use of Cash Collateral on an Emergency Basis, Prior to the Interim Hearing**

49.      The NewPage Debtors have upcoming payroll obligations, in the amount of approximately $4.5 million, that must be funded no later than January 27, 2015.  Due to the time needed to process payments, the NewPage Debtors require authority to use Cash Collateral no later than Noon on January 27.  As the Interim Order may not be entered until late in the day, the NewPage Debtors cannot wait until the entry of the Interim Order to obtain use of Cash Collateral.  The consequences of a failure to fund payroll will be highly disruptive to the NewPage Debtors' operations, and devastating for the NewPage Debtors' employees, whose continued service will be critical to the success of the NewPage Debtors' restructuring efforts. Accordingly, by this Motion, the NewPage Debtors respectfully request that the Court authorize the NewPage Debtors to use Cash Collateral of the Prepetition Secured Parties as soon as practicable (but no later than 12:00 noon on January 27, 2016), on a temporary and emergency basis, in an amount not to exceed $4.5 million, which such temporary authority expiring upon the earlier of (a) the NewPage Debtors' funding of the payroll obligations described herein and (b) the closing of the DIP Financing.  The Prepetition ABL Agent, which holds the senior lien on Cash Collateral, has consented to this request.

**E.**     **All Parties Granted Liens and Claims Under the Interim Order Have Acted in Good Faith and Are Entitled to the Protections of Section 364(e) and 363(m).**

50.     The DIP Documents and the proposed Interim Order are the product of extended arm's length, good faith negotiations between the NewPage Debtors, the DIP Secured Parties and certain Prepetition Secured Parties, in which all parties made concessions in order to ensure that the NewPage Debtors have access to the liquidity they need to embark on a successful voyage through chapter 11.  Moreover, as set forth above, the terms and conditions of the DIP Documents are fair and reasonable, and the NewPage Debtors' entry into the DIP Documents is in the best interests of the NewPage Debtors and their estates and creditors.

51.     Additionally, the Interim SSA Protocol, pursuant to which the Verso Debtors may (but not necessarily) become entitled to an SSA Lien and Verso True-Up Claim, was extensively and zealously negotiated by independent fiduciaries of each of the NewPage Debtors' and Verso Debtors' estates, as well as key creditor constituencies at each such estate. As set forth below, the benefits of the Interim SSA Protocol to the NewPage Debtors are substantial, as the arrangement will enhance the NewPage Debtors' operational stability and liquidity during the crucial first few months of these cases.

52.     Accordingly, the NewPage Debtors respectfully submit that the Court should find that the DIP Secured Parties, Prepetition Secured Parties, and the NewPage Debtors acted in good faith within the meaning of sections 364(e) and 363(m) of the Bankruptcy Code, to the extent each is applicable.

**F.**     **The Highlighted Provisions Are Appropriate.**

(i)     *The Roll-Up and Refinancing of the Prepetition ABL Debt Are Appropriate.*

53.     A key term of the Term DIP Facility is the Roll-Up, pursuant to which, for each dollar of New Money Term DIP Loans extended by the Term DIP Lenders, one dollar of

the Term DIP Lenders' loans under the Prepetition Term Facility will be deemed borrowed under the Term DIP Facility.  Based on the NewPage Debtors' negotiations with the Term DIP Lenders, it was clear that the Term DIP Lenders viewed the Roll-Up as a non-negotiable term, without which the Term DIP Lenders would not have extended the essential New Money Term DIP Loans being provided pursuant to the Term DIP Facility.  Importantly, the NewPage Debtors are not seeking approval of the Roll-Up in the Interim Order, such that parties in interest will have a meaningful opportunity to appear and be heard in connection with approval of the Roll-Up.

54.     The critical nature of the financing being provided by the Term DIP Lenders in the form of New Money Term DIP Loans - which is the only true "new money" financing being provided to the NewPage Debtors - alone justifies the Roll-Up.  The NewPage Debtors and their stakeholders are receiving a benefit from that financing that far exceeds the nominal value of the $175 million in New Money Term DIP Loans; namely, avoidance of a value-destructive free-fall scenario in which the NewPage Debtors lack the financial wherewithal to continue operating their business and are forced to close or idle their mills.  In contrast, the Term DIP Facility allows the NewPage Debtors to enter chapter 11 with stable operations and a path to a successful restructuring.

55.     Also notable is the Term DIP Lenders' agreement to allow the Roll Up Term DIP Loans to be compromised by a class vote under any chapter 11 plan.  *See* Term DIP Credit Agreement, §§ 1.01 (definition of "Roll-Up Priority Provision," 2.01(d)(iv)).  This term provides the NewPage Debtors with greater flexibility in formulating a plan than "classic" roll-ups in which each lender's rolled-up loans must be paid in cash unless the lender consents to different treatment.  Here, the terms of the Roll-Up would allow the NewPage Debtors to

compromise *all* Roll Up Term DIP Loans so long as the requisite bankruptcy majorities of holders of such loans consent.

56.     The proposed refinancing of the Prepetition ABL Debt is also justified under the circumstances. *First*, although the proposed refinancing requires highlighting under the letter of Local Rule 4001-2(a)(i)(E), it does not violate the rule's spirit. The refinancing of the Prepetition ABL Facility through the DIP Facility is effectively a continuation of the prepetition status quo, and will not layer any additional debt onto the top of the Verso Debtors' capital structure. Nor does it reshuffle the relative priorities of creditors in any way.

57.     *Second*, the proposed refinancing will lower the NewPage Debtors' debt service costs, in the aggregate, relative to the scenario in which the Prepetition ABL Facility were not refinanced. If the Prepetition ABL Facility remained outstanding, the Prepetition ABL Secured Parties, as oversecured creditors, would unquestionably be entitled to postpetition interest at the contract rate under section 506(b) of the Bankruptcy Code. This would have two negative implications for the NewPage Debtors. For one thing, the NewPage Debtors would have no ability to borrow or pay down the Prepetition ABL Facility, and thus the full amount of the outstanding principal balance would accrue interest for the pendency of the case. In contrast, with the Revolving DIP Facility in place, the NewPage Debtors will have the flexibility to borrow and pay down their ABL debt as necessary to meet their liquidity needs, and avoid paying unnecessary interest. For another, the Prepetition ABL Secured Parties could assert that postpetition interest should be paid at the *default* rate provided in the Prepetition ABL Facility. The refinancing of the Prepetition ABL Facility takes that issue off the table.

58.     *Third*, the refinancing of the Prepetition ABL Facility should provide comfort to the NewPage Debtors' vendors and other trade creditors. The fact that the Revolving

DIP Facility is being provided itself demonstrates that the NewPage Debtors are creditworthy parties with whom to do business.  In addition, with access to the liquidity provided by the Revolving DIP Facility, trade creditors can rest assured that the NewPage Debtors will have the financial wherewithal to honor their postpetition obligations to such parties.

59.    Roll-ups are a common feature of debtor-in-possession financings, and have been approved in a variety of cases.  *See In re Laboratory Partners, Inc*., Case No. 13-12769 (Bankr. D. Del. Oct. 29, 2013) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (Bankr. D. Del. Oct. 1, 2012) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Appleseed's Intermediate Holdings LLC, et al.,* Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Hayes Lemmerz Int'l, Inc.,* Case No. 09-11655 (Bankr. D. Del. May 14, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Source Interlink Cos. Inc.,* Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Dayton Superior Corp*., Case No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Aleris Int'l, Inc*., Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Pacific Energy Resources, Ltd.*, Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Foamex International Inc.,* Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing debtor-in-possession financing that included full roll-up under the interim order); *In re Hilex Poly Co. LLC,* Case No. 08-10890 (Bankr. D. Del. May 7, 2008)

(authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Holley Performance Products Inc.,* No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order).

(ii)   *The Treatment of the PJT Success Fee Under the Carve-Out Is Appropriate.*

60.     Paragraph 8 of the Interim Order establishes a Carve-Out for certain expenses, including the expenses of administration of these cases, that may be paid from Collateral notwithstanding the occurrence of an Event of Default under the DIP Facilities or termination of the NewPage Debtors' right to use Cash Collateral. The Carve-Out provides for the same treatment of professionals retained by the NewPage Debtors and Creditors' Committee with only one exception: the Carve-Out will be available to pay success fees payable to the NewPage Debtors' financial advisor, PJT Partners ("**PJT**"), post-default, but not to pay any other post-default success fees. The Interim Order provides that PJT's success fee will not reduce the post-default capped amount ($5 million) available for case professionals (without any preference or priority for the Verso Debtors' professionals), and thus the Creditors' Committee will not be prejudiced by the payment of PJT's fees). Moreover, any success fee would be paid solely from the DIP Non-ABL Priority Collateral, *i.e.*, the fixed assets with respect to which PJT would be most likely to advise on and assist with a sale.

61.     The NewPage Debtors believe any disparity between the treatment of the success fee of PJT and other financial advisors is justified because, in a post-default scenario, PJT would effectively be advising on transactions that were primarily, if not exclusively, for the benefit of the NewPage Debtors' secured creditors. In such a scenario, PJT should not be forced to work for free, and accordingly, the NewPage Debtors' secured creditors have agreed to the treatment of the PJT success fee set forth in the proposed Interim Order. Any financial advisor

retained by the Creditors' Committee would be highly unlikely to render services that would entitle such advisor to a success fee under such circumstances.   Accordingly, the NewPage Debtors believe that there is a valid basis for the disparity in treatment of success fees that justifies approval of the Carve-Out in its current form.

(iii)   *The "Equities of the Case" Waiver is Appropriate.*

62.   In connection with consenting to priming liens or the use of cash collateral, prepetition secured parties commonly request a waiver the "equities of the case" exception from the general rule, established by section 552 of the Bankruptcy Code, that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds of collateral.   Here, subject to the terms of the Interim Order, the requisite Prepetition Secured Parties are consenting to the priming DIP Financing and the NewPage Debtors' use of Cash Collateral without contest, thereby providing the NewPage Debtors with sufficient funds with which to continue their business operations and, as a result, providing a substantial benefit to the NewPage Debtors' estates.   As a condition to providing consent, the requisite Prepetition Secured Parties required the NewPage Debtors to waive the "equities of the case" exception under Bankruptcy Code section 552(b), subject to and effective upon entry of the Final Order. Absent such consent, the NewPage Debtors would be forced to seek non-consensual use of Cash Collateral and priming of the Prepetition Secured Parties' liens, which would require costly litigation, the outcome of which would be highly uncertain, with devastating consequences if the NewPage Debtors did not prevail.   In addition, the "equities of the case" waiver would only be approved pursuant to the Final Order, such that parties in interest (including any Creditors' Committee that is appointed) would have an opportunity to be heard in connection with the

approval of such waiver.  Accordingly, the NewPage Debtors submit that the proposed "equities of the case" waiver is appropriate.

**G.      The SSA Lien and SSA True-Up Claim Should Be Granted**

63.      By separate motion, the NewPage Debtors are seeking approval of the Interim SSA Protocol, which resolves certain disputed issues between the NewPage Debtors and Verso Debtors relating to the Shared Services Agreement on an interim basis.  As part of that resolution, the parties have agreed that the NewPage Debtors will reduce their monthly payments to the Verso Debtors under the Shared Services Agreement from approximately $12 million per month to $3.5 million ("**Interim Payment**") per month for the 90-day term of the Interim SSA Protocol, with the Verso Debtors' entitlement to the full amount of the contractual payments provided for in the Shared Services Agreement fully preserved.  The Interim SSA Protocol contemplates that, if the parties are unable to consensually determine the amount due from the NewPage Debtors to the Verso Debtors on account of postpetition obligations under the Shared Services Agreement, the court will determine the appropriate amount of such obligations (the "**Determined Claim**").  Any difference between the Determined Claim and the sum of the Interim Payments (the "**SSA True-Up Claim**") would give rise to an SSA True-Up Claim in favor of either the Verso Debtors and the NewPage Debtors against the other debtor group, which SSA True-Up Claim would be, if against the NewPage Debtors, (a) entitled to super-priority administrative expense claim status in the NewPage Debtors' cases, and (b) secured by a priming lien (the "**SSA Lien**"), subject to the limitations on the extent of such superpriority claim and priming lien set forth in the Interim SSA Protocol.  The priority of the SSA Lien varies depending on the relevant Collateral, as illustrated in the table of lien priorities set forth in the summary at the beginning of this Motion.

64.     Consistent with the Interim SSA Protocol, the Interim Order grants and approves the SSA Lien and SSA True-Up Claim, if any, against the NewPage Debtors.  As described in the motion seeking approval of the Interim SSA Protocol, approval of the SSA Lien and SSA True-Up Claim is appropriate and necessary to implement the Interim SSA Protocol because the Debtor group entitled to the SSA True-Up Claim is effectively extending postpetition credit to the other Debtor group within the meaning of section 364 of the Bankruptcy Code.  Adequate protection is not an issue, because all creditors whose liens would be primed by the SSA True-Up Claim have consented (or are deemed to consent under applicable Intercreditor agreements) to the priming mechanism set forth in the Interim SSA Compromise.

**H.     The VMPH Transactions Should Be Authorized**

65.     The Interim Order would authorize the NewPage Debtors to complete two transactions with their non-Debtor affiliate, VMPH.  The first such transaction is the repurchase of certain stores and supplies inventory (the "**Stores Inventory Repurchase**") that was sold by the NewPage Debtors to the Verso Debtors at fair market value on January 6, 2016, in order to provide the NewPage Debtors with temporary, but essential, liquidity.  The inventory subject to that transaction is critical to the NewPage Debtors' operations and, accordingly, the NewPage Debtors have already begun to repurchase (and intend to continue purchasing) such inventory from the Verso Debtors at the same price at which it was sold to the Verso Debtors, without any premium.  Notably, the NewPage Debtors believe that it would cost substantially more to purchase equivalent stores inventory on the open market.  Given the favorable economic terms of the Stores Inventory Repurchase, and the NewPage Debtors' need for the stores inventory, the

NewPage Debtors respectfully submit that the Stores Inventory Repurchase constitutes an exercise of their sound business judgment and should be approved.

66.     The second transaction proposed to be authorized by the Interim Order is the NewPage Debtors' reimbursement of their proportionate share of $1 million advanced by VMPH to Canadian National Railway on January 25, 2016.  Any delay in payment to Canadian National Railway beyond January 25 would have held up pending deliveries to the NewPage Debtors' Escanaba and Stevens Point mills, as well as certain deliveries to the Verso Debtors. Because the NewPage Debtors did not have access to sufficient liquidity with which to make the required payments to Canadian National Railway, VMPH, to avoid any disruption to the NewPage Debtors' business, made the payments on all Debtors' behalf.  The NewPage Debtors submit that they should be permitted to reimburse VMPH for their pro rata share of that extension of credit (estimated to be $666,666.00), because reimbursement will serve to restore the NewPage Debtors and Verso Debtors to the status quo and ensure that neither Debtor group is prejudiced by the extension of credit by VMPH (which is a subsidiary of the Verso Debtors but not of the NewPage Debtors).

I.     **Approval of Interim Relief is Appropriate.**

67.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  However, on request, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

68.     The urgent need for immediate relief could not be any clearer.   As described above, the NewPage Debtors must have cash now to pay salaries, vendors, and other day-to-day expenditures, all as set forth in the first-day motions filed concurrently with this Motion, that are critical to their continued viability and ability to reorganize.   Given the immediate and irreparable harm to the NewPage Debtors, their estates, and their creditors absent interim relief, the NewPage Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two business days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

**J.     The NewPage Debtors Request a Final Hearing.**

69.     The DIP Credit Agreements require that a Final Order approving the Motion be entered within forty-five (45) days after the entry of the Interim Order.   As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the NewPage Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than forty (40) days following the entry of the Interim Order, and fix the time and date before the Final Hearing for interested parties to file objections to the Motion.

<b><u>NOTICE</u></b>

70.     The Debtors will provide notice of this motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Ropes & Gray LLP as counsel to the Steering Committee of NewPage Term Loans; (iv) Milbank, Tweed, Hadley & McCloy LLP as counsel to the Informal Committee of Holders of Verso First Lien Debt; (v) Sidley Austin LLP as counsel to Credit Suisse AG as administrative agent and collateral agent under the Debtors' prepetition cash flow revolving facility;  (vi) all  agents  and  trustees  under  the  Debtors'  prepetition  debt  instruments;

(vii) Skadden, Arps, Slate, Meagher & Flom LLP as counsel to Barclays Bank PLC as administrative agent and collateral agent under the NewPage Revolving DIP Facility and NewPage Term DIP Facility; (viii) Davis Polk & Wardwell LLP as counsel to Citibank, N.A. as administrative agent and collateral agent under the Verso Revolving DIP Facility; (ix) the Internal Revenue Service; (x) the Securities and Exchange Commission; (xi) the Pension Benefit Guaranty Corporation; (xii) all parties known by the NewPage Debtors to hold or assert a lien on any asset of any NewPage Debtor, (xiii) all relevant state taxing authorities, and (xiv) all of the NewPage Debtors' landlords, and owners and/or operators of premises at which any of the NewPage Debtors inventory and/or equipment is located. Following the hearing, a copy of this motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these chapter 11 cases. A copy of the motion is also available on the Debtors' case website at https://cases.primeclerk.com/verso.

71.    As this motion is seeking "first day" relief, notice of this motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the relief requested, the NewPage Debtors submit that no other or further notice is necessary.

## **NO PRIOR MOTION**

72.    The NewPage Debtors have not made any prior motion for the relief sought in this motion to this Court or any other.

**WHEREFORE**, the NewPage Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (ii) following the Final Hearing, enter the Final Order, and (iii) grant the NewPage Debtors such other and further relief as may be just or proper.

Dated:  January 26, 2016
         Wilmington, Delaware

/s/ Mark D. Collins
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
George A. Davis (*pro hac vice* admission pending)
Suzzanne S. Uhland (*pro hac vice* admission pending)
Peter Friedman (*pro hac vice* admission pending)
Andrew M. Parlen (*pro hac vice* admission pending)
Diana M. Perez (*pro hac vice* admission pending)
Times Square Tower
Seven Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061

*Proposed Attorneys for the*
*Debtors and Debtors in Possession*