## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:

VERSO CORPORATION, *et al.*,[1]

           Debtors.

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 16-10163 (KG)

Joint Administration Requested

**Re: Docket Nos. 48 & 49**

-------------------------------------------------------------x

## STEVEN M. ZELIN'S DECLARATION IN SUPPORT
## OF THE DIP FINANCING MOTIONS

I, Steven Zelin, declare under penalty of perjury:

1.   I am a Partner in the Restructuring & Special Situations Group at PJT Partners ("**PJT**") and one of the lead restructuring advisors involved in this case. PJT is the proposed investment banker to Verso Corporation and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"). PJT began working for the Debtors in July 2015. I submit this declaration (this "**Declaration**") in support of the DIP Motions.[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Verso Corporation (7389); Verso Paper Finance Holdings One LLC (7854); Verso Paper Finance Holdings LLC (7395); Verso Paper Holdings LLC (7634); Verso Paper Finance Holdings Inc. (7851); Verso Paper Inc. (7640); Verso Paper LLC (7399); nexTier Solutions Corporation (1108); Verso Androscoggin LLC (7400); Verso Quinnesec REP Holding Inc. (2864); Verso Maine Energy LLC (7446); Verso Quinnesec LLC (7404); Bucksport Leasing LLC (5464); Verso Sartell LLC (7406); Verso Fiber Farm LLC (7398); NewPage Holdings Inc. (5118); NewPage Investment Company LLC (5118); NewPage Corporation (6156); NewPage Consolidated Papers Inc. (8330); Escanaba Paper Company (5598); Luke Paper Company (6265); Rumford Paper Company (0427); Wickliffe Paper Company LLC (8293); Upland Resources, Inc. (2996); NewPage Energy Services LLC (1838); Chillicothe Paper Inc. (6154); and NewPage Wisconsin System Inc. (3332). The address of the Debtors' corporate headquarters is 6775 Lenox Center Court, Suite 400, Memphis, Tennessee 38115-4436.

[2] The DIP Motions include: *Debtors' Motion for Orders (I) Authorizing NewPage Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**NewPage DIP Motion**") *and Debtors' Motion for Orders (I) Authorizing Certain Verso Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361,*

2.      Unless otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' senior management, members of the PJT team, or other interested parties, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called to testify, I would testify competently to the facts set forth below.

## QUALIFICATIONS

3.      I received a B.S. in Accounting in 1984 from the University at Albany, where I currently serve as a member of the School of Business Advisory Board, and a Masters of Business Administration in Finance in 1991 from New York University's Stern School of Business, where I am a member of the Board of Overseers. I am also a Certified Public Accountant.

4.      I have worked in the restructuring field for over twenty-seven years. Prior to PJT's spinoff from Blackstone Advisory Partners L.P. ("**Blackstone**") in 2015, I was a Senior Managing Director of Blackstone, where I was employed for more than 17 years. Before Blackstone, I was a partner with Ernst & Young LLP in its restructuring advisory group. I joined Ernst & Young as an auditor in 1984.

5.      Since 1988, I have been a full-time advisor in bankruptcy and restructuring situations, representing debtors, creditors, and investors in distressed companies. Among other things, I advise companies with respect to corporate restructurings, recapitalizations, sale transactions, the raising of postpetition financing, refinancings, and

---

*362, 363, 364 and 507 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**Verso DIP Motion**"). Capitalized terms not otherwise defined in this Declaration have the meanings set forth in the DIP Motions.

negotiations with interested purchasers, credit providers, and creditors, among other constituents.

6.      In addition to working with the Debtors in these cases, some of my most notable publicly disclosed assignments include AbitibiBowater, Inc.; American Axle & Manufacturing, Inc.; Apex Silver Mines; Aquila, Inc.; Caesars Entertainment Operating Company; Clearwire Corporation; Delphi Corporation; Energy Future Holdings; Enron Corp.; Entergy New Orleans; Ford Motor Company; General Motors Corporation; The Goodyear Tire & Rubber Company; Indianapolis Downs, LLC; Intrawest ULC; Kerzner International Holdings Limited; LightSquared Inc.; Marvel Entertainment Group, Inc.; Motorola (re: Iridium LLC); The Pacific Lumber Company/Scotia Pacific Company LLC; R.H. Macy & Company; Samson Resources Corporation; SemGroup, L.P.; TerreStar Corporation/TerreStar Networks Inc.; Vencor, Inc; Walter Energy, Inc.; Washington Mutual, Inc.; and Xerox Corporation.

## THE DEBTORS' LIQUIDITY NEEDS

7.      The Debtors have an urgent and immediate need to obtain postpetition financing and use the Prepetition Secured Lenders' Cash Collateral. The Debtors lack sufficient funds on hand and do not generate sufficient funds from operations to fund their business. Without postpetition financing and the use of Cash Collateral, the Debtors will not have the liquidity to operate their business, fund their ordinary course expenditures, including paying their over 5,200 employees, honor customer programs, or pay the expenses necessary to administer the chapter 11 cases. Absent adequate funding, the Debtors could be forced to close their mills prematurely, lose valuable customer accounts, and liquidate on a piecemeal basis, resulting in irreparable harm to the Debtors and every one of their stakeholders. Put simply, the Debtors need immediate financing to avoid serious repercussions.

8.    The proposed DIP Facilities are essential to the Debtors' continued operational viability and will, in my opinion, provide the Debtors with the opportunity to preserve their business through a process that will maximize value for all constituents. I also believe, based on my analysis and discussions with the Debtors' other professionals and finance personnel, that the sizing of the DIP Facilities and the interim and final draw amounts thereunder are appropriately sized and necessary and sufficient to meet the Debtors' projected liquidity needs.

## THE PROPOSED DIP FACILITIES

9.    The Debtors seek authority to obtain secured postpetition financing in an aggregate principal amount of up to $775 million (collectively, the "**DIP Facilities**") pursuant to the terms and conditions of the following credit agreements (collectively, the "**DIP Credit Agreements**" and the lenders party from time to time thereunder, the "**DIP Lenders**"):

- the Superpriority Senior Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of January 26, 2016, among the NewPage Corporation, NewPage's subsidiaries that are a debtor and debtor in possession in the above captioned cases other than Upland Resources, Inc., NewPage Energy Services LLC, and Chillicothe Paper Inc., the lenders from time to time party thereto, Barclays Bank PLC ("**Barclays**"), acting as Administrative Agent and Collateral Agent, and BMO Harris Bank N.A. ("**BMO**"), as Co-Collateral Agent (the "**NewPage Revolving DIP Credit Agreement**" and the financing provided thereunder the "**NewPage Revolving DIP Facility**");

- the Superpriority Sernior Debtor-in-Possession Term Loan Agreement, dated as of January 26, 2016, among NewPage Corporation, NewPage's subsidiaries that are a debtor and debtor in possession in the above captioned cases other than Upland Resources, Inc., NewPage Energy Services LLC, and Chillicothe Paper Inc., the lenders from time to time party thereto, and Barclays, acting as Administrative Agent and Collateral Agent (the "**NewPage Term DIP Credit Agreement**" and the financing provided thereunder, the "**NewPage Term DIP Facility**"); and

- the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 26, 2016, among Verso Paper Holdings LLC, the direct and

4

indirect subsidiaries of Verso Holdings that are debtors and debtors in possession in the above captioned cases, the lenders from time to time party thereto, and Citibank, N.A. ("**Citi**"), acting as Administrative Agent and Collateral Agent (the "**Verso Revolving DIP Credit Agreement**" and the financing provided thereunder, the "**Verso Revolving DIP Facility**").

10.     The DIP Lenders and the Prepetition Secured Parties have consented to the use of Cash Collateral and entry into the DIP Credit Agreements.

## THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

11.     In my capacity as investment banker to the Debtors, I was actively involved in the arm's length negotiations that preceded execution of the DIP Credit Agreements. While negotiating the terms of the proposed DIP Credit Agreements, I, along my colleagues at PJT, also explored, on behalf of the Debtors, alternative DIP financing from the Debtors' existing lenders and various third party financing sources. Specifically, PJT approached five prospective agent banks regarding the Debtors' financing needs, two of which (Citi and Barclays) agreed to solicit a variety of potential financing sources on behalf of Verso and NewPage, respectively.

12.     Together, PJT and the agent banks sought funding from a variety of potential capital providers. None of the parties contacted were willing to provide alternative financing on terms that were more favorable to the Debtors than the terms set forth in the DIP Credit Agreements. Generally speaking, parties that were not existing stakeholders of the Debtors were not interested in lending for reasons including the challenging economic conditions, the complex dynamics presented by the Debtors' dual capital structure, the priming structure of the NewPage Term DIP Facility, and matters related to the Shared Services Agreement (the "**SSA**"). As a result, PJT was unable to secure a commitment to provide financing from any party outside the Debtors' capital structure. In short, after a diligent search,

no other committed financings were available other than from the Prepetition Secured Parties in

their capacity as DIP Lenders.

### APPROVING THE DIP FACILITIES IS IN THE ESTATES' BEST INTERESTS AND THE TERMS OF THE DIP FACILITIES ARE COMMERCIALLY REASONABLE

13.    Based on my discussions with alternative sources of postpetition financing

and my analysis of the DIP Facilities' terms, as well as my familiarity with the current market for

DIP and other financing, the DIP Facilities represent the most favorable financing available to

the Debtors under the circumstances. Moreover, in my opinion, it is essential that the Debtors

have committed postpetition financing at the outset of these chapter 11 cases in order to capture

the confidence of the Debtors' customers, employees, vendors, and unions.

14.    Moreover, the Debtors have already garnered tremendous creditor support

to achieve a global restructuring that will substantially deleverage their capital structure and

maximize the value of their assets, as demonstrated by the Debtors' execution of a Restructuring

Support Agreement with virtually all of the their principal creditor constituencies. But that

Restructuring Support Agreement is not self-effectuating. The proposed DIP Facilities are

critical to the Debtors' ability to implement the transactions contemplated by that agreement.

Without the liquidity and flexibility provided by the DIP Facilities, a strong future would be

impossible (with or without a consensual restructuring deal in hand). Accordingly, for the

reasons set forth below, I believe the Court should approve the DIP Facilities.

### A.  Revolving DIP Facilities

15.    PJT and the Debtors determined that it was in the Debtors' best interest to

keep in place asset based forms of lending (*i.e.* ABL financing). In my experience, ABL

financing offers a borrower a number of advantages, including improved liquidity, increased

flexibility, and an overall reduction in the cost of capital. PJT approached a number of the leading ABL lenders in the market, including lenders both inside and outside of the Debtors' capital structure. However, in light of the complex case issues and different silos of debt at Verso and NewPage, no party outside of the capital structure was willing to provide a commitment to provide alternative ABL financing.

16.    In my opinion, based on my experience in the current debtor in possession financing market, the pricing, fees, interest rates and other terms and conditions of the NewPage Revolving DIP Facility and the Verso Revolving DIP Facility (collectively, the "**Revolving DIP Facilities**") are reasonable and in the Verso Debtors' and NewPage Debtors' best interests. Indeed, the terms and conditions are generally consistent with those in place under the preexisting revolving credit facility for Verso (the "**Prepetition Verso ABL Facility**") and NewPage (the "**Prepetition NewPage ABL Facility**," and together with the Prepetition Verso ABL Facility, the "**Prepetition ABL Facilities**"). Moreover, in my view, the covenants and restrictions included in the Revolving DIP Facilities are not designed to make the Verso Debtors or NewPage Debtors disproportionately susceptible to a breach of such terms. I also believe that the size of the Revolving DIP Facilities and the availability under them are both necessary and sufficient to meet the Verso Debtors' and NewPage Debtors' immediate and projected liquidity needs.[3]

17.    The fairness of the terms of the Revolving DIP Facilities are further evidenced by their negotiating history. The Revolving DIP Facilities are the product of good-

---

[3] The Verso Revolving DIP Facility will provide substantial liquidity to the Verso Debtors during these cases because certain amounts outstanding under the Prepetition Verso ABL Facility will be paid down upon entry of the DIP Orders as a result of a dividend to be made from Verso Maine Power Holdings, LLC (a non-debtor subsidiary) to debtor Verso Paper, LLC. That dividend transaction is a critical important source of liquidity for the Verso Debtors.

faith, arm's length negotiations spanning over the course of more than a month between the Debtors, the DIP Lenders, and Barclays and Citi as DIP Agents under the respective Revolving DIP Facilities, each of whom was represented by experienced counsel and financial advisors.

**B. NewPage Term DIP Facility**

18.    Given the urgent need to obtain financial stability, as well as my analysis of the terms of the NewPage Term DIP Credit Agreement, I believe that approval of the NewPage Term DIP Facility is necessary to preserve the value of the NewPage Debtors' estates and provide needed liquidity.

19.    The NewPage Term DIP Facility, which is being provided by certain of the lenders (the "**Prepetition NewPage Term Lenders**") under the preexisting term loan facility (the "**Prepetition NewPage Term Facility**") will be used to pay down the Revolving NewPage DIP Facility following the refinancing of the Prepetition NewPage Term Facility, thereby increasing the NewPage Debtors' borrowing availability under the Revolving NewPage DIP Facility, and enhancing liquidity relative to the NewPage Debtors' prepetition position. I believe that the saving the NewPage Debtors will realize through this structure could not be realized in a scenario in which the NewPage Debtors only secured a term loan with no accompanying revolving facility and a refinancing of the Prepetition NewPage ABL Facility. This is because the Prepetition NewPage ABL Facility is oversecured, and the lenders thereunder (the "**Prepetition NewPage ABL Lenders**") are entitled to postpetition interest. If the Prepetition NewPage ABL Facility remained outstanding, that postpetition interest would accrue on the full balance of the NewPage Debtors' obligations thereunder, and the NewPage Debtors would not have the option to use excess cash on hand to repay the Prepetition NewPage ABL Facility and reduce their postpetition interest burden. In addition, the Prepetition NewPage ABL Lenders

could assert that such postpetition interest is payable at the contractual default rate, which would exceed the rate of interest payable under the Revolving NewPage DIP Facility. Accordingly, through the refinancing, the NewPage Debtors will eliminate the possibility of paying postpetition interest at the default rate.

20.    In my view and in light of the complexities and risks inherent in financing NewPage (specifically, the challenging economic conditions in the Debtors' industry, the complexity of the Debtors' capital structure, and issues related to the Shared Services Agreement), the terms, conditions and fees of the NewPage Term DIP Credit Agreement are appropriate, particularly given the absence of any practical alternative source of postpetition financing. Of paramount importance, because of the risks and difficulties associated with financing NewPage, no party outside the Debtors' capital structure expressed serious interest in providing NewPage a debtor-in-possession loan. And, no party in the capital structure was willing to provide unsecured DIP financing or secured financing backed by junior liens on the NewPage Term Priority Collateral. Rather, any lenders insisted upon liens that would prime the Prepetition NewPage Term Lenders under 364(d) of the Bankruptcy Code.

21.    Accordingly, due to the risk and costs of a non-consensual priming fight, the Debtors concluded that such a course of action was not worth pursuing, particularly at this crucial stage in the Debtors' restructuring.

22.    *The NewPage DIP Roll-Up.* Fifty percent of the $350 million NewPage Term DIP Facility will be a deemed borrowing used to roll-up the outstanding obligations under the Prepetition NewPage Term Facility on the closing date. I believe that the roll-up is justified because the NewPage Debtors would not have been able to secure the NewPage Term DIP Facility without that condition. Following extensive arm's length negotiations in which the

NewPage Debtors sought removal of that feature, it was evident that the roll-up was a necessary inducement to obtain the NewPage Term DIP Facility, which was the only financing available to the NewPage Debtors.

23.    Notably, while denominated a roll-up, the NewPage Term DIP facility includes certain terms that make it less onerous and restrictive than a typical roll-up and provide the NewPage Debtors with needed flexibility with respect to their restructuring. For example, unlike a traditional DIP loan, the NewPage Debtors are not necessarily required to pay the $175 million of the rolled-up portion of the loan in full on confirmation; rather, the treatment of the rolled-up loan may be compromised under a plan of reorganization by an accepting class vote. Moreover, there are no fees or cash pay interest associated with the rolled-up portions of the financing—interest on the rolled-up debt will only be paid-in-kind.

24.    I also believe that the NewPage Term DIP facility is in the NewPage Debtors' best interests because it is essential to implementing a highly-negotiated interim protocol regarding the SSA, which is described in a separate motion. The interim protocol will allow the Debtors to avoid very costly and highly contentious litigation and provide the Debtors with critical stability at the beginning of their chapter 11 cases. Additionally, it is my understanding that all of the DIP Lenders designed their credit agreements to accommodate this interim protocol, which is beneficial to the Debtors.

25.    Like the Revolving DIP Facilities, the fairness of the terms of the NewPage Term DIP Facility are further evidenced by their negotiating history. The DIP Facilities are the result of an extensive, good-faith, arm's-length negotiation between the NewPage Debtors, the DIP Lenders, and Barclays, each of whom was represented by experienced counsel and financial advisors.

26.    Based on the threat of a very complicated and heavily contested priming fight, coupled with the complex dynamics presented by the dual capital structure and the SSA, the NewPage Debtors determined that it was in their best interest to enter into the NewPage Term DIP Credit Agreement and avoid lengthy and expensive litigation with the Prepetition Secured Parties. Despite an extensive marketing process for alternative sources of capital, the NewPage Term DIP Facility was the only committed source of financing the NewPage Debtors were able to secure for this needed liquidity. If the NewPage Debtors could not obtain the additional liquidity provided by the NewPage Term DIP Facility, the Debtors could be forced to sell mills on a piecemeal basis to the detriment of all of the Debtors' stakeholders.

## THE NEED FOR INTERIM RELIEF

27.    It is my understanding that the Debtors propose to use the proceeds of the DIP Facilities to support the Debtors' operations in chapter 11, including to fund the wages, salaries and benefits of the Debtors' employees, procure necessary goods and services (and maintain trade terms with the Debtors' vendors), finance the costs of these chapter 11 cases, and meet certain other working capital needs. Thus, immediate access to the Revolving DIP Facilities and $125 million of the NewPage Term DIP Facility will facilitate their efforts to preserve value for their stakeholders through these cases. I believe that the interim relief sought by the DIP Motions is both necessary and sufficient to fund the Debtors' operations in the interim period and prevent immediate and irreparable harm to the value of the Debtors' estates.

28.    Based upon the foregoing and the facts and circumstances of these cases, I believe that the proposed DIP Facilities are the best financing that is currently available to the Debtors, and the size of the proposed DIP Facilities are appropriate.

*        *        *

11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  January 26, 2016
        New York, New York

                                        */s/ Steven Zelin*
                                        Steven Zelin
                                        Partners
                                        PJT Partners